# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

CASE NO: 20-cv-01376-JLH

KURT MORALES II et. al.,

     Plaintiffs,

v.

SUNPATH LTD, et. al.

     Defendants.

_____/

**EXHIBIT TO DECLARATION OF STEPHEN D. DARGITZ IN SUPPORT OF DEFENDANT AFFORDABLE AUTO SHIELD, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**O'HAGAN MEYER, PLLC**

*/s/ Stephen D. Dargitz*
Stephen D. Dargitz (Del. No. 3619)
O'HAGAN MEYER PLLC
800 North King Street, Plaza Level
Wilmington, Delaware 19801
(302) 492-2150
sdargitz@ohaganmeyer.com
*Counsel to Defendant*
*Affordable Auto Shield, Inc.*

# Exhibit 1

**AAS EXHIBIT 1:**
**PERSONS CLAIMED BY DECLARANTS IN PLAINTIFFS' EXHIBITS TO BE**
**RESPONSIBLE FOR CALLS, AND ACTIONS ALREADY TAKEN BY DECLARANTS**

| NAME | PL. OR CLASS REP? | DATES OF ALLEGED CALLS | PARTIES ALLEGED TO HAVE SOLD VSCs | ROW IN EX.2, SHEET 1, DEALER SORT | NAMED PLAINTIFF ELSEWHERE AGAINST SAME DEFENDANT(S)? |
|---|---|---|---|---|---|
| Ballan, Scot | No | 10/22/19 | *National Car Cure*, Sunpath, Sunsimp | 122769 | None found – but see Callier, Day |
| Boehm, Andrew | No | 11/26/19 | *VAD*, Sunpath, Northcoast | 136348 | None found – but see Canfield |
| **Callier, Brandon** | **Yes** | **12/27/19** | ***National Car Cure*, Sunpath, Northcoast** | **123477**<br><br>**[Customer is Ana Callier]** | **W.D. Tex. (3:20-cv-00106) – Sunpath Ltd, Northcoast Warranty Services, Inc., *National Car Cure, LLC, Celtic Marketing LLC [a/k/a VAD]*; default judgment obtained against Celtic Marketing, LLC, final judgment dismissing all claims against National Car Cure after settlement** |
| | | **02/12/20** | ***Affordable Car Cure*, Sunpath, Walco** | **136787 (as Vehicle Activation Department)** | |
| | | **10/05/21** | ***AAP*, Sunpath, Mepco** | **7794 (as Advanced Auto Protection 0)**<br><br>**[Customer is Ana Callier]** | |
| | | **9/22/20** | | **30655 (as Affordable Car Cure)** | |

| Canfield, Daniel | No – settled claims against VAD and Sunpath | 05/31/19 | *VAD*, Sunpath | 135030 | C.D. Cal. (8:19-cv-01162-AG-KES) – vs. *VAD*, Sunpath Limited Corp., Northcoast Warranty Services, Inc.; dismissed after settlement |
|---|---|---|---|---|---|
| Day, Nathen | No – did not purchase Sunpath VSC | 02/17/20 | Unknown (voice mail) | Not on the list | |
| | | 03/06/20 | *National Car Cure*, Matrix Financial Services LLC | Not on the list | D. Neb. (8:20-cv-00104-JFB-CRZ) – vs. Gustav Renny, *National Car Cure LLC*, Matrix Financial Services, LLC, Matrix Warranty Solutions, Inc., *National Auto Protection Corp.*; dismissed after settlement |
| Fabrikant, Ben | Dropped from Fourth Amended Complaint (09/20/22) | 08/23/19 | *Assured Auto Group*, Sunpath, Northcoast | Not on the list | D. Neb (8:2019-cv-00383-SMB) – *Assured Auto Group, Inc.*, Northcoast Warranty Services, Inc., Sunpath Limited Corp., Wesco Insurance Company; dismissed after settlement |
| | | 09/13/19 | *Affordable Automotive Solution*, Sunpath, Northcoast | Not on the list | None found – but see Smith |
| | | 09/10/20 | *Affordable Car Cure, Inc.*, Walco, Sunpath | Not on the list | |
| **Horton, Lucas** | **Yes** | **04/29/20** | ***VAD*, Sunpath, Mepco** | **137071** | **None found against VAD – but see Canfield, Callier** |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | **N.D. Tex. (3:20-cv-01884-B-BH) – Sunpath; dismissed for lack of personal jurisdiction**<br><br>**N.D. Tex (3:22-cv-02130-N-BT) – Sunpath; voluntarily dismissed**<br><br>**N.D. Tex. (3:20-cv-03626-M-BH) – Northcoast Warranty Services; dismissed without prejudice** |
| **Morales, Kurt** | **Yes** | **03/04/20** | ***National Car Cure,* Sunpath, Northcoast** | **124322** | **None found – but see Callier, Day** |
| Shanahan, Catherine | No – did not purchase Sunpath VSC | 06/03/19 | *National Auto Protection Corp.*, Matrix Financial Services, LLC, Nation Motor Club, LLC | Not on the list | N.D. Ill. (1:19-cv-03788) – *National Auto Protection Corp.*, Matrix Financial Services, LLC, Nation Motor Club, LLC; dismissed after settlement |
| Smith, Regan | No | 04/05/19 | *Affordable Automotive Solution*, Sunpath, Wesco | Not on the list | D. Neb. (8:19-cv-00259-LSC-MDN) – *Affordable Automotive Solution*, Sunpath Limited, Northcoast Warranty Services, Inc.; voluntary dismissal |
| Teleis, Kenneth | No – call received on wife's phone | 10/16/20 | *Affordable Car Cure, Inc.*, Sunpath Ltd., Wesco Insurance Company | 31129 | None found – but see Callier |

| Trowbridge, Jon | No | 02/04/20 | *National Car Cure*, Sunpath, Simplicity | 124005 | None found – but see Callier, Day |
|---|---|---|---|---|---|
| Affordable Auto Shield, Inc. was formed on January 21, 2022 and therefore made none of the calls alleged by the declarants. | | | | | |
| Pelican Investment Holdings LLC d/b/a AAP ("Pelican") was formed on November 4, 2020, and submitted a Direct Marketing ("Dealer") Application Form on or around November 16, 2020 for the fictious name "AAP." However, Pelicans have proffered no evidence in their submission establishing that Pelican is the same "AAP" identified as the entity that allegedly called Brandon Callier on October 5, 2021 to sell him a Sunpath VSC. | | | | | |

# Exhibit 2

**AAS EXHIBIT 2**

**DATES OF FORMATION/OPERATION OF SO-CALLED "RENNY ENTITIES" DISPROVE PLAINTIFFS' ASSERTIONS**

| ENTITY | FORMATION | RENNY ROLE | DATES IN OPERATION PER STONE EAGLE LIST | | # OF CUSTOMERS ON STONE EAGLE LIST | |
|---|---|---|---|---|---|---|
| Advanced Auto Protection [This name is followed by a trailing number of 0,1,2,3, or 5] – likely fictitious name, but not linked to an entity by any document or testimony in plaintiffs' class action certification submission | No information provided in D.I. 328 Ex. 13 | No information provided in D.I. 328 Ex. 13 No questions at AAS deposition. | 0 | 12/21/20-11/26/22 | 0 | 13,583 |
| | | | 1 | 12/30/20-11/09/22 | 1 | 5,874 |
| | | | 2 | 12/29/20-01/05/21 | 2 | 113 |
| | | | 3 | 12/31/20-06/28/21 | 3 | 1,167 |
| | | | 5 | 03/30/21, 07/09/21 | 5 | 2 |
| Affordable Auto Protection, LLC | 08/03/20 – FL LLC Dissolved 09/23/22 | Manager D.I. 328 Ex. 13 No questions at AAS deposition | | Not on the list | | Not on the list |
| Affordable Auto Shield, Inc. | 01/21/22 – DE Corp. | No information provided in D.I. 328 Ex. 13 Renny submitted a 1099.  He is a compliance officer and co-founder but sold the business and reports to owner and President Robert Stecher.  Renny 11:3-13, 15:21-16:5, 20:9-21:4-8, | | 03/23/22-12/04/23 | | 4,611 |

1

2

| | | | |
|---|---|---|---|
| Affordable Car Cure, Inc. | 01/08/20 – WY Corp. Dissolved 11/23/21 | Renny was one of two directors; other director was the sole officer. D.I. 328 Ex. 13 No questions at AAS deposition, though said he was a principal of Affordable Car **Care**. Renny 43:22-44:16. | 06/24/20-12/22/20 | 2,873 |
| Assured Auto Group, Inc. | 11/08/17 – FL Corp. Dissolved 03/13/20 | Renny was one of two directors. D.I. 328 Ex. 13 Signed software server agreement 7/23/18. Renny 42:5-43:15. | 01/09/19-03/05/20 | 3,022 |
| National Auto Protection Corp | 05/21/15 – FL Corp. Dissolved 09/13/19 | Renny was one of two directors. D.I. 328 Ex. 13 Renny was asked about NAPC at the AAS deposition, but not specifically about his role. | 11/09/15-12/02/19 | 20,406 |
| National Car Cure LLC | 03/18/19 – FL LLC Dissolved 09/22/23 | Renny was an LLC member. D.I. 328 Ex. 13 No questions at AAS deposition. | 04/08/19-05/04/21 | 6,391 |
| Pelican Investment Holdings, LLC d/b/a AAP | 11/04/20 – DE LLC Sold @ October 2021 | Falcon Endeavors, Inc. is Manager. D.I. 328 Ex. 13 Renny began as a partner and general | Neither Pelican nor "AAP" is on the list, at least not as such. | Neither Pelican nor "AAP" is on the list, at |

3

| | | | | |
|---|---|---|---|---|
| | | manager, then became compliance officer. Sold the business to Vajira Samararatne and continued to work as compliance officer. Renny 26:24-27:15, 28:1-32:13, 33:21-34:12, 39:15-40:6, 55:15-56:7 | Not on the list | least not as such. |
| Pelican Investment Holdings Group, LLC [This may be a scrivener's error on a certificate of administrative dissolution.] | 01/13/21 – DE LLC? No DE certificate provided in D.I. 328 Ex. 13 Dissolved 09/15/22. D.I. 328 Ex. 13. | Unknown | Not on the list | Not on the list |

# Exhibit 3

# AAS EXHIBIT 3: TIMELINE OF SO-CALLED "RENNY ENTITIES"[1]

<u>2015</u>
May 21, 2015:                National Auto Protection Corp is formed
November 9, 2015:            First National Auto Protection Corp customer on Stone Eagle list

<u>2016</u>
                             National Auto Protection Corp continues to do business

<u>2017</u>
                             National Auto Protection Corp continues to do business
November 8, 2017:            Assured Auto Group, Inc. is formed

<u>2018</u>
                             National Auto Protection Corp continues to do business

<u>2019</u>
January 9, 2019:             First Assured Auto Group, Inc. customer on Stone Eagle list
March 18, 2019:             National Car Cure LLC is formed
April 8, 2019:              First National Car Cure LLC customer on Stone Eagle list
September 13, 2019:          National Auto Protection Corp dissolves
December 2, 2019:            Last National Auto Protection Corp customer on Stone Eagle list

<u>2020</u>
                             National Car Cure LLC continues to do business
January 8, 2020:            Affordable Car Cure, Inc. is formed
March 5, 2020:              Last Assured Auto Group, Inc. customer on Stone Eagle list
March 13, 2020:             Assured Auto Group, Inc. dissolves
**MARCH 15, 2020:**          **States begin to implement shutdowns due to COVID-19**
June 24, 2020:              First Affordable Car Cure, Inc. customer on Stone Eagle list
August 3, 2020:             Affordable Auto Protection, LLC is formed
November 4, 2020:           Pelican Investment Holdings, LLC is formed
December 21, 2020:          First Advanced Auto Protection 0 customer on Stone Eagle list
December 22, 2020:          Last Affordable Car Cure, Inc. customer on Stone Eagle list
December 29, 2020:          First Advanced Auto Protection 2 customer on Stone Eagle list
December 30, 2020:          First Advanced Auto Protection 1 customer on Stone Eagle list
December 31, 2020:          First Advanced Auto Protection 3 customer on Stone Eagle list

---

[1] This timeline is based on information in the Stone Eagle List and in Plaintiffs' Exhibit 13. The timeline is solely for illustrative purposes, and AAS reserves the right to challenge the accuracy of any of the information submitted by Plaintiffs.

## 2021

| | |
|---|---|
| January 5, 2021: | Last Advanced Auto Protection 2 customer on Stone Eagle list |
| March 30, 2021: | First of two Advanced Auto Protection 5 customers on Stone Eagle list |
| May 4, 2021: | Last National Car Cure LLC customer on Stone Eagle list |
| June 28, 2021: | Last Advanced Auto Protection 3 customer on Stone Eagle list |
| July 9, 2021: | Second and last Advanced Auto Protection 5 customer on Stone Eagle list |
| Autumn 2021: | Renny sells his interest in Pelican Investment Holdings, LLC |
| November 23, 2021: | Affordable Car Cure, Inc. dissolves |

## 2022

| | |
|---|---|
| January 21, 2022: | Affordable Auto Shield, Inc. is formed |
| March 23, 2022: | First Affordable Auto Shield, Inc. customer on Stone Eagle list |
| September 23, 2022: | Affordable Auto Protection, LLC dissolved |
| November 9, 2022: | Last Advanced Auto Protection 1 customer on Stone Eagle list |
| November 26, 2022: | Last Advanced Auto Protection 0 customer on Stone Eagle list |

## 2023

| | |
|---|---|
| September 22, 2023: | National Car Cure LLC dissolves |
| December 4, 2023: | Last Affordable Auto Shield, Inc. customer on Stone Eagle list |

# Exhibit 4

Page 1

1             IN THE UNITED STATES DISTRICT COURT
2                FOR THE DISTRICT OF DELAWARE
3
4    KURT MORALES II; BRANDON          )
     CALLIER; LUCAS HORTON,            )
5    individually, and on behalf       )
     of all others similarly           )
6    situated,                         )
                                       )
7          Plaintiffs,                 )
                                       )   Civil Action No.
8    v.                                )   20-cv-01376-JLH-SRF
                                       )
9    SUNPATH LTD.; NORTHCOAST          )
     WARRANTY SERVICES, INC.;          )
10   AMTRUST NORTH AMERICA, INC.;      )
     SING FOR SERVICE, LLC; and        )
11   PELICAN INVESTMENT HOLDINGS       )
     GROUP, LLC,                       )
12                                     )
             Defendants.               )
13
14
15              A remote deposition of BRANDON L. CALLIER
16   was taken pursuant to notice before Ellen Corbett Hannum,
17   Registered Merit Reporter, in Wilmington, Delaware, on
18   Thursday, January 23, 2025, beginning at approximately
19   10:32 a.m., there being present:
20
21
22
                     VERITEXT LEGAL SOLUTIONS
23                     MID-ATLANTIC REGION
                  300 Delaware Avenue - Suite 815
24                    Wilmington, DE 19801

```
                                                        Page 2

 1    APPEARANCES:
 2                        MARK L. JAVITCH, ESQ.
                         Javitch Law Office
 3                          3 East 3rd Avenue
                           Suite 200
 4                          San Mateo, CA 94401
                           (650)781-8000
 5                          mark@javitchlawoffice.com
                                and
 6                        JEFFREY D. BLAKE, ESQ.
                         Zimmerman Law Offices
 7                          77 West Washington Street
                           Suite 1220
 8                          Chicago, IL 60602
                           (312)767-6463
 9                          jeff@attorneyzim.com
10                        Attorneys for Plaintiff
11
12                        LEO J. HURLEY, JR., ESQ.
                         AARON H. GOULD, ESQ.
13                        Connell Foley LLP
                            185 Hudson Street
14                          Harborside 5, Suite 2510
                           Jersey City, NJ 07311
15                          (201)521-1000
                           lhurley@connellfoley.com
16
                         Attorneys for Defendants NorthCoast
17                       Warranty Services, Inc. and Amtrust
                         North America, Inc.
18
19                        STEPHEN D. DARGITZ, ESQ.
                         O'Hagan Meyer
20                          1717 Arch Street
                           Suite 3910
21                          Philadelphia, PA 19103
                           (215)461-3328
22                          sdargitz@ohaganmeyer.com
23                       Attorney for Defendant Affordable
                         Auto Shield and Pelican Investment
24                       Holdings Group, LLC
```

Page 3

1                      APPEARANCES (Continued):

2

                       BRION B. DOYLE, ESQ.

3                      Varnum LLP

                          333 Bridge Street NW

4                      Suite 1700

                       Grand Rapids, MI 49504

5                          (616)336-6479

                          bbdoyle@varnumlaw.com

6

                       Attorney for Defendant SING for

7                      Service

8

    ALSO PRESENT:    Mahrad Ramin, Paralegal, Connell Foley,

9                    LLP

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 4

1                          I N D E X
2                                               PAGE
3    TESTIMONY OF BRANDON L. CALLIER.............   6
4    EXAMINATION BY MR. HURLEY...................   6
     EXAMINATION BY MR. DOYLE....................  180
5    EXAMINATION BY MR. DARGITZ..................  229
6
7                       E X H I B I T S
8    CALLIER              DESCRIPTION                PAGE
9    Exhibit 15  "Plaintiff's Original Complaint,"
                 Case 3:20-cv-00001-KC               49
10
     Exhibit 10  "Fifth Amended Class Action Complaint,"
11               Case No.: 20-cv-01376-RCA          59
12   Exhibit 11  "Voluntary Petition for Individuals
                 Filing for Bankruptcy"             62
13
     Exhibit 12  "Debtors Notice to Convert Chapter 13 to
14               Chapter 7," Case No. 17-30242      67
15   Exhibit 13  "Amended Schedules for Conversion to
                 Chapter 7," Case No. 17-30242      68
16
     Exhibit 2   "Declaration of Brandon Callier,"
17               Case No.: 20-cv-01376-RGA          78
18   Exhibit 4   "Plaintiff's Original Complaint," Case
                 No.: 3:20-cv-00105-FM             146
19
     Exhibit 5   "Plaintiff's Original Complaint," Case
20               No.: 20-cv-0106-FM                151
21   Exhibit 6   "Order to Consolidate," Case No.:
                 EP-20-cv-00105-FM                 154
22
     Exhibit 7   "Order of Dismissal," EP-cv-00106-FM    155
23
     Exhibit 17  "Plaintiff's First Amended Complaint,"
24               Case No. 3:20-cv-00106            158

Page 5

1    EXHIBITS (Continued):

2    CALLIER                    DESCRIPTION                    PAGE

3    Exhibit 8    "Judgment For Sum Certain By Default,"
                  Case No. 3:20-cv-00106-FM                  163

4

     Exhibit 9    "Final Judgment," EP-20-cv-00106-FM        164

5

     Exhibit 18   "Payment Plan Agreement"                   219

6

     Exhibit 19   Brandon Callier document production,

7                 1-38                                       224

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
                                              Page 6
 1                COURT REPORTER:  The attorneys
 2   participating in this deposition acknowledge that I am
 3   not physically present in the deposition room, and that I
 4   will be reporting this deposition remotely.
 5                They further acknowledge that in lieu of
 6   an oath administered in person, I will administer the
 7   oath remotely.
 8                The parties and their counsel further
 9   agree that the witness may be in a state where I am not a
10   notary and stipulate to the witness being sworn in by an
11   out-of-state notary.
12                If any party does have an objection to
13   this manner of reporting, please state so now.
14                (No response.)
15                MR. HURLEY:  Any objection?
16                MR. JAVITCH:  No objection.
17                          - - -
18             BRANDON L. CALLIER, having first been duly
19   sworn according to law, was examined and testified as
20   follows:
21                      EXAMINATION
22   BY MR. HURLEY:
23        Q.   Mr. Callier, good morning.
24        A.   Good morning.
```

1    Q.    My name is Leo Hurley.  I'm an attorney with

2    the law firm of Connell Foley, LLP.  I am physically

3    sitting in Jersey City, New Jersey right now, which is

4    where one of my firm's offices is.  And I serve as

5    counsel to NorthCoast Warranty Services, Inc. and Amtrust

6    North America, Inc. in a matter where you and two other

7    plaintiffs have brought an action against my clients and

8    a number of other entities in the United States District

9    Court for the District of Delaware.  And we are here for

10   the notice of your deposition in this case.

11            Before we get started, I am going to ask

12   you some preliminary questions and give you some

13   preliminary instructions.  And if you could just work

14   with me through this process, I think it will make things

15   easier in the long run.

16            The first thing that I would note is that

17   Ms. Corbett Hannum, who is also on your screen -- this is

18   a Zoom deposition.  She should be on your screen.  If you

19   are looking at it like I am, it's like a Hollywood

20   Squares kind of format.  She is a court reporter.  She is

21   taking a stenographic record of the questions asked, the

22   responses given, and any other objections or colloquy

23   that comes out of anyone's mouth during this deposition.

24   The transcript of these proceedings may be used in court

Page 8

1    proceedings and at trial.

2                    Do you understand that?

3        A.    Yes, sir.

4        Q.    Okay.  When you are answering questions today,

5    your answers must be completely verbal.  What I mean by

6    that is sometimes people when they are answering a

7    question will give a nod of the head up and down to

8    signify yes or back and forth to signify no, they may

9    wave their hand for some reason.  You can't do that here

10   today.  So if, by chance, you do that and I say to you, I

11   need you to answer the question, I am not trying to be

12   fresh; I am trying to make sure that we abide the rules

13   so that we get an appropriate stenographic record of the

14   proceedings today.

15                   Do you understand that and can you try to

16   abide that instruction not to communicate in non-verbal

17   means?

18       A.    Yes.

19       Q.    Okay.  I am going to ask you if you could,

20   please, while we are taking this deposition, I am going

21   to be asking questions, you are going to be giving

22   answers, I would ask that before you begin answering your

23   question, you wait until I finish asking the question

24   before you respond.  The reason for that is that the

Page 9

1   court reporter would have a very hard time getting down

2   in the stenographic record two people talking over each

3   other at the same time.  The same rule applies to me.  I

4   will do my best to not speak over you while you are

5   giving an answer to a question, and in instances where

6   there is other colloquy as well.

7              Do you understand the instruction and do

8   you think that you can abide it?

9        A.   Yes.

10       Q.   I can tell you that I am going to do my best

11  to abide it, but as I said to these folks on other

12  occasions, I have done this for a very long time, and if

13  we are able to get through a deposition today where one

14  of us is not speaking over each other, we are going to

15  wind up being in rarified air.  So we are just going to

16  try to give our best efforts and move on.

17             When I ask you a question, if you do not

18  know the answer to the question, I'd ask you to say I

19  don't know.  I don't want you to speculate.  I am not

20  asking you to speculate.  If you are approximating or

21  estimating, please tell us that you are approximating and

22  estimating.  If I am asking you a question where I want

23  you to approximate or estimate, I will specifically

24  indicate that I am asking for you to approximate or

Page 10

1   estimate; but at bottom, I am asking you and instructing

2   you not to speculate in your answers to questions.

3             Do you understand the instruction and can

4   you abide that instruction today?

5        A.   Yes.

6        Q.   Similarly, if you do not understand a question

7   that is asked of you, please ask me to rephrase it and I

8   will do my best to rephrase the question.

9             Do you understand that instruction and can

10  you abide that instruction?

11       A.   Yes.

12       Q.   If you do answer a question, I am going to

13  assume that you understood the question that was asked of

14  you.

15            Do you understand that instruction and can

16  you abide that instruction?

17       A.   Yes.

18       Q.   And can you agree with that, that if I ask you

19  a question that I can assume that you understand it, if

20  you answer?

21       A.   Yes.

22       Q.   Okay.  If your attorney attempts to place an

23  objection on the record, I would ask you to stop talking

24  and wait until your attorney finishes placing that

Page 11

1    objection on the record before you begin answering the

2    question.  This is similar to the instruction that I gave

3    you earlier about talking over each other or trying not

4    to talk over each other.

5                    Do you understand this instruction and can

6    you abide this instruction?

7         A.    Yes.

8         Q.    Okay.  If at any time you need to take a break

9    for any reason, to use the restroom, to stretch your

10   legs, to answer a doorbell, any reason, please let me

11   know and I will try to accommodate you as best I can

12   within the scope of where we are in the line of

13   questioning that I'm asking you, but if I am in the

14   middle of a question, at a minimum, if I am in the middle

15   of a question to you, I am going to require you to finish

16   answering the question.

17                   Do you understand that instruction and can

18   you abide that instruction?

19        A.    Yes.

20        Q.    Are you taking any medication right now that

21   would affect your ability to provide truthful testimony

22   today?

23        A.    No.

24        Q.    Are you under the influence of any other

Page 12

1    substance that would affect your ability to provide

2    truthful testimony today?

3         A.    No.

4         Q.    Are you taking any medication that would

5    inhibit your ability to recall the events that are

6    alleged in this Complaint that you filed that we are here

7    for the deposition of related to today?

8         A.    No.

9         Q.    Are you under the influence of any substance

10   that would affect your ability to recall that which

11   surrounds the allegations made in your Complaint for

12   which we are here in your deposition today?

13        A.    No.

14        Q.    Do you have any medical condition that would

15   inhibit your ability to recall events related to that

16   which you filed your Complaint for which we are here for

17   today for your deposition?

18        A.    No.

19        Q.    Okay.  Did you review any documents or other

20   materials to prepare for your deposition today?

21        A.    Yes.

22        Q.    What did you review, sir?

23        A.    I reviewed the Motion For Class Certification

24   I believe is what it's called, and I reviewed the last

Page 19

1    didn't happen?

2         A.    To the best of my memory, that didn't happen.

3         Q.    Do you communicate regularly through messaging

4    applications?

5         A.    No.

6         Q.    Do you have a Signal app?

7         A.    Yes, I do.

8         Q.    Do you use Signal?

9         A.    Very rarely.

10        Q.    Do you have a WhatsApp?

11        A.    Yes.

12        Q.    Do you use WhatsApp?

13        A.    When I travel out of the country, I do.

14        Q.    How many times have you communicated with

15   Mr. Horton?

16        A.    Zero.

17        Q.    Have you ever been on a Zoom with Mr. Horton?

18        A.    No.

19        Q.    Have you ever been on a Zoom with Mr. Morales?

20        A.    No.

21        Q.    Have you ever been on a Zoom with Mr. Morales,

22   Mr. Horton and your attorneys?

23        A.    No.

24        Q.    Have you ever been deposed before?

Page 29

1    Q.    Are you a Certified Public Accountant?

2    A.    No.

3    Q.    Have you ever taken a CPA exam?

4    A.    No.

5    Q.    Have you ever taken any exams for professional

6    licensure that you haven't passed?

7    A.    No.

8    Q.    Have you ever been arrested?

9    A.    Yes.

10   Q.    How many times have you been arrested, sir?

11   A.    Once.

12   Q.    When were you arrested, sir?

13   A.    Three, four years ago.

14   Q.    Three or four years ago?

15   A.    Yes.

16   Q.    Where were you arrested?

17   A.    El Paso, Texas.

18   Q.    What were the charges that were brought

19   against you in that arrest?

20   A.    I was accused of -- I am trying to think of

21   the exact charges.  I am sure you have it in front of

22   you.  Of operating, like, an unlicensed massage parlor.

23   Q.    You were accused of operating an unlicensed

24   massage parlor.  In what court were those charges made?

Page 30

1          A.    It would have been El Paso County.

2          Q.    Were those felony charges, sir?

3          A.    Yes.

4          Q.    What was the ultimate disposition of those

5     charges?

6          A.    I took a plea deal.  I did deferred

7     adjudication; I was on probation for six months.

8          Q.    Did you enter a plea of guilty to a felony?

9          A.    Yes.

10         Q.    Are you a convicted felon?

11         A.    No.

12         Q.    Are you certain of that?

13         A.    Yes.

14         Q.    What were the specific allegations, sir, that

15    were made in that matter?

16         A.    They said that the women in there, that worked

17    there, that leased the place from me, were doing

18    unlicensed massages and were apparently giving people

19    happy endings.

20         Q.    I don't understand what that means, sir.  Can

21    you explain that?

22         A.    Yes.  They were accusing them or me of leasing

23    the place and benefiting from these ladies who were

24    giving guys hand jobs.

Page 31

1      Q.    Just so I am crystal clear, when you say

2   "giving guys hand jobs," you mean that the female

3   employees were engaging in the masturbation of male

4   customers?

5      A.    That is what they accused, yes.

6      Q.    Okay.  You mentioned property.  Did you own

7   the property?

8      A.    No.

9      Q.    Who owned the property?

10      A.    The property was owned by -- I don't know the

11   name of the company that owned the property.

12      Q.    What was the address?

13      A.    I don't remember the address.  It was on

14   Airport Boulevard, but I don't remember the address, or

15   Airport Road.

16      Q.    So you leased space from an owner on Airport

17   Boulevard, correct?

18      A.    I didn't lease the space, no.

19      Q.    Well, then how did you come to occupy the

20   space?

21      A.    The space was leased by a third party who was

22   going to do taxes with me.  We got into an active or --

23   excuse me -- it's a long story.  I don't know if I need

24   to go into this.

Page 32

1        Q.    No, I would like you to go into it.

2        A.    Okay.  Well, ask me your specific question.

3        Q.    You did not lease the space?

4        A.    No.  At least not in my name.

5        Q.    Was the lease in the name of an LLC, an Inc.,

6   or a private individual?

7        A.    A private individual.

8        Q.    Who is the private individual?

9        A.    Craig Cunningham.

10        Q.    Craig Cunningham?

11        A.    Yes.

12        Q.    Mr. Cunningham leased the space?

13        A.    Yes.

14        Q.    Were you in business with Mr. Cunningham?

15        A.    No.

16        Q.    How did you know Mr. Cunningham?

17        A.    I met Mr. Cunningham at Fort Bliss, Texas.

18        Q.    Were you in the service, sir?

19        A.    I was an accounting chief -- no, I was not.

20        Q.    How did you meet Mr. Cunningham at Fort Bliss,

21   Texas?

22        A.    I worked at Fort Bliss, Texas.

23        Q.    We are going to get to your employment history

24   in a second.

Page 33

1              So you met him while you were working at

2    Fort Bliss; is that correct?

3         A.    Yes.

4         Q.    Okay.  Now you are in El Paso.  There's a

5    lease in the name of Mr. Cunningham.  You do not have --

6    you are not the lessee.

7              What then became your relationship to this

8    space?

9         A.    Mr. Cunningham took the lease out because we

10   were going to do taxes out of the building.  He then

11   moved to Dallas and I had the lease in his name.  The

12   lease was sublet, and I picked up the checks and

13   delivered them to the leasing office for him or to the

14   place that he had leased it from.

15        Q.    If I am understanding this correctly, who was

16   the subtenant?

17        A.    The subtenant, I don't remember her name.

18        Q.    What was your involvement in the business?

19        A.    I had no involvement in the business other

20   than picking up the checks to deliver to the leasing

21   office.

22        Q.    Did you enter a plea of guilty under oath?

23        A.    I did.

24        Q.    What did you admit to doing under oath?

Page 34

```
 1        A.   I admitted to -- I don't know what the
 2   specific charges are.
 3        Q.   I mean, in terms of facts that came out of
 4   your mouth that you admitted doing, what did you admit to
 5   doing?
 6        A.   I don't remember.  I repeated back -- the
 7   judge read the charges, and I just said, "I agree on the
 8   advice of my counsel."  They said it wasn't worth it,
 9   that I wasn't going to go to jail, I wasn't going to be a
10   convicted felon.  I have been fighting it for three
11   years.  And, very reluctantly, I said, "I am guilty."
12        Q.   Give me one second, sir.
13        A.   Yes.
14        Q.   You mentioned that you were going to do taxes
15   at that location.
16        A.   Yes.
17        Q.   Correct?
18        A.   Mm-hmm.
19        Q.   You are not a CPA, correct?
20        A.   Right.
21        Q.   Do you have an IRS preparer tax identification
22   number?
23        A.   Yes.
24        Q.   Is that still valid?
```

Page 38

1    ended in 2020.

2            Q.    When in 2020, sir?

3            A.    September, Octoberish.

4            Q.    Why did you leave the Department of the Army?

5            A.    I had been wanting to leave for years, and

6    left.

7            Q.    Did you resign or were you terminated?

8            A.    I resigned.

9            Q.    Okay.  Did you take different employment after

10   that?

11           A.    I have been working for myself.

12           Q.    You have working for yourself in what field,

13   sir?

14           A.    I have a tax prep business and do bookkeeping

15   myself.

16           Q.    I didn't hear the second part of that?

17           A.    And bookkeeping.

18           Q.    Bookkeeping and tax prep business.  What is

19   the name of your business?

20           A.    Aero Tax Services.

21           Q.    Is that formed as an LLC, an Inc.?  Does it

22   have a corporate entity?

23           A.    An LLC.

24           Q.    Who are the members of the LLC?

Page 39

1          A.    Me.

2          Q.    Just you.  Does it have a brick-and-mortar

3     location?

4          A.    Yes.

5          Q.    Where is the brick-and-mortar location?

6          A.    It's now 6090 Surety Drive here in El Paso

7     Texas; previous to that it was 10921 Pellicano Drive, El

8     Paso, Texas.

9          Q.    Did you spell the name of the business yet for

10    me?

11         A.    A-E-R-O Tax Services.

12         Q.    Do you have employees, sir?

13         A.    No.

14         Q.    Have you ever had any employees at that

15    business?

16         A.    No.

17         Q.    What's the name of the LLC itself?

18         A.    I just told you.

19         Q.    I didn't know if it that was a d/b/a or LLC?

20         A.    No.

21         Q.    Aero Tax Services, LLC is the name of the LLC?

22         A.    Yes.

23         Q.    Yes?

24         A.    Yes.

Page 40

1      Q.    And that's also the d/b/a, correct?

2      A.    Yes.

3      Q.    Okay.  Give me one second, sir.

4            Are you also charged with an offense in

5   Maryland?

6      A.    Yes.  I wasn't withholding stuff.  I literally

7   didn't remember that until you said something just now.

8   And I only found out about that, like, I don't know, a

9   year ago, just through happenstance.

10     Q.    You found out about it about a year ago?

11     A.    Yes.

12     Q.    Okay.  But the case was filed in 2010, right?

13     A.    Apparently.

14     Q.    And what's the current status of that matter?

15     A.    I have no idea.

16     Q.    Is it possible that there's a warrant out for

17   your arrest for that matter?

18     A.    I don't know.

19     Q.    When you found out about this a year ago, did

20   you attempt to reach out to any court authorities or

21   other authorities in Maryland to resolve the matter?

22     A.    I reached out to Maryland to find out why in

23   the world I had been -- or what was going on, and I don't

24   remember what they said, but I have no interest in going

Page 41

1   back to Maryland.  And the charge is ridiculous, in my

2   mind.

3         Q.   So even if there were open charges in Anne

4   Arundel County brought against you that you just found

5   out about, you have no intention of going there to

6   resolve those charges?

7         A.   (Pause.)

8               MR. JAVITCH:  You can take the Fifth

9   Amendment.

10               THE WITNESS:  Yeah, I will plead the Fifth

11   on that.

12               MR. HURLEY:  It's probably a good time for

13   a break.  Let's take ten minutes.

14               MR. JAVITCH:  Thanks.

15               (A brief recess was taken.)

16   BY MR. HURLEY:

17         Q.   Mr. Callier, you understand that there are two

18   charges currently pending against you in Anne Arundel

19   County, correct?

20               MR. JAVITCH:  I object to form.

21               THE WITNESS:  No, I am not aware.

22   BY MR. HURLEY:

23         Q.   You understood that there are charges pending

24   against you in Maryland, correct?

Page 42

1        A.    I thought that there might be one charge.

2    Apparently, you are saying there are two.  I don't know

3    what those charges are, no.

4        Q.    You said you found out about them recently.

5    How did you find out about them?

6        A.    A friend of mine was looking wherever he was

7    looking and called and said:  "Did you know that you had

8    something in Maryland?"  And I said, "No.  I have no idea

9    what you are talking about."

10       Q.    Who is your friend?

11       A.    James Shelton.

12       Q.    Who is James Shelton?

13       A.    He is a friend of mine.

14       Q.    So James Shelton lives where?

15       A.    He lives in Pennsylvania.

16       Q.    So James Shelton, a friend in Pennsylvania,

17   calls you to tell you that you have charges pending in

18   Maryland?

19       A.    Well, he didn't say charges plural, but yes.

20       Q.    He just figured this out and decided to call

21   you?

22       A.    James Shelton is nosy and looks into just --

23   looks into people's business.

24       Q.    And those charges under the criminal code are

Page 43

 1   harassment, course of conduct and electronic mail

 2   harassment.  You understand that, right?

 3                   MR. JAVITCH:  I object to form.

 4   BY MR. HURLEY:

 5        Q.   You can answer.

 6        A.   I'm taking your word as to what the charge is.

 7        Q.   You understand that there's been a warrant out

 8   for your arrest for nearly 15 years, right?

 9        A.   No, I did not know that.

10        Q.   You said you reached out to Maryland.  Who did

11   you speak to in Maryland?

12        A.   I spoke to, I believe, a clerk, or something,

13   asking them who I might contact to figure out what's

14   going on.

15        Q.   Did you ever make a motion or request to

16   recall or quash the warrant or summons?

17                   MR. JAVITCH:  I object to form.

18                   THE WITNESS:  I wrote a letter, I believe.

19   BY MR. HURLEY:

20        Q.   That would have been in 2021?

21        A.   Okay.  Then it was a little further back than

22   I remembered, but yes.

23        Q.   And you've asked them to recall the warrant or

24   summons or quash it?

Page 44

1          MR. JAVITCH:  I object to form.

2          THE WITNESS:  I don't believe I used those

3     words.  I don't remember what it was, but I wouldn't have

4     used those words.

5     BY MR. HURLEY:

6          Q.   But you knew that that request was denied,

7     correct?

8          A.   Yes.

9          Q.   So since 2021 you have had charges pending in

10    Maryland that are unaddressed and remain open?

11          MR. JAVITCH:  I object to form.

12    BY MR. HURLEY:

13          Q.   You can answer.

14          A.   Yeah.  I found out about it in 2021, and then

15    went on with my life and didn't think about it anymore.

16    It wasn't at the top of my mind.

17          Q.   And you indicated earlier you have no

18    intention of doing anything about those charges, correct?

19          MR. JAVITCH:  I object to form.

20          THE WITNESS:  Those charges will have to

21    be dealt with at some point.

22    BY MR. HURLEY:

23          Q.   Okay.  And back to the Texas matter.  You were

24    initially charged with aggravated promotion of

```
                                             Page 45
 1    prostitution, correct?

 2                MR. JAVITCH:  I object to form.

 3    BY MR. HURLEY:

 4         Q.   You can answer.

 5         A.   If that's what you have there, then yes.

 6         Q.   And you entered a plea of guilty to aggravated

 7    promotion of prostitution, correct?

 8                MR. JAVITCH:  I object to form.

 9                THE WITNESS:  If that's what you have

10    there, then yes.

11    BY MR. HURLEY:

12         Q.   Okay.  And you mentioned a friend named Jamie

13    Shelton, correct?

14         A.   I said James Shelton.

15         Q.   Is it Jamie Shelton?

16         A.   I told you James Shelton.

17         Q.   Okay.  And he is from Pennsylvania?

18         A.   Yes.

19         Q.   And he is a friend of yours?

20         A.   Yes.

21         Q.   And is he associated with Final Verdict

22    Solutions?

23         A.   Yes.

24         Q.   What's Final Verdict Solutions, sir?
```

Page 46

1          A.    He collects on judgments.

2          Q.    Why would you need to be in touch with someone

3     who collects on judgments?

4          A.    Because I have a judgment that needed

5     collecting, and that's how I met him.

6          Q.    Okay.  Now, he is also a frequent TCPA

7     plaintiff, correct?

8                     MR. JAVITCH:  I object to form.

9                     THE WITNESS:  That's your determination.

10    BY MR. HURLEY:

11         Q.    Do you know him to have brought claims under

12    the TCPA previously?

13         A.    Yes.

14         Q.    Back to the Texas matter, though.  You

15    actually entered a plea of guilty to aggravated promotion

16    of prostitution during the pendency of this case,

17    correct?

18                     MR. JAVITCH:  I object to form.

19                     THE WITNESS:  I entered a plea to deferred

20    adjudication, served probation, and so I am not a

21    convicted felon.

22    BY MR. HURLEY:

23         Q.    I didn't ask if you were a convicted felon.  I

24    asked if you went in and entered a plea where you

Page 47

1  admitted that you had violated a statute for aggravated

2  promotion of prostitution?

3                    MR. JAVITCH:  I object to form.

4  BY MR. HURLEY:

5       Q.   You admitted to violating a criminal statute

6  for aggravated promotion of prostitution, correct?

7                    MR. JAVITCH:  I object to form.

8  BY MR. HURLEY:

9       Q.   You can answer.

10      A.   I took a plea based on the advice of my

11  counsel, based on the proposed penalty, and the fact that

12  I wouldn't be a convicted felon, so yes.

13      Q.   So, yes, you went into open court and admitted

14  to a judge that you had engaged in aggravated promotion

15  of prostitution within the state of Texas, correct?

16                    MR. JAVITCH:  I object to form.

17                    THE WITNESS:  You can keep asking the same

18  thing over and over.

19  BY MR. HURLEY:

20      Q.   As it is a yes or a no, sir, I don't need an

21  explanation.  I need an answer to my question.

22      A.   I answered.

23      Q.   The question was:  Did you walk into a

24  courtroom in Texas and, under oath, admit to violating a

Page 48

1    Texas criminal statute --

2                    MR. JAVITCH:  I object to form.

3                    MR. HURLEY:  Excuse me.

4    BY MR. HURLEY:

5        Q.    -- that prohibited aggravated promotion of

6    prostitution?  You admitted to violating that under oath,

7    correct?

8                    MR. JAVITCH:  I object to form.

9                    THE WITNESS:  Yes.

10    BY MR. HURLEY:

11        Q.    Thank you.

12                    This case is one of many TCPA cases that

13    you brought as a plaintiff, correct?

14        A.    I have brought TCPA cases, yes.

15        Q.    Four or five?

16        A.    No.

17        Q.    Twenty?

18        A.    More.

19        Q.    Fifty?

20        A.    More than 100.

21        Q.    More than 100 TCPA cases.  Okay.

22                    Do you remember a case called Callier v.

23    Marathon Administrative Company, Inc.?

24        A.    Vaguely.

Page 83

1          A.    Remembering back five years, I believe so.

2          Q.    Did you hang up after you heard what you

3    claimed to have heard?

4          A.    On some of the calls.

5          Q.    Did you engage on some of the other calls?

6          A.    I don't want to make a material

7    misrepresentation, I don't remember.

8          Q.    If you don't remember, you don't remember.

9    Where it says "press one to speak to a representative" in

10   your declaration, did it offer you the ability to press a

11   different number and be placed on a do-not-call list?

12         A.    I don't know.

13         Q.    You don't know or you don't remember?

14         A.    I don't know.

15         Q.    You don't know.  Do you just not remember?

16         A.    If given, if I get a prerecorded voice call

17   and it says press one as the first option, I will press

18   one.

19         Q.    Okay.

20         A.    So I wouldn't know what would follow.

21         Q.    And when you pressed one, you had no intention

22   of ever doing business with the people who were on the

23   phone, correct?

24               MR. JAVITCH:  Object to form.

Page 84

1    BY MR. HURLEY:

2         Q.    You can answer.

3         A.    I had an intention of finding out, purchasing

4    a vehicle service warranty to find out who had made the

5    phone call.

6         Q.    How did you know you needed to purchase the

7    vehicle service warranty in order to figure out who made

8    the call?

9         A.    Because the prerecorded message violated the

10   law by not identifying the company who was placing the

11   call.

12        Q.    So is your testimony that at no point during

13   the phone call did someone identify who was calling you?

14             MR. JAVITCH:  Object to form.

15   BY MR. HURLEY:

16        Q.    You can answer.

17        A.    My -- you asked me why I pressed one.

18        Q.    No.  I just asked you a different question.

19        A.    No.

20        Q.    No, no, no.  Now I want you to answer the

21   question you are being asked.

22        A.    Okay.

23             MR. HURLEY:  Read back the question.

24   BY MR. HURLEY:

Page 85

1        Q.    You are under oath and this is a deposition.

2              MR. JAVITCH:  Leo, can you stop yelling?

3              MR. HURLEY:  I'm not yelling.

4              THE WITNESS:  Yes, you are.

5              (The reporter read from the record as

6    requested.)

7              THE WITNESS:  Correct.  No one

8    identified -- to the best of my memory, no one on the

9    phone call identified any of the companies that ended up

10   being in the vehicle service contract.

11   BY MR. HURLEY:

12       Q.    Paragraph 6 of your declaration indicates

13   that:  "A true and correct copy of certain pages of the

14   vehicle service contract I purchased was produced in this

15   litigation as Callier_003 and attached hereto as Exhibit

16   A."

17              That's what it says, correct?

18       A.    Correct.

19       Q.    And if we go to Exhibit A, sir, I will

20   represent to you that this is the entirety of Exhibit A.

21   My first question is, can you show me where in Exhibit A

22   it indicates that NorthCoast was involved here?

23              MR. JAVITCH:  Object to form.

24   BY MR. HURLEY:

Page 97

1                    THE WITNESS:  No.

2    BY MR. HURLEY:

3         Q.    Back to your declaration, sir.

4                    Actually, before we go to that:  Why

5    didn't you provide your own name for the purchase of the

6    VSC?

7                    MR. JAVITCH:  Object to form.

8                    THE WITNESS:  Because I was going to use

9    my wife's car.  I had the VIN number handy.

10   BY MR. HURLEY:

11        Q.    Did your wife know you were doing that?

12                   MR. JAVITCH:  Object to form.

13                   THE WITNESS:  I don't know.

14   BY MR. HURLEY:

15        Q.    Did your wife know that you made a habit of

16   using her name when you were doing this?

17                   MR. JAVITCH:  Object to form.

18                   THE WITNESS:  You are making a

19   representation that's not accurate.

20   BY MR. HURLEY:

21        Q.    Which part is inaccurate?

22        A.    "Habit."

23        Q.    Well, you used her name at least twice, right?

24        A.    Okay.

Page 98

```
 1          Q.   How many times did you use your wife's name?

 2                    MR. JAVITCH:  Object to form.

 3                    THE WITNESS:  Apparently, twice.

 4    BY MR. HURLEY:

 5          Q.   Any other times than that?

 6          A.   No.

 7          Q.   Why didn't you sue National Car Cure in this

 8    action?

 9                    MR. JAVITCH:  Objection.  That's

10    privileged.  Don't answer that.

11                    MR. HURLEY:  That's not privileged.  You

12    get to answer that.  That's not privileged.

13    BY MR. HURLEY:

14          Q.   Why isn't National Car Cure being sued here?

15                    MR. JAVITCH:  It's immaterial --

16                    MR. HURLEY:  I am not asking him what his

17    conversations with you were.  I am asking why he didn't

18    sue National Car Cure.

19                    MR. JAVITCH:  It's attorney work product.

20                    MR. HURLEY:  It's not work product.  It is

21    not, Mark.

22    BY MR. HURLEY:

23          Q.   Why didn't you sue National Car Cure?

24                    MR. JAVITCH:  Well, I directed him not to
```

Page 99

1    answer.

2                        MR. HURLEY:  You are directing him not to

3    answer a question as to why you didn't sue National Car

4    Cure?

5                        MR. JAVITCH:  Yes.  On privilege.

6                        MR. HURLEY:  That's your direction to not

7    answer, that his Complaint that doesn't include National

8    Car Cure and my question about why it doesn't is a

9    privileged matter?

10                       MR. JAVITCH:  Yes.

11   BY MR. HURLEY:

12       Q.   Sir, you would agree with me that National Car

13   Cure appears in this document that's on the screen right

14   now, right?

15       A.   Yes.

16       Q.   You would agree with me that you have not sued

17   them in this matter, correct?

18       A.   Yes.

19       Q.   Did you tell your wife that you were buying

20   VSCs using her car?

21                       MR. JAVITCH:  Object to form.

22                       THE WITNESS:  Probably not.

23   BY MR. HURLEY:

24       Q.   You canceled this VSC, correct?

```
                                              Page 113

 1   BY MR. HURLEY:

 2        Q.   I didn't ask if you would have a way of

 3   knowing.  I said:  Do you have any facts indicating, that

 4   you can articulate right now, indicating that Amtrust

 5   ever had a conversation with anyone from VAD?

 6                  MR. JAVITCH:  Object to form.

 7                  THE WITNESS:  Yeah, I just said no.

 8   BY MR. HURLEY:

 9        Q.   I just want to make sure the record is clear.

10                  Paragraph 11 you indicate that on

11   September 20 of 2020 you received an unwanted phone call

12   to my cell phone number ending in 4604 that played an

13   artificial or prerecorded message.  That's what you said,

14   correct?

15        A.   Correct.

16        Q.   You indicate in paragraph 12 that there was an

17   artificial or prerecorded voice that said that "your car

18   warranty is about to expire" and to "press one to speak

19   to a representative."  Correct?

20        A.   Correct.

21        Q.   You indicate that you were connected to a

22   sales agent who attempted to sell you a vehicle service

23   contract from Affordable Car Cure, SunPath and Walco,

24   correct?
```

                                                    Page 133

1                    MR. JAVITCH:  Object to form.

2                    THE WITNESS:  None.

3     BY MR. HURLEY:

4          Q.    Thank you.

5                    MR. HURLEY:  Why don't we take a couple of

6     minutes.

7                    MR. JAVITCH:  Okay.  Thanks.

8                    (A brief recess was taken.)

9                    MR. HURLEY:  Mr. Ramin, could you please

10    put....  Let's go to the next page.

11    BY MR. HURLEY:

12         Q.    Mr. Callier, are you good?

13         A.    Yes, sir.

14         Q.    Sir, directing your attention to Exhibit 2,

15    Callier 2, which is still on the screen, paragraph 14.

16    You allege that on or about October 5th, 2021 you

17    received an unwanted phone call to your cell phone number

18    that played an artificial recording or prerecorded

19    message, correct?

20         A.    Correct.

21         Q.    Okay.  And you alleged that there was a

22    prerecorded voice that said "your warranty is about to

23    expire" and "press one to speak to a representative,"

24    correct?

Page 134

1      A.   Correct.

2      Q.   And you allege that you pressed one because

3   you wanted to identify the caller, not because you were

4   interested in the warranty, correct?

5      A.   Correct.

6      Q.   So as with the prior two contracts that were

7   produced, VSCs, you had no interest in doing business

8   with these folks except to the extent you wanted

9   information about people that were involved, correct?

10     A.   Correct.

11     Q.   Okay.  And you indicated at paragraph 16 that

12  you were connected to a sales agent who attempted to sell

13  you a vehicle service contract from AAP, SunPath and

14  Mepco, correct?

15     A.   Correct.

16          MR. HURLEY:  And if you go back to the

17  Fifth Amended Complaint, which I believe was Callier 10,

18  if you could split the screen and go down a little bit.

19  BY MR. HURLEY:

20     Q.   The sum and substance of those same

21  allegations that I just walked you through are

22  contained -- would you agree that they are contained at

23  paragraphs 206 and 207 of the Fifth Amended Complaint?

24     A.   Yes.

Page 174

```
 1        Q.   I'm sorry?

 2        A.   Then I found a number and just called him out

 3   of the blue.

 4        Q.   Do you still communicate with Mr. Shelton

 5   about TCPA matters?

 6        A.   I communicate with him about judgment

 7   collection matters, occasionally.

 8        Q.   About TCPA?

 9        A.   Occasionally.

10        Q.   Do you receive consulting income in any form

11   or fashion from Mr. Shelton or any of the entities he

12   owns or controls?

13        A.   No.

14        Q.   Would you agree with me that since 2020 you

15   filed approximately 122 to 123 TCPA litigations in the

16   Western District of Texas?

17        A.   Yes.

18        Q.   In 2024, what was your income from settlements

19   of TCPA matters?

20        A.   I haven't done my taxes for the year.  It's

21   probably going to be about 150,000.

22        Q.   So you make more from your TCPA settlements

23   than you do from your business?  When I say "your

24   business," I mean Aero.
```

Page 175

1        A.   Yes.

2        Q.   You make more from TCPA settlements than you

3   do from Aero, correct?

4        A.   In 2024, I did, yes.

5        Q.   How about in 2023?

6        A.   Yes.

7        Q.   How much did you make from TCPA settlements in

8   2023?

9        A.   Probably about the same.

10       Q.   The same for each, Aero and the TCPA

11  settlements?

12       A.   No.  I thought you meant --

13       Q.   It was a poor question by me.  Let me make

14  sure it's articulate.

15            In 2023, how much income did you derive

16  from the TCPA settlements?

17       A.   Probably about 180 or so.

18       Q.   And how much income did you derive from Aero?

19       A.   About 80 is typically about -- on average,

20  about 80,000 a year.

21       Q.   So more than double the amount that you earned

22  from your business you derived from TCPA settlements,

23  correct?

24       A.   Yes.

Page 180

1          Q.    Correct?

2          A.    No.

3          Q.    It has not turned into a significant revenue

4    generator for you?

5                    MR. JAVITCH:  Object to form.

6                    THE WITNESS:  How do you define

7    "significant"?

8    BY MR. HURLEY:

9          Q.    It has turned into a more significant revenue

10   generator for you than your actual business, correct?

11                   MR. JAVITCH:  Object to form.

12   BY MR. HURLEY:

13         Q.    Objectively?

14         A.    Yes.

15                   MR. HURLEY:  I don't have any further

16   questions for you, Mr. Callier.  Thank you so much.

17                   THE WITNESS:  Thank you.

18                   MR. DOYLE:  I am ready to start with my

19   questioning.  Mark, are you good to keep going?

20                   MR. JAVITCH:  Yes.

21                        EXAMINATION

22   BY MR. DOYLE:

23         Q.    Good afternoon, Mr. Callier.

24         A.    Hello.

Page 229

```
 1              MR. DOYLE:  I have no further questions
 2    for this witness at this time.  Thank you.
 3                   (A brief recess was taken.)
 4                        EXAMINATION
 5    BY MR. DARGITZ:
 6         Q.   Mr. Callier, my name is Steve Dargitz.  I am a
 7    lawyer, and I represent the Defendants Affordable Auto
 8    and Pelican Investment Holdings.  Let's see if I can
 9    share my screen here.
10              I am sharing with you right now I think a
11    document that has been marked earlier as Callier Exhibit
12    2.  This is the declaration that you submitted and it's
13    part of the Motion For Class Certification.
14              And just taking you through that once
15    again, scrolling to, let's see, start with paragraph 3
16    where you describe a call on December 27, 2019.  And you
17    go on to say that you, in paragraph 5, that you
18    ultimately were connected to a sales agent who "attempted
19    to sell me a vehicle service contract from National Car
20    Cure, SunPath and NorthCoast."
21              And I think you testified earlier that on
22    these calls the people you talked to never identified a
23    company on whose behalf they were calling from?
24         A.   Correct.
```

Page 230

1      Q.   Okay.  And the reason why you say then that

2    the sales agent attempted to sell you a vehicle service

3    contract from National Car Cure, SunPath and NorthCoast

4    is why?

5      A.   That's based on the vehicle service contract

6    that eventually showed up in the mail.

7      Q.   And so --

8      A.   It was taken from the contract.

9      Q.   I didn't mean to cut you off.

10     A.   No, I'm sorry, sir.

11     Q.   So you saw those names somewhere on the

12   paperwork that you received in the mail; is that correct?

13     A.   Yes.

14     Q.   Okay.  Now, I noticed that these names do not

15   include either Affordable Auto Shield or Pelican

16   Investment Holdings, so are you claiming that Affordable

17   Audio Shield is a successor to any of these entities?

18     A.   Again, doing this from memory and not having

19   this in front of me, but I believe that they are a

20   successor to National Car Cure.

21     Q.   You think they are a successor to National Car

22   Cure.  And why is that?

23     A.   Again, doing this from memory, I can be

24   mistaken and confused on the companies, because there are

Page 231

1    a lot of companies involved, but I believe that those are

2    all Gus Renny companies.  So if National Car Cure was a

3    Gus Renny company, then it would have been a successor,

4    and then it would have preceded the other companies that

5    were successors to the company.

6         Q.    Now, I think you were saying earlier that you

7    went on Biznet or something and looked up business

8    entities?

9         A.    Sunbiz.

10        Q.    I'm sorry, Sunbiz, was it, sir?

11        A.    Yes, sir.

12        Q.    And so these are records by the Florida

13   Department of State or business entities that are

14   registered in Florida?

15        A.    Yes, sir.

16             MR. JAVITCH:  Do you mind speaking a

17   little bit louder?

18             MR. DARGITZ:  Certainly.

19   BY MR. DARGITZ:

20        Q.    And so you said that you identified a number

21   of the entities that had been affiliated with Gus Renny,

22   right?

23        A.    Yes, sir.

24        Q.    And how many entities were those?

Page 232

1          A.    It numbered in the 30s, I believe.

2          Q.    In the 30s?

3          A.    But different types of businesses, not all

4     vehicle-service-contract-related companies.

5          Q.    Okay.  So which of the entities that you think

6     were associated with Gus Renny were involved with vehicle

7     service contracts?

8          A.    Pelican, AAP, are two that I can think of off

9     the top of my head.

10         Q.    Okay.  Were there any other than the ones that

11    are in your declaration here?  Paragraph 5 you mentioned

12    National Car Cure.  In paragraph 9 you mentioned VAD,

13    which I think we learned earlier was Celtic -- I can't

14    remember the full name of the entity.  And then in, let's

15    see, paragraph 13 you refer to Affordable Car Cure again.

16    And then in paragraph 16 you refer to AAP.  Let's see.

17                   And then other than that, the other

18    entities you refer to are SunPath, Mepco, Walco and

19    NorthCoast.  So besides those entities that we have just

20    talked about, were there any -- and I think you mentioned

21    Pelican and AAP -- were there any other Gus-Renny-

22    affiliated entities that were associated with the VSCs?

23         A.    I believe there were.  The names escape me

24    right now.  He may have been involved with a company

Page 233

1   named Dimension is one that I can think of.  That might

2   be wrong.  I am not saying that with 100 percent

3   accuracy.

4       Q.   I get that you might not remember the specific

5   names.  About how many would you say there were?

6       A.    I believe I found -- I saw six or seven

7   companies that do vehicle service contracts that were

8   connected to Mr. Renny.

9       Q.   Okay.  So I noticed that you have named as

10  defendants in this case Affordable Auto Shield and

11  Pelican Investment Holdings, but you have not mentioned,

12  I guess, six or seven, let's call them, Gus-affiliated-

13  vehicle-service-contract companies.

14              And what is it about Affordable Auto

15  Shield that puts it on your radar?

16              MR. JAVITCH:  I think we objected to this

17  line of questioning earlier, Steve, on privilege as to

18  what companies to sue is ultimately attorney work

19  product.

20              MR. DARGITZ:  Well, no.  I mean, he needs

21  to -- you need -- okay.  You, as the lawyer, need to have

22  a Rule 11 basis to name Affordable Auto Shield as a

23  defendant.  So, I mean, and he, as the plaintiff, you

24  know, puts his name behind the allegations of the

Page 234

1    Complaint.  So presumably there's a basis for it.  And I

2    want to know what that is.

3                    MR. JAVITCH:  Okay.

4                    THE WITNESS:  The companies that were

5    named were the ones that, at least personally, I felt

6    like we could make the most direct connection to with

7    respect to the calls that I received.

8    BY MR. DARGITZ:

9        Q.    Why is that?

10       A.    Again, doing this from memory, going back a

11   number of years, it seemed like that those were the

12   companies that were started in the wake of Mr. Renny

13   essentially dissolving the other companies and opening up

14   new companies.

15       Q.    Okay.  So I am not sure that I follow.  You

16   would agree that Affordable Auto Shield was never

17   mentioned on the phone to you?

18       A.    Yes.

19       Q.    And you would agree that Affordable Auto

20   Shield did not appear in any of the paperwork that you

21   received?

22       A.    Yes.

23       Q.    And so to the extent that you are naming them

24   as defendant, I don't want to put words in your mouth,

Page 235

1    but it sounds as though you are speculating based on when

2    Affordable Auto Shield was formed that it therefore

3    called you?

4                        MR. JAVITCH:  I will object to form.

5    BY MR. DARGITZ:

6          Q.    Is that right?

7          A.    Yes.

8          Q.    Okay.  Why Affordable Auto Shield and not one

9    of the other companies that engages in telemarketing?

10   Why do you think it was them?

11                       MR. JAVITCH:  Object to form.

12                       THE WITNESS:  Why it wasn't one of the

13   other two companies that I mentioned just now?

14   BY MR. DARGITZ:

15         Q.    Those are presumably not the only companies in

16   the United States that engage in telemarketing, right?

17         A.    Well, there are a lot of companies that engage

18   in telemarketing, but the claims would be limited to --

19   successor claims would be limited to companies formed by

20   Mr. Renny.

21         Q.    Well, okay.  Earlier you said, or you went

22   through -- it doesn't sound as though you have live

23   claims against either VAD or National Car Cure, right?

24   So basically, to the extent that you would have claims

Page 236

1    against either of my clients, I think it would be limited

2    to this contract you talk about in paragraph 16.  And you

3    say that that's a vehicle service contract from AAP sent

4    out to Mepco and that's because AAP appears on the

5    documents?

6                    MR. JAVITCH:  Object to form.

7                    THE WITNESS:  Yes, sir.

8    BY MR. DARGITZ:

9        Q.   Okay.  AAP was never identified on the phone

10   to you, right?

11       A.   Correct.

12       Q.   And Pelican was not identified on the phone to

13   you?

14       A.   Correct.

15       Q.   And Pelican did not appear in the paperwork

16   that you got for the VSC?

17                    MR. JAVITCH:  Object to form.

18                    THE WITNESS:  Correct.

19   BY MR. DARGITZ:

20       Q.   The word Pelican.

21            I will represent to you that Pelican

22   Investment Holdings has occasionally done business as

23   AAP, right?  But without belaboring the point, you would

24   agree, would you not, that AAP could?  It's an acronym,

Page 237

1   right?

2          A.    Yes, sir.

3          Q.    And did the paperwork ever spell out what AAP

4   stood for?

5          A.    Advanced Auto Protection comes to mind, but I

6   don't know if that's just something that I saw online or

7   I saw that in the paperwork.

8          Q.    Right.

9          A.    Or if it's even correct for what it stands

10  for.

11         Q.    Now, you said that you had produced certain

12  pages of what you got, that there's a whole booklet and

13  you are going to look for that and produce that.

14              Do you think that you saw a spelled-out

15  version of AAP in that paperwork somewhere?

16         A.    I don't recall seeing a spelled-out version

17  anywhere.  That could have been something I saw online or

18  it could have been something that just popped in my head

19  that seemed a reasonable approximation for what AAP would

20  stand for.

21              So I don't want to state with certainty

22  that that's what AAP means.

23         Q.    To your knowledge, did SunPath have an

24  exclusive marketing arrangement with Gustav Renny?

Page 238

1               MR. JAVITCH:  Object to form.

2               THE WITNESS:  Not to my knowledge, no.

3     BY MR. DARGITZ:

4          Q.   So SunPath would have been free to contract

5     with any number of companies engaging in telemarketing,

6     right?

7          A.   Yes.

8          Q.   When did you first file a TCPA claim?  I'm not

9     talking about in this case, I am just talking about the

10    first one.

11         A.   No, I know.  Probably either late 2019 or

12    2020, I don't know when the first one I filed was.

13         Q.   Okay.  And when did you meet James Shelton?

14         A.   I met James Shelton probably a year and a half

15    ago or so.

16         Q.   So, roughly, sometime in 2023?

17         A.   It sounds about right, yes.

18         Q.   Okay.  You didn't go to school with him then?

19         A.   No, sir.

20         Q.   And he has never been a co-worker?

21         A.   No, sir.

22         Q.   Okay.  And you have not met him at social

23    gatherings?

24         A.   I have seen him at social gatherings, yes.

Page 244

1                    C E R T I F I C A T E

2

3

4       I do hereby certify that I am a Notary Public in

5   good standing, that the aforesaid testimony was taken

6   before me, pursuant to notice, at the time and place

7   indicated; that said deponent was by me duly sworn to

8   tell the truth, the whole truth, and nothing but the

9   truth; that the testimony of said deponent was correctly

10  recorded in machine shorthand by me and thereafter

11  transcribed under my supervision with computer-aided

12  transcription; that the deposition is a true and correct

13  record of the testimony given by the witness; and that I

14  am neither of counsel nor kin to any party in said

15  action, nor interested in the outcome thereof.

16

17      WITNESS my hand and official seal this 24th day of

18  January 2025.

19

20

21



22

                    Notary Public

23

24

Page 245

1    MARK L. JAVITCH, ESQ.

2    mark@javitchlawoffice.com

3                        January 27, 2025

4    RE: Morales, Kurt II, Et Al  v. Sunpath LTD, Et Al

5        1/23/2025, Brandon L. Callier (#7122999)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-ny@veritext.com

16    Return completed errata within 30 days from

17   receipt of testimony.

18      If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22               Yours,

23               Veritext Legal Solutions

24

DELAWARE RULES OF CIVIL PROCEDURE

Part V. Depositions and Discovery

Title V, Rule 30

(e) Submission to witness; changes; signing. When the testimony is fully transcribed, the deposition shall be submitted to the witness for examination and shall be read to the witness, unless such examination and reading are waived by the witness and by the parties. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness, unless the parties by stipulation waive the signing or the witness is ill or cannot be found or refuses to sign. If the deposition is not signed by the witness within 30 days after the date when the reporter notifies the witness and counsel by mail of the availability for examination by the witness, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the witness or the fact of the refusal to sign together with the reason, if any, given therefor; and the deposition may then be

1       used as fully as though signed, unless on a motion

2       to suppress under Rule 32(d) the Court holds that

3       the reasons given for the refusal to sign require

4       rejection of the deposition in whole or in part.

5

6

7

8

9

10      DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

11      ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

12      THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

13      2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

14      OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

15

16

17

18

19

20

21

22

23

24

25

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit 5

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE
 2                    -  -  -
 3    KURT MORALES II;            :
      BRANDON CALLIER; LUCAS      :
 4    HORTON, individually,      :
      and on behalf of all       :
 5    others similarly           :
      situated,                  : Case No.:
 6              Plaintiffs,  : 20-cv-01376-
                              : JLH-SRF
 7        vs.                    :
                                 :
 8    SUNPATH LTD.;              :
      NORTHCOAST WARRANTY        :
 9    SERVICES, INC.;            :
      AMTRUST NORTH AMERICA,     :
10    INC.;                      :
      SING FOR SERVICE, LLC;     :
11    and PELICAN                :
      INVESTMENT HOLDINGS        :
12    GROUP, LLC,                :
                  Defendants.  :
13                    -  -  -
14              January 22, 2025
15                    -  -  -
16
17          Oral deposition of LUCAS HORTON,
18    taken via Zoom, beginning at 9:00 a.m., before
19    LINDA ROSSI-RIOS, a Federally Approved
20    Registered Professional Reporter, Certified
21    Court Reporter and Notary Public.
22
23                    -  -  -
24
```

Page 2

```
 1     A P P E A R A N C E S :
       (Via Zoom unless otherwise indicated)
 2

 3      Representing the Plaintiff Lucas Horton
              JAVITCH LAW OFFICE
 4            BY:  MARK JAVITCH, ESQUIRE
              3 East 3rd Avenue, Suite 200
 5            San Mateo, CA 94401
              javitchm@gmail.com
 6            (Present with witness)

 7

 8      Representing the Plaintiffs in the
       Proposed Class
 9            ZIMMERMAN LAW OFFICES PC - IL
              BY:  JEFF BLAKE, ESQUIRE
10            77 W. Washington Street, Suite 1220
              Chicago, IL 60602
11            jeff@attorneyzim.com

12

13      Representing the Defendants, Amtrust and
       Northcoast
14            CONNELL FOLEY LLP
              BY:  LEO J. HURLEY JR., ESQUIRE
15            185 Hudson Street, Suite 2510
              Jersey City, NJ 07311
16            lhurley@connellfoley.com

17

18      Representing the Defendant, Sing For
       Service, LLC d/b/a Mepco
19            VARNUM LLP
              BY:  BRION DOYLE, ESQUIRE
20               JUSTIN ALLEN, ESQUIRE
              333 Bridge Street NW
21            Grand Rapids, MI 49504
              bbdoyle@varnumlaw.com

22

23

24
```

Page 3

1      A P P E A R A N C E S:

2

       Representing the Defendant, Affordable
3      Auto Shield and Pelican Investment
       Holdings Group, LLC

4            O'HAGAN MEYER, PLLC
             BY:  STEPHEN DARGITZ, ESQUIRE
5            800 North King Street, Suite 303
             Wilmington, DE 19801
6            sdargitz@ohaganmeyer.com

7

8      A L S O   P R E S E N T :
9      MAHRAD (MATT) RAMIN, Paralegal
10

11

                     -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 4

1                       I N D E X
2

   WITNESS                              PAGE
3
LUCAS HORTON
4
   BY MR. HURLEY                        7, 193
5
   BY MR. DOYLE                         137, 200
6
   BY MR. JAVITCH                       185
7
8              E X H I B I T S
9    MARKED           DESCRIPTION          PAGE
10   Horton-2      Horton SunPath            87
                   Complaint
11
     Horton-3      Notice of Appearance      92
12
     Horton-6      Fifth Amended Class       96
13                 Action Complaint
14   Horton-9      Declaration of Lucas     130
                   Horton
15
     Horton-12     Complaint                116
16
     Horton-13     Motion for Default       119
17                 Judgment
     HM-1          Horton production        148
18                 HORTON-001 to
                   HORTON-025
19   HM-2          ROI Network Payment      153
                   Plan Agreement
20
     HM-3          VAD Payment Plan         153
21                 Agreement
22
23
                      -   -   -
24

```
                                                  Page 5

 1            DEPOSITION SUPPORT INDEX
 2      DIRECTION TO WITNESS NOT TO ANSWER
 3      Page    Line
 4      (None)
 5
 6
 7
        REQUEST FOR PRODUCTION OF DOCUMENTS
 8
        Page    Line
 9
        151     10
10      165      8
11
12
13
14      STIPULATIONS
15      Page    Line
16      203     9
17
18
19
        QUESTIONS MARKED
20
        Page    Line
21
        (None)
22
23
24
```

Page 6

```
 1                    -  -  -

 2            COURT REPORTER:  The attorneys

 3       participating in this deposition

 4       acknowledge that I am not physically

 5       present in the deposition room, and

 6       that I will be reporting this

 7       deposition remotely.

 8               They further acknowledge that in

 9       lieu of an oath administered in person,

10       I will administer the oath remotely.

11               The parties and their counsel

12       further agree that the witness may be

13       in a state where I am not a Notary and

14       stipulate to the witness being sworn in

15       by an out-of-state Notary.

16               If any party does have an

17       objection to this manner of reporting,

18       please state so now.

19               (No objections.)

20                    -  -  -

21            LUCAS HORTON, after having been

22       duly sworn, was examined and testified

23       as follows:

24                    -  -  -
```

Page 7

1                    EXAMINATION

2                       -   -   -

3    BY MR. HURLEY:

4          Q.     Mr. Horton, good morning.

5          A.     Good morning.

6          Q.     My name is Leo Hurley.  I'm an

7    attorney, and I'm an attorney with the law

8    firm Connelly Foley LLP.  My office is in

9    Jersey City, New Jersey, and I and my firm

10   serve as counsel to Northcoast Warranty

11   Services, Inc. and Amtrust North America, Inc.

12   And we're here today for your noticed

13   deposition in the matter of Morales, et al.

14   versus SunPath, et al.

15              Before we get started, I want to

16   ask you a couple of preliminary questions and

17   give you a couple of instructions, if that's

18   okay.

19         A.     Sure.

20         Q.     The first thing I want to

21   reiterate is something that the court reporter

22   had said.  I've only heard you say a couple of

23   words so far this morning.  But if you could

24   just keep your voice up, not just physically

1    close to the screen, but if you could maybe

2    raise your voice just a little bit from the

3    level it's at.

4              A.     Okay.

5              Q.     That would be helpful.  I don't

6    want to be -- I'd rather not be in a place

7    where we have to repeat ourselves out of

8    necessity, and keeping our voices up I think

9    will go a long way in doing that.

10             A.     Okay.

11             Q.     I've never been accused of not

12   keeping my voice up, but I will do my best to

13   do the same and if you or Mark says to me I

14   can't hear you.  Okay?

15             A.     Sure.

16             Q.     Thanks.  So I mentioned the

17   court reporter.  It sounds as if there is

18   background noise.

19                    MR. HURLEY:  Off the record.

20                         -  -  -

21                    (A discussion off the record

22        occurred.)

23                         -  -  -

24   BY MR. HURLEY:

Page 9

```
 1          Q.      Just for purposes of the record,
 2    so everybody knows, there was a switch between
 3    one computer and another computer due to some
 4    volume issues on Mr. Horton and Mr. Javitch's
 5    end.  Moving forward.
 6                  Mr. Horton, as you can probably
 7    see and as you've heard, there is a court
 8    reporter present.  She's visible on the
 9    screen.  When I say on the screen, this is a
10    Zoom deposition that takes on almost a
11    Hollywood squares format if you're doing it in
12    a gallery view.  What she is doing is taking a
13    literal verbatim record of today's
14    proceedings.  My questions, your answers, any
15    other objections that are placed on the record
16    by any counsel here.
17                  This deposition, of course, you
18    understand is both under oath and the record
19    of this deposition can be used at trial.  You
20    understand that.  Right?
21          A.      Yes.
22          Q.      You understand that this
23    deposition that is being given under oath
24    carries with it all of the formalities and the
```

Page 10

```
 1      majesty as if we were sitting in this instance
 2      in a courtroom in the United States District
 3      Courthouse in the District of Delaware, and
 4      there were a judge on the bench.  You
 5      understand that?
 6              A.    Yes.
 7              Q.    I'd ask, if you could, ensure
 8      that your answers be verbal today.  Again,
 9      there is a court reporter taking down a record
10      of these proceedings.  While I can appreciate
11      that sometimes in general conversation people
12      may respond with nonverbal gestures to
13      indicate a verbal -- what would otherwise be a
14      verbal response, the court reporter can't take
15      down nonverbal responses.  Do you understand
16      and can you agree to give verbal responses to
17      the questions?
18              A.    Yes.
19              Q.    My next instruction is, I'd like
20      you to, before you begin your response, wait
21      until I finish asking the question before you
22      do that.  The court reporter cannot physically
23      take down what two people are saying at the
24      same time.  Of course, the same rules of the
```

```
                                              Page 11

 1     road apply to me.  I will do my best to ensure

 2     if you are giving an answer, that I'm not

 3     speaking over you.  Do you understand that

 4     instruction and do you think you can abide it?

 5             A.     Yes.

 6             Q.     I'll just say as a matter of

 7     form that in doing this now for almost two

 8     decades, if we get through a deposition today

 9     where someone is not at one point talking over

10     somebody else, then we will have gotten into

11     rarified area.  We'll see how today's

12     deposition goes.  We'll make best efforts in

13     that regard.

14                    I want to be very clear, I don't

15     want you to guess if you do not know the

16     answer to a question.  I don't want you to

17     speculate.  In fact, I'm directing you not to

18     speculate.  If you don't know the answer to a

19     question, it's perfectly acceptable to say I

20     don't know.  If you are estimating or

21     approximating something, I would ask that you

22     indicate that you are estimating or

23     approximating something.

24                    Do you understand those
```

                                                    Page 12

1      instructions and can you abide them?

2              A.      Yes.

3              Q.      Similarly, if you do not

4      understand a question, please ask me to

5      rephrase it, and I will be happy to do so.  Do

6      you understand that instruction and can you

7      abide it?

8              A.      Yes.

9              Q.      If you did not hear a question

10     that I've asked, please ask me to repeat it,

11     and I will either repeat it or ask the court

12     reporter to read it back.  Do you understand

13     that instruction and can you abide that

14     instruction?

15             A.      Yes.

16             Q.      If you do answer a question, I'm

17     going to assume that you understood the

18     question that was asked when you responded to

19     it.  Do you understand that instruction and

20     can you abide that instruction?

21             A.      Yes.

22             Q.      If your attorney places an

23     objection on the record, I'll ask that you

24     stop talking and wait until that objection is

Page 13

1    fully placed on the record before you proceed

2    with your answer.  Do you understand that

3    instruction and can you abide that

4    instruction?

5            A.    Yes.

6            Q.    If at any time during this

7    deposition you need to take a break for

8    whatever reason, to go to the bathroom, to

9    stretch your legs, to clear your head, to take

10   a business call, to throw up, whatever it may

11   be, please simply let me know and I will do my

12   best to accommodate you within reason, but I

13   specifically will tell you if you ask to take

14   a break after I have asked you a question, I'm

15   go to need you to answer the question before I

16   can consider giving you a break.

17            Do you understand those

18   instructions and can you abide those

19   instructions?

20            A.    Yes.

21            MR. JAVITCH:  Leo, just to give

22       you a heads up.  He is expecting a

23       mattress delivery.  So that would be a

24       quick thing that if he hears the

Page 14

```
 1            doorbell, he may have to take a break
 2            at that time.
 3                    MR. HURLEY:  Do you have a
 4            ballpark, Mark, when that is supposed
 5            to happen?
 6                    THE WITNESS:  They said between
 7            8:00 and 12:00.  I might get a text.
 8            They texted me that it's out for
 9            delivery this morning around 6:00, so
10            maybe they'll text me an update when
11            they're closer.  I doubt it, though.
12     BY MR. HURLEY:
13            Q.    I understand.  So we got a
14     ballpark window where something is going to
15     happen.  If you had told me it was X time, we
16     would have kind of tried to structure around a
17     very specific time.  I certainly do appreciate
18     the delivery outfits are not able to do much
19     beyond a broad, multiple hour estimated
20     window.
21                    Besides that point, did you
22     understand the instruction and can you abide
23     the instruction?
24            A.    Yes.
```

Page 15

1          Q.     Mr. Horton, are you taking any

2     medication that would affect your ability to

3     provide truthful testimony?

4          A.     No.

5          Q.     Are you under the influence of

6     any substance that would affect your ability

7     to provide truthful testimony today?

8          A.     No.

9          Q.     Are you taking any medication

10     that would affect your ability to recall

11     events?

12          A.     No.

13          Q.     Are you under the influence of

14     any substance that would inhibit your ability

15     to recall events?

16          A.     No.

17          Q.     Do you have any physical

18     condition or medical diagnosis that would

19     inhibit your ability to recall events?

20          A.     No.

21          Q.     Did you review any documents or

22     other materials in preparation for your

23     deposition today?

24          A.     Yes.

Page 20

1    have you spoken to them?

2           A.    Only once when we were talking

3    about our motion to certify class.

4           Q.    Okay.  Have you ever met

5    Mr. Blake or anyone from the Zimmerman firm in

6    person?

7           A.    No.

8           Q.    Do you know the name Kurt

9    Morales?

10          A.    I do.

11          Q.    How do you know that name?

12          A.    He's a fellow plaintiff.

13          Q.    Have you met him in person?

14          A.    No.

15          Q.    Have you ever spoken to him?

16          A.    Yes.  Not directly.

17          Q.    What do you mean by not directly?

18          A.    I was on a Zoom call with him.

19          Q.    Who else was on the Zoom call?

20          A.    The three plaintiffs and Mark

21   Javitch, and I can't remember the other guy's

22   name.  What is his name?

23          Q.    You can't ask your attorney.

24          A.    I don't remember the other guy's

Page 80

1    service contract.  You said you canceled it.

2    When you purchased that vehicle service

3    contract, you had no intention of seeing that

4    contract to conclusion.  Correct?

5                    MR. JAVITCH:  Object to form.

6    BY MR. HURLEY:

7            Q.    You can answer.

8            A.    Correct.

9            Q.    How many vehicle service

10   contracts have you entered into and canceled

11   in your life?

12           A.    I think five.  Maybe four.  Four

13   or five.

14           Q.    What is Amtrust North America?

15                   MR. JAVITCH:  Object to form.

16   BY MR. HURLEY:

17           Q.    You can answer.

18           A.    The insurance company behind

19   these warranties.

20           Q.    Tell me what you mean by that,

21   sir.

22           A.    They're the ones that guaranteed

23   these warranties.  I'm not really sure.

24           Q.    What do you mean by guaranteed

Page 98

1    BY MR. HURLEY:

2         Q.    Have you read this Complaint,

3    sir, before it was filed?

4         A.    Yes.

5         Q.    Paragraph 211 alleges Horton

6    received at least the following calls:

7    February 10, 2020; April 6, 2020; April 11;

8    2020; April 9, 2020; April 30, 2020; May 11,

9    2020.  Correct?

10              MR. JAVITCH:  I think it says

11        April 29.

12   BY MR. HURLEY:

13        Q.    April 29, 2020; April 30, 2020;

14   May 11, 2020.  There are six calls in that

15   Excel spreadsheet box.  Correct?

16        A.    Yes.

17        Q.    And it says at 212, you allege

18   on the 29th you received a phone call that

19   played an artificial prerecorded message.  It

20   says that.  Right?

21        A.    Yes.

22        Q.    And it says, Horton listened to

23   the message and purchased a SunPath Horizon

24   Diamond New 60-month plan from the caller,

Page 99

```
 1       resulting in a VSC with VAD d/b/a Celtic
 2       Marketing LLC, SunPath and Mepco.  Correct?
 3             A.    Yes.
 4             Q.    As you sit here now, you can't
 5       allege anything specific about Amtrust's
 6       involvement in those calls.  Correct?
 7             A.    Correct.
 8             Q.    As you sit here right now, you
 9       can't allege anything specific about
10       Northcoast's involvement in those calls.
11       Correct?
12             A.    Sure.
13             Q.    Paragraph 212 alleges claims
14       against VAD, SunPath, and Mepco only.
15       Correct?
16             A.    Yes.
17             Q.    VAD is not a party in this case.
18       Correct?
19             A.    I guess not.
20             Q.    Why not, sir?
21             A.    I don't know.  I guess because
22       they -- I don't know.
23             Q.    You were saying I guess.  I
24       don't want you to guess.
```

Page 100

1          A.      So I'm not going to.

2          Q.      I appreciate that.  I just want

3    to make sure.  You don't know why they're not

4    here?

5          A.      No.

6          Q.      Have you ever settled any

7    matters with VAD?

8          A.      No.

9          Q.      Have you ever settled any TCPA

10   cases before Complaints were filed?

11         A.      No.

12         Q.      You've never once settled a TCPA

13   claim before a lawsuit was filed?

14         A.      I don't think anyone has ever

15   offered me money before I filed a lawsuit, no.

16         Q.      Okay.  At paragraph 214 in the

17   Complaint you allege that you agreed to have

18   the claims dismissed in Texas so that they

19   could be heard in the instant suit related to

20   the 1884 matter.  You see that.  Correct?

21              MR. JAVITCH:  It's a little

22         small.  I've only got a 13-inch laptop

23         here.

24              THE WITNESS:  That's correct.

Page 101

1    BY MR. HURLEY:

2         Q.    Now, you allege in the next

3    paragraph, on June 3, 2021, Horton filed suit

4    against defendants for TCPA violations by

5    joining the Third Amended Complaint in the

6    instant lawsuit.  You allege that while the

7    case was pending, you received another set of

8    unsolicited phone calls soliciting VSCs from

9    defendants.  Correct?

10        A.    Yes.

11        Q.    On the next page, there is

12   another Excel spreadsheet matrix at the top of

13   the page.  You would agree with that.  Right?

14        A.    Yes.

15        Q.    And it lists four dates in March

16   of 2022 and four calls.  Correct?

17        A.    Correct.

18        Q.    And it says on March 16, 2022,

19   you received a phone call that resulted in a

20   VSC with SunPath, Mepco, and Auto Defender.

21   Correct?

22        A.    Yes.

23             MR. JAVITCH:  We're really

24        having to lean in and squint.

Page 102

1             MR. HURLEY:  Mr. Ramin.

2             Is that better, guys?

3             MR. JAVITCH:  Thank you.

4             MR. HURLEY:  Is that helpful?

5             MR. JAVITCH:  Thank you.  Yes.

6             MR. HURLEY:  Sometimes people

7        say thank you when it's not helpful.

8             MR. JAVITCH:  I shouldn't offer

9        too much information here.

10   BY MR. HURLEY:

11        Q.    Paragraph 216, you allege Horton

12   received a phone call that resulted in a VSC

13   with SunPath, Mepco and Auto Defender.  Right?

14        A.    Yes.

15        Q.    You're making no allegations

16   related to these calls about Amtrust.

17   Correct?

18        A.    I guess they weren't involved in

19   that set of calls.

20        Q.    Can you express to me right now

21   what claims, if any, you are bringing against

22   Amtrust related to that set of calls?

23        A.    Looks like according to the

24   Complaint, none.  But those calls --

Page 106

1          to 12:33 p.m.)

2                         -   -   -

3     BY MR. HURLEY:

4          Q.     Mr. Horton, you remain under

5     oath.

6          A.     Okay.

7          Q.     Did you -- during the luncheon

8     break, did you speak about this matter with

9     anyone?

10         A.     No.

11         Q.     Did you speak about this matter

12    with your attorney?

13         A.     No.

14              MR. HURLEY:  Mr. Ramin, if you

15         could put that Fifth Amended Class

16         Action Complaint back on the screen

17         which was I believe Horton-6.

18    BY MR. HURLEY:

19         Q.     Mr. Horton, at paragraph 216,

20    you indicated you received a phone call which

21    resulted in a VSC with SunPath, Mepco, and

22    Auto Defender.  Is there any reason Auto

23    Defender hasn't been named as a defendant in

24    this case?

Page 107

1                    MR. JAVITCH:  Objection.

2          Attorney-client work product.

3                    MR. HURLEY:  He can answer the

4          question.

5     BY MR. HURLEY:

6          Q.    Do you know why they have not

7     been named?

8          A.    I can only guess.

9          Q.    So the answer is you do not know

10    why they haven't been named?

11         A.    No.  Auto Defender is ROI

12    Network.  Aren't they named in it?

13         Q.    Sir, neither ROI Network nor

14    Auto Defender are parties in this action?

15         A.    They're the same thing.  I don't

16    know why.  Probably because they have no

17    money.

18         Q.    You previously testified that

19    you can't articulate any basis or reason for

20    Amtrust's involvement in the four calls that

21    are at the top of the screen.  Correct?

22                   MR. JAVITCH:  Object to form.

23    BY MR. HURLEY:

24         Q.    You can answer.

Page 112

1      different VSC.  Correct?

2             A.     Yes.

3             Q.     That is correct.  Right?

4             A.     Yes.  What are -- is the

5      document that we're looking at, is this the

6      Fifth Amended Complaint.

7             Q.     Yes, sir.

8             A.     All right.

9             Q.     Next page.  You would agree that

10     there is a matrix with four calls at the top.

11     Correct?

12            A.     Yes.

13            Q.     Paragraph 216 references a

14     March 16 phone call which is included in the

15     matrix of four above, that resulted in a VSC

16     with SunPath, Mepco and Auto Defender.

17     Correct?

18            A.     Yes.

19            Q.     Your allegations end at

20     paragraph 218.  Correct?

21            A.     Yes.

22            Q.     Okay.  So there is two VSCs and

23     two sets of calls.  Correct?

24            A.     Yes.

Page 175

1          Q.    Do you think that Amtrust had

2     anything to do with these calls?

3               MR. JAVITCH:  Object to form.

4               THE WITNESS:  I'm not sure.

5     BY MR. DOYLE:

6          Q.    Do you think that Pelican

7     Investment Holdings had anything to do with

8     these four calls?

9          A.    No.

10         Q.    Do you think that Affordable

11    Auto Shield had anything to do with these four

12    calls?

13               MR. JAVITCH:  Object to form.

14               THE WITNESS:  I don't know what

15          Affordable Auto Shield is.  I didn't

16          deal with them.

17    BY MR. DOYLE:

18         Q.    Do you have any information that

19    Mepco knew that these four calls were being

20    made to you at the time they were made?

21               MR. JAVITCH:  Object to form.

22               THE WITNESS:  No.

23    BY MR. DOYLE:

24         Q.    Do you have any information that

Page 191

1              (The court reporter read the
2         pertinent part of the record.)
3                   -   -   -
4    BY MR. JAVITCH:
5         Q.    Is it your understanding under
6    the TCPA that you are able to sue for
7    vicarious liability?
8         A.    Yes.
9              MR. HURLEY:  Objection as to form.
10   BY MR. JAVITCH:
11        Q.    Did you intend to sue Northcoast
12   for vicarious liability for these calls?
13        A.    Yes.
14        Q.    And then going to the second set
15   of calls resulted in a -- it was SunPath,
16   Mepco, and Auto Defender.  When you said
17   earlier that some defendants had no
18   involvement in the calls, was that limited to
19   solely the fact that they didn't physically
20   place the calls?
21        A.    No, I'm talking about Gus Renny
22   and the last defendant.  They had nothing to
23   do with these calls.
24        Q.    Who?

Page 192

1           A.      Gus Renny and the last

2      defendant.  I don't know the name.

3           Q.      Advanced Auto Shield?

4           A.      Yeah, they didn't have anything

5      to do with these two batches of calls.

6           Q.      But did Amtrust, Mepco, and

7      SunPath, are they vicariously liable for these

8      calls?

9           A.      Yes.

10              MR. DOYLE:  Object to the form.

11              MR. HURLEY:  Same objection.

12     BY MR. JAVITCH:

13          Q.      Just to clear up, why was it so

14     difficult to identify the parties that are

15     responsible for these calls?

16          A.      I wasn't necessarily looking.  I

17     wouldn't say it's difficult.  I was just

18     looking at SunPath and the big names that were

19     on the front, not the ones in the fine print

20     like Amtrust.

21          Q.      Amtrust wasn't identified on the

22     call so it was difficult for you to find out

23     who called?

24          A.      Yes.  The only way I would know

Page 204

1                    C E R T I F I C A T E

2

3              I do hereby certify that I am a Notary

4      Public in good standing, that the aforesaid

5      testimony was taken before me, pursuant to

6      notice, at the time and place indicated; that

7      said deponent was by me duly sworn to tell the

8      truth, the whole truth, and nothing but the

9      truth; that the testimony of said deponent was

10     correctly recorded in machine shorthand by me

11     and thereafter transcribed under my

12     supervision with computer-aided transcription;

13     that the deposition is a true and correct

14     record of the testimony given by the witness;

15     and that I am neither of counsel nor kin to

16     any party in said action, nor interested in

17     the outcome thereof.

18              WITNESS my hand and official seal this

19     27th day of January 2025.

20

21

                   _____

22                 Linda Rossi-Rios, RPR, CSR

                   Notary Public

23

24

```
                                        Page 205

 1    Mark Javitch, Esq.

 2    javitchm@gmail.com

 3                         January 27, 2025

 4    RE:    Morales, Kurt II, Et Al  v. Sunpath LTD, Et Al

 5         1/22/2025, Lucas Horton (#7122982)

 6         The above-referenced transcript is available for

 7    review.

 8         Within the applicable timeframe, the witness should

 9    read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12         The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15    cs-ny@veritext.com

16     Return completed errata within 30 days from

17   receipt of testimony.

18      If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                     Yours,

23                     Veritext Legal Solutions

24

25
```

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit 6

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

1
- - -

2

3    KURT MORALES, II, BRANDON   :
CALLIER, LUCAS HORTON,         :
4    INDIVIDUALLY AND ON BEHALF :
OF ALL OTHERS SIMILARLY        :
5    SITUATED,                     :
:CASE NO.
6           Plaintiffs,          :
:20-CV-01376-JLH-SRF
7           vs.                   :
:
8    SUNPATH LTD.; NORTHCOAST    :
WARRANTY SERVICES, INC.;       :
9    AMTRUST NORTH AMERICA,      :
INC.; SING FOR SERVICE,        :
10   LLC; AND PELICAN INVESTMENT:
HOLDINGS GROUP, LLC,           :
11                                 :
Defendants.         :
12
- - -

13
Tuesday, January 21, 2025
14
- - -

15

16           Oral deposition of KURT MORALES, II,
17   taken remotely at the location of the witness in
18   Dallas, Texas, commencing at 10:00 a.m., and
19   recorded stenographically by Theresa F. Franco,
20   a Court Reporter and Notary Public.
21

22                        - - -
23
VERITEXT LEGAL SOLUTIONS
24           MID-ATLANTIC REGION

---

                                                                Page 2

```
1     APPEARANCES:   (Remotely via teleconference)
2          JAVITCH LAW OFFICE
           By:  MARK JAVITCH, ESQUIRE
3          3 East 3rd Avenue
           Suite 200
4          San Mateo, California  94401
           650-781-8000
5          mark@javitchlawoffice.com
           Representing the Plaintiff, Kurt Morales
6
7
           ZIMMERMAN LAW OFFICE
8          By:  JEFF BLAKE, ESQUIRE
           77 West Washington Street
9          Suite 1220
           Chicago, Illinois  60602
10         312-767-6463
           jeff@attorneyzim.com
11         Representing the Plaintiff, Kurt Morales
12
13         CONNELL FOLEY, LLP
           By:  LEO HURLEY, ESQUIRE
14              AARON GOULD, ESQUIRE
           185 Hudson Street
15         Suite 2510
           Jersey City, New Jersey  07300
16         201-521-1000
           lhurley@connellfoley.com
17         Representing the Defendants, Northcoast
           Warranty Services and Amtrust North America
18
19
           O'HAGAN MEYER
20         By:  STEPHEN D. DARGITZ, ESQUIRE
           800 North King Street
21         Suite 300
           Wilmington, Delaware  19801
22         215-461-3328
           sdargitz@ohaganmeyer.com
23         Representing the Defendants, Affordable Auto
           Shield and Pelican Investment Services
24
```

--- 

```
                                              Page 3

 1    APPEARANCES CONTINUED:

 2        VARNUM LLP

          By:  BRION DOYLE, ESQUIRE

 3             JUSTIN ALLEN, ESQUIRE

               HANNAH CONE, ESQUIRE

 4        333 Bridge Street NW

          Grand Rapids, Michigan  49504

 5        616-336-6479

          bbdoyle@varnumlaw.com

 6        Representing the Defendant, Sing for Service

 7

 8    ALSO PRESENT:

 9        MAHRAD RAMIN - Paralegal for Connell Foley

10                         - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

---

Page 4

1                          I N D E X

2                            - - -

3    Witness: KURT MORALES                        PAGE

4    By Mr. Hurley . . . . . . . . . . .      6

5    By Mr. Doyle  . . . . . . . . . .      178

6    By Mr. Dargitz  . . . . . . . . .      203

7                            - - -

8                        E X H I B I T S

9                            - - -

10    NUMBER              DESCRIPTION          PAGE

11   Morales-2  Exhibit to Mr. Blakes'        88
                Declaration

12

     Morales-3  Three-page document with      71
13                Morales-26, 27, 28 inclusive,
                  AT&T record

14

     Morales-5  Screen capture of a Wells    158
15                Fargo bank account

16   Morales-6  Bates number Morales         166
                  031, email regarding the
17                do-not-call list

18                            - - -

19

20

21

22

23

24

KURT MORALES

Page 5

1                          - - -

2              THE COURT REPORTER:  The attorneys

3        participating in this deposition

4        acknowledge that I am not physically

5        present in the deposition room and that I

6        will be reporting this deposition

7        remotely.  They further acknowledge that,

8        in lieu of an oath administered in person,

9        I will administer the oath remotely.  The

10       parties and their counsel consent to this

11       arrangement and waive any objections to

12       this manner of reporting.

13              If anyone has an objection, please

14       indicate that now on the record.

15              (No response.)

16              THE COURT REPORTER:  Hearing none,

17       Mr. Morales, please raise your right hand.

18                          - - -

19              KURT MORALES, having been first

20       remotely duly sworn pursuant to agreement

21       of counsel, was examined and testified as

22       follows:

23

24

KURT MORALES

Page 6

1                           - - -

2                        EXAMINATION

3                           - - -

4    BY MR. HURLEY:

5         Q.     Mr. Morales, good morning.  My name

6    is Leo Hurley.  I'm an attorney.  I'm an

7    attorney with the law firm of Connell Foley,

8    LLP.  I'm sitting right now in Jersey City, New

9    Jersey, and I serve as counsel, in this matter

10   where you are a plaintiff, to Amtrust North

11   America and to Northcoast Warranty Services,

12   Inc.

13              First of all, can you hear me loud

14   and clear?

15        A.     Yes.

16        Q.     Okay.  I want to go through a few

17   instructions and a few preliminary questions

18   that, kind of, are instructions in and of

19   themselves, if I could.  First, have you ever

20   been deposed before?

21        A.     Yes.

22        Q.     How many times have you been

23   deposed?

24        A.     Once.

KURT MORALES

Page 7

1        Q.      When were you deposed?

2        A.      Sometime last year, maybe the year

3    prior.

4        Q.      What was the general nature of the

5    case in which you were deposed?

6        A.      An insurance case.

7        Q.      Can you describe what you mean by

8    an insurance case?

9        A.      Home insurance, bad faith situation

10   with my insurance carrier.

11       Q.      A bad faith situation with your

12   insurance carrier?

13       A.      Yes.

14       Q.      Were you personally the plaintiff

15   in that matter?

16       A.      Yes.

17       Q.      Where was that matter venued?

18       A.      Here in Texas.

19       Q.      Where in Texas?  Pretty big state.

20       A.      Dallas, the Dallas area, Garland.

21       Q.      In state court or federal court,

22   sir?

23       A.      I can't recall off the top of my

24   head.

KURT MORALES

Page 8

1        Q.      Okay.  Who was your counsel for
2    that case?
3        A.      My counsel, it's still ongoing,
4    Clifford K. McKeyasen.
5        Q.      Okay.  And you said bad faith.
6    What specifically are the nature of the bad
7    faith claims that you are alleging against the
8    insurance carrier?
9        A.      It's nonpayment stuff, things we
10   found out through deposition.  I'm not sure how
11   much I can go into it without violating any
12   restrictions of that case.
13       Q.      What -- I don't understand what
14   that means.  Are there any other plaintiffs?
15       A.      No.
16       Q.      Are there any other defendants?
17       A.      Just the ones related to the
18   insurance carrier.
19       Q.      Who is the insurance carrier, sir?
20       A.      It was Hippo.  I think the specific
21   entity is Spanniker (sic) Insurance --
22   Spinnaker.
23       Q.      And is this an insurance coverage
24   claim?

KURT MORALES

Page 9

1          A.     Yes.

2          Q.     And is your claim that you, in

3     essence, had a policy for insurance, paid

4     money, a casualty event happened, and they did

5     not cover the claim, according to your

6     allegations, that they should have?

7          A.     Generally along those lines.

8          Q.     Sir, how old are you?

9          A.     Twenty-seven.

10         Q.     Okay.  So I'm going to go through

11    some instructions and some questions even

12    though you've been deposed before.

13               You understand, of course, that

14    Theresa Franco, Ms. Franco, is here in this

15    Zoom deposition, and she's a court reporter.

16    Her job is to take a written record of the

17    questions, answers, and other colloquies that

18    take place here today.

19               You understand that, right?

20         A.     Yes.

21         Q.     You understand that this matter is

22    venued in the Federal Court in the United

23    States District of Delaware, correct?

24         A.     If that's where it is.

KURT MORALES

Page 10

1      Q.    Do you know that or do you not know
2   that?
3      A.    I believe it's in Delaware,
4   wherever a lot of these plaintiffs are
5   incorporated.  There have been multiple motions
6   and amended answers, a lot of legal paperwork
7   that I've received from the attorneys on this
8   matter.  I know some are changed.  I know
9   they're currently working for a class
10  certification, which I'm not sure how that will
11  affect the venue, whether it will remain in --
12  where it currently is or move somewhere else.
13     Q.    Okay.  Do you understand that when
14  you're giving a deposition that you're under
15  oath?
16     A.    Yes.
17     Q.    Do you understand that when you're
18  giving a deposition under oath, it's as if you
19  were sitting in a courtroom next to a judge?
20  It carries with it all of the majesty as if you
21  were testifying in open court before that
22  judge.  Do you understand that?
23     A.    I'm aware.
24     Q.    Okay.  And you understand that your

KURT MORALES

Page 11

1   responses here could be used at trial or will

2   be presented -- could be presented to a Court

3   at some point in time, right?

4        A.    Yes.

5        Q.    Okay.  So you understand that your

6   answers today need to be verbal in nature?

7        A.    Yes.

8        Q.    To that end, is it okay that I ask

9   you not to nod your head yes, shake your head

10  no, but to answer every question that you're

11  asked verbally?

12       A.    I'll -- yes.  I'll still nod my

13  head.  It's habit.  I'll try to accompany it

14  with a verbal answer as well.

15       Q.    Okay.  And if for some reason you

16  don't give a verbal answer and I ask you to

17  articulate something verbally, I'm not trying

18  to be fresh.  I just want to make sure that

19  we're getting a record.  You understand that,

20  right?

21       A.    Yes.  Apologies ahead of time when

22  that occurs.

23       Q.    No problem.  I'd ask you, if you

24  could please, to wait to answer until I finish

KURT MORALES

1        asking my question because the court reporter

2        would have a very hard time taking down both my

3        question and your answer at the same time.

4                That's a fair request, right?

5        A.    Yeah.

6        Q.    Do you understand the request?

7        A.    Yes.  Overlapping talking will be

8        hard to understand through just one speaker.

9        Q.    Can you abide that request?

10       A.    Yeah.

11       Q.    I want to ask you, if you could,

12       please, not to guess if you do not know the

13       answer to a question that I'm asking.  Is that

14       fair?

15       A.    Sure.

16       Q.    Can you abide that request?

17       A.    I can attempt.

18       Q.    Fair enough.  And if you're

19       approximating or estimating, can you please

20       tell us that that's exactly what you're doing?

21       A.    If I recall, yes.

22       Q.    Okay.  If you don't understand a

23       question, please ask me to rephrase it, and

24       I'll be happy to do so.

KURT MORALES

Page 13

1          Can you abide that request?

2     A.     I'll ask for clarification.

3     Q.     Thank you.  If you answer a

4  question, I'm going to assume that you

5  understood the question.  Is that fair?

6     A.     Yeah.

7     Q.     Now, at certain points in time an

8  attorney, your attorney, some other attorney,

9  may place an objection on the record.  If

10 they're doing so, I'm going to stop talking or

11 try to stop talking.  I'm going to ask you to

12 try to stop talking to allow them to place the

13 objection on the record.

14          Can you abide that instruction?

15    A.     Yes.

16    Q.     And then we addressed this briefly

17 offline, but if at any time you need to take a

18 break for any reason, clear your head, respond

19 to a work call, go to the bathroom, whatever

20 that may be, please let me know, and I'll do my

21 best to accommodate you, with the caveat that

22 if I'm in the middle of a question, I'm going

23 to need you to answer the question before I

24 give you a break.  Is that fine?

KURT MORALES

Page 14

1         A.     Yes.  I'll append something to the

2    end of my answer requesting a break if I need

3    one.

4         Q.     Are you taking any medication that

5    might affect your ability to provide truthful

6    testimony today?

7         A.     No.

8         Q.     Are you under the influence of any

9    drug that could or might affect your ability to

10   provide truthful testimony today?

11        A.     No.

12        Q.     Are you taking any medication or

13   under the influence of any substance that might

14   cause you to not recall the events surrounding

15   the allegations that you've made in this

16   Complaint that you filed?

17        A.     No.  I am not taking any medication

18   or any drugs of any sort currently.

19        Q.     Okay.  Did you review any documents

20   or materials in preparation for this

21   deposition?

22             MR. JAVITCH:  Objection.  Only

23        answer to the extent it's not privileged.

24             MR. HURLEY:  No.  You can answer

KURT MORALES

Page 33

1          Q.     Have you ever used any other kind
2     of communication to speak with him, like Signal
3     or What's App or text message?
4          A.     No.
5          Q.     Do you know Lucas Horton?
6          A.     Is he another plaintiff?
7          Q.     I'll represent to you, sir, that
8     he's a plaintiff in this matter.  Have you ever
9     met Mr. Horton?
10         A.     The only time I would have ever met
11    any other plaintiff would have been on a Zoom
12    call earlier on, I think a few months ago.
13         Q.     Who was on the Zoom call?
14         A.     The attorneys and class
15    representatives.
16         Q.     How long did that call last?
17         A.     I can't remember the exact length.
18    More than 30 minutes probably.
19         Q.     More than an hour?
20         A.     Potentially.
21         Q.     More than two hours?
22         A.     I'm not sure.
23         Q.     Do you have a record of when that
24    took place?

KURT MORALES

Page 34

1          A.      I might have an email or some
2      correspondence about the date.
3          Q.      Okay.  We talked about how in 2017
4      you owned a 2003 CRV.  We talked about how you
5      ultimately purchased a 2020 Chevy Spark and
6      that you financed that Chevy Spark.  Where did
7      you purchase the Chevy Spark, sir?
8          A.      Reliable Chevrolet.
9          Q.      Where is that, sir?
10         A.      Off of 75 and Arapaho.
11         Q.      Sir, as someone who may have once
12     lived in Texas, though it's a big state, 75 and
13     Arapaho, could you tell me where that is?
14         A.      Oh, the city might be near Garland.
15     It's west of my house, the first highway.
16         Q.      And when did you purchase that
17     vehicle, sir?
18         A.      I believe '21.  I don't -- I didn't
19     get the car -- I mean it wasn't 2019, right?
20     So pretty sure it was '21.
21         Q.      Do you have any documentation
22     related to that?
23         A.      Yeah.
24         Q.      You have a title deed for that car?

KURT MORALES

Page 57

1       assistance of your lawyer or a piece of paper?

2                   MR. JAVITCH:  Object to form.

3       BY MR. HURLEY:

4           Q.      Yes or no?

5           A.      Incorrect.

6           Q.      But you just said that you can't

7       tell me specifically what Northcoast did.  It's

8       one of any number of things, right?

9                   MR. JAVITCH:  Object to form.

10                  THE WITNESS:  I'm specifically

11              saying the actions of these companies.  As

12              for which name did what, I need to look

13              back and recall.  As I stated previously,

14              I'm not the best with names.

15      BY MR. HURLEY:

16          Q.      I got it, and I just want to make

17      sure that I'm clear about it.  Without having a

18      paper to look at, you're not able right now to

19      testify about what any of these individually

20      named companies did, correct?

21                  MR. JAVITCH:  Object to form.

22                  THE WITNESS:  Wrong.

23      BY MR. HURLEY:

24          Q.      What did they all do?  Tell me with

KURT MORALES

Page 58

1    specificity what they did.

2              MR. JAVITCH:  Object to form.

3    BY MR. HURLEY:

4         Q.    Not either/or, who did what?

5         A.    Well, I know National Car Cure

6    or -- and the multiple, like for National Car

7    Cure, I know National Car Cure was one of the

8    entities that was selling the policies, the one

9    making the automated messages and all that.

10   There are multiple names, multiple companies on

11   that policy specifying, you know, other things.

12   Like --

13        Q.    Did you know -- did you know who

14   Amtrust was before this litigation started?

15        A.    I didn't know what National Car

16   Cure was or a lot of these names before this

17   started.  They don't provide their names.

18        Q.    Let's -- let's talk about that for

19   a second.

20              Do you know what a vehicle service

21   contract is?

22        A.    You'd have to be more specific.

23   It's --

24        Q.    It's really a yes-or-no question.

KURT MORALES

Page 102

```
 1        Q.    And you don't have any information

 2   about who was calling other than your own

 3   suppositions and assumptions, correct?

 4        A.    The same automated message, the

 5   same sort of transfer, but --

 6        Q.    Not what I -- not what I asked you,

 7   though, sir.  You -- you don't know who made

 8   those calls?

 9        A.    No.  They won't relinquish their

10   information.

11        Q.    Okay.  So you made the decision

12   upon receiving this call to do something?

13        A.    Yes.

14        Q.    So you were -- when you got this

15   call --

16             MR. JAVITCH:  Sorry, Leo.

17             THE WITNESS:  You said a few small

18        questions.

19             MR. HURLEY:  One more.  One more.

20   BY MR. HURLEY:

21        Q.    So it was this call on this day

22   that put you over the top, and you said, I'm

23   going to do something about this?

24        A.    Yes.  This was the call that made
```

KURT MORALES

```
 1     me want to get their information.

 2              MR. HURLEY:  We can take a break.

 3         Why don't we take -- what do you want to

 4         take, Mark?  We can take five, do another

 5         45 and then take 25, or we can do 25 right

 6         now?

 7              MR. JAVITCH:  Five, should be okay

 8         now.

 9                        - - -

10              (A short recess was taken.)

11                        - - -

12              COURT REPORTER:  We're back on the

13         record.

14     BY MR. HURLEY:

15         Q.    Where we just left off was

16     Mr. Morales' testimony that was that today was

17     the day that he was -- he was going to --

18     whatever the testimony.

19              MR. HURLEY:  What was the last bit

20         of testimony?  I don't want to

21         mischaracterize it.  Question and answer.

22                        - - -

23              (The court reporter read back the

24         pertinent testimony.)
```

KURT MORALES

Page 104

1                        - - -

2      BY MR. HURLEY:

3          Q.    You would agree with me that 33

4      seconds --

5                    MR. HURLEY:  Are we on the record?

6                    COURT REPORTER:  We are on the

7          record.

8      BY MR. HURLEY:

9          Q.    You would agree with me that 33

10     seconds into the call, you don't know who made

11     this call to you, correct?

12         A.    Aside from what was given in that

13     33 seconds, yes.

14         Q.    What was given in the 33 seconds,

15     sir, that led you to believe specifically who

16     made the call to you?

17         A.    Specifically, like the exact

18     entity?

19         Q.    Yes.

20         A.    I just know it was the same people

21     and the same recorded message.

22         Q.    And again, just for purposes of

23     this going forward, the same people, the same

24     recorded message, that's all something you

KURT MORALES

Page 105

1    assumed, correct?

2         A.    Sure.

3         Q.    Okay.  And as of 33 seconds in, the

4    caller themselves has not identified themself,

5    correct?

6         A.    Did they say something about dealer

7    services or some vague non --

8         Q.    Let's play it again.

9             MR. HURLEY:  Play the first 33

10        seconds again, please.

11                    - - -

12            (Listening to audio.)

13                    - - -

14            THE WITNESS:  Correct.  They only

15        use nondescript pronouns.

16   BY MR. HURLEY:

17        Q.    So you don't know who is calling

18   you at that point, correct?

19        A.    The automated message did not state

20   the entity making the call.

21        Q.    Okay.

22            MR. HURLEY:  Keep playing.

23                    - - -

24            (Listening to audio.)

KURT MORALES

Page 106

1                           - - -

2                THE WITNESS:  Stop it real quick.

3           Leo, can you pause it real quick?  I just

4           wanted to add or ask real quick, do you

5           have a time line to skip over the holding?

6      BY MR. HURLEY:

7           Q.    No.  I'm going to play the whole

8      thing, sir.  This is my deposition.

9           A.    Okay.  So we're just going to sit

10     on hold.

11          Q.    We're going to play the whole

12     thing.

13                          - - -

14                (Listening to audio.)

15                          - - -

16                MR. HURLEY:  Stop that.

17     BY MR. HURLEY:

18          Q.    You would agree that the person who

19     was just speaking to you asked you to verify

20     the year, make and model of your vehicle,

21     right?

22          A.    National Dealer Services, yeah.

23          Q.    That's not the question I asked,

24     sir.  I want you to just answer the question,

KURT MORALES

1      okay?  The question I asked you was, the woman

2      just asked you to verify the year, make and

3      model of your vehicle, correct?

4           A.    I believe it was a man, but yeah.

5           Q.    Okay.  The voice -- just so the

6      record's clear and you're answering the

7      question, the woman or man who was just

8      speaking just asked you to verify the year,

9      make and model of your vehicle, correct?

10          A.    Yes.

11          Q.    And what did you say?

12          A.    2018 Honda CRV.

13          Q.    You don't own a 2018 Honda CRV; do

14     you?

15          A.    Nope.

16          Q.    You never owned a 2018 Honda CRV;

17     did you?

18          A.    Correct.

19          Q.    So you lied?

20          A.    Yes.

21               MR. HURLEY:  Next -- keep playing.

22                        - - -

23               (Listening to audio.)

24                        - - -

KURT MORALES

Page 108

1              MR. HURLEY:  Stop it.

2      BY MR. HURLEY:

3          Q.    You were just asked what's the

4      mileage of that vehicle, and you said 25, less

5      than 25, correct?

6          A.    Correct.

7          Q.    And you just made that up, right?

8          A.    Yep.

9              MR. HURLEY:  Keep playing the

10      audio.

11                      - - -

12              (Listening to audio.)

13                      - - -

14              MR. HURLEY:  Stop.

15      BY MR. HURLEY:

16          Q.    She asked you, are you still living

17      in the state of Texas, correct?

18          A.    Yes.

19          Q.    Okay.  And you said yes, right?

20          A.    Yes.

21          Q.    That means that she had some

22      information about you, right?

23          A.    Yeah, or supposedly.  The 512 is a

24      Texas area code I believe.

KURT MORALES

Page 109

1        Q.    Okay.

2               MR. HURLEY:  Keep playing the

3        recording.

4                       - - -

5               (Listening to audio.)

6                       - - -

7               MR. HURLEY:  Stop.

8   BY MR. HURLEY:

9        Q.    So she asked you again to confirm

10   the make, year and model of your car and you

11   lied again, right?

12       A.    Yes.  I was restating the same

13   mis-fact.

14       Q.    And you lied about the mileage

15   because how could you have mileage on a car

16   that was not yours, right?

17       A.    Yes.  The car did not exist nor

18   information on the imaginary car.

19       Q.    The car did not exist.  Okay.

20               MR. HURLEY:  Keep going.  Let's

21       keep playing the audio.

22                       - - -

23               (Listening to audio.)

24                       - - -

KURT MORALES

Page 110

1          MR. HURLEY:  Stop.

2     BY MR. HURLEY:

3          Q.     That was a lie too, right?

4          A.     Which part?

5          Q.     Where you said the reason you

6     hadn't bought yet was because you were just

7     busy with life.

8          A.     Yeah.

9          MR. HURLEY:  Keep going.

10                    - - -

11          (Listening to audio.)

12                    - - -

13          MR. HURLEY:  Stop.

14     BY MR. HURLEY:

15          Q.     "No mechanical problems.  I just

16     had it inspected for the registration."  That

17     was a lie too, right?

18          A.     Leo --

19          Q.     Yes or no?

20          A.     Leo, if -- I'm not denying the fact

21     I made up the car and provided fake information

22     about the car and the state of the fake car to

23     receive their information.  So if we can just

24     skip over.

KURT MORALES

 1          Q.      No.  We're not skipping over

 2     anything.  Did you lie to the woman again there

 3     about a car --

 4          A.      -- that did not exist, yeah.

 5          Q.      -- being inspected?  Yes?

 6          A.      Correct.

 7          Q.      You lied again?

 8          A.      Sure.

 9               MR. HURLEY:  Keep going.

10                        - - -

11               (Listening to audio.)

12                        - - -

13               MR. HURLEY:  Stop.

14     BY MR. HURLEY:

15          Q.      Where did you have the tires

16     replaced on your fake car?

17          A.      Candyland?

18          Q.      Candyland.  Because you lied again,

19     right?  You lied about there being tires

20     needing to be replaced on the car?

21          A.      Again, the fake, imaginary car I

22     made up to get their information does not

23     exist, nor any information I provided about the

24     car.

KURT MORALES

Page 112

1        Q.      That doesn't answer my question.

2        A.      It does.

3        Q.      That -- sir, the question was, you

4    lied to her again when you told her there were

5    tires replaced, correct?

6        A.      Yeah.

7                MR. HURLEY:  Keep playing.

8                        - - -

9                (Listening to audio.)

10               MR. HURLEY:  Stop.

11   BY MR. HURLEY:

12       Q.      When you were asked whether you

13   were up to date on oil changes and regular

14   maintenance and you said mm-hmm, that was a

15   lie, correct?

16       A.      Right.  The imaginary car did not

17   have an oil pan.

18               MR. HURLEY:  Keep playing.

19                       - - -

20               (Listening to audio.)

21                       - - -

22               MR. HURLEY:  Hold on.  Stop.

23   BY MR. HURLEY:

24       Q.      When you said the vehicle was

KURT MORALES

Page 113

1      registered for your personal use, that was a

2      lie, correct?

3              A.      Sure.

4                      MR. HURLEY:  Keep going.

5                              - - -

6                      (Listening to audio.)

7                              - - -

8                      MR. HURLEY:  Let me stop right

9          there.

10     BY MR. HURLEY:

11             Q.      Did you understand what she just

12     said to you?

13             A.      Sorry, that was a lot of jargon.

14             Q.      Jargon?

15             A.      Yeah.  A long little bit of prompt

16     that she was running through.  I probably zoned

17     out at the same time she was reading it.  Yeah.

18     I mean the person --

19             Q.      She was saying -- let me ask it

20     this way.

21             A.      Yeah.

22             Q.      She was saying to you, was she not,

23     that there was essentially some level of

24     contractual coverage being issued to you?

KURT MORALES

Page 120

1      complex?

2              THE WITNESS:  Yeah, 3015.

3    BY MR. HURLEY:

4      Q.     Right, and the street address you

5    just gave is 3105, right?

6      A.     Did I?

7      Q.     You gave your wrong address.

8              MR. HURLEY:  Keep playing it.

9                     - - -

10             (Listening to audio.)

11                    - - -

12             MR. HURLEY:  Hold on.

13   BY MR. HURLEY:

14     Q.     Did I just hear correctly that you

15   were asked, are you near your vehicle so you

16   can give me the VIN number and mileage, and you

17   said you "won't be able to get to it for a few

18   hours"?

19     A.     Sure.

20     Q.     Okay.

21             MR. HURLEY:  Keep playing.

22                    - - -

23             (Listening to audio.)

24                    - - -

KURT MORALES

Page 122

```
 1        Q.     Do you often give people your wrong
 2   home address?
 3        A.     Not really.
 4        Q.     Just a -- just a mistake that
 5   happened today on this call?
 6        A.     I don't exactly give out my address
 7   to places.  I mean since I moved out of my
 8   house -- I have my house address memorized, but
 9   the apartment addresses I've been in, you know,
10   in one ear, out the other.  I don't receive
11   mail or packages at them.
12        Q.     Okay.  Can I ask you, you asked
13   about scope of coverage when you were speaking
14   with that woman named Jasmine, right?
15        A.     I -- are you talking about the
16   compressor stuff?
17        Q.     Yeah, you asked if the compressors
18   were included, right?
19        A.     Yeah.
20        Q.     In the scope of coverage, right?
21        A.     I believe, yeah, that was in the
22   call.
23        Q.     Why were you asking about the scope
24   of coverage if your testimony here has been
```

KURT MORALES

Page 123

1     that you had no intention of doing this for any

2     reason other than finding things out about

3     people.

4          A.     You can correct me if I'm wrong,

5     but I think through the entire duration of the

6     call, the only information of this entity that

7     has been provided was their phone number.  So I

8     still haven't received at this point even the

9     name of the company or --

10         Q.     I appreciate your narrative, sir,

11    but that doesn't answer my question.  That

12    would be like if I asked did you watch the

13    Notre Dame football game last night and your

14    answer was, I love Wendy's.  So let's answer

15    the question that I asked you.

16              The question that I asked you was,

17    why were you asking about scope of coverage if

18    you previously testified that you had no

19    interest in doing this for any reason other

20    than finding out the identities of individuals

21    or entities who placed the call?

22         A.     The same reason I made up the car.

23         Q.     I don't understand, what was the

24    reason for asking about coverage then?

KURT MORALES

Page 124

1         A.      To present myself as an actual

2     potential buyer of their little policy scam

3     thing.

4         Q.      To buttress the lie; is that right?

5         A.      To what?

6         Q.      Buttress, to make it seem

7     believable, right?

8         A.      Yeah.  You can call it social

9     engineering, call it lying to get their

10    information, sure.

11        Q.      Okay.  Let's keep playing.

12                      - - -

13                (Listening to audio.)

14                      - - -

15                MR. HURLEY:  Stop.

16    BY MR. HURLEY:

17        Q.      So now it's in reverse.  This isn't

18    you making a mistake, telling someone the

19    address, you would agree with me that this new

20    woman read back 3105 to you and you confirmed

21    it, correct?

22        A.      Yep.

23        Q.      You confirmed the wrong address,

24    correct?

KURT MORALES

Page 125

1         A.      Yeah.   That was a mistake.

2         Q.      Another mistake.  Was a mistake --

3    was it a mistake when you lied about owning

4    the 2018 Honda CRV?

5         A.      I'm sorry?

6         Q.      Was it a mistake when you lied

7    about owning the Honda CRV?

8         A.      No.

9         Q.      The 2018, yes or no?

10        A.      I said no.

11        Q.      That wasn't a mistake.  You

12   purposely lied?

13        A.      Yes.  I made up the car.  I mean

14   are you saying my name isn't Kurt Morales?  Are

15   you saying I didn't make a payment?  I mean...

16        Q.      I'm asking you a question as to

17   which misrepresentations are mistakes and which

18   ones are purposeful lies?

19        A.      Well, the car was a complete

20   fabrication along with this information.  But

21   my name, the payment that was accepted, my

22   email address, and the apartment, aside from

23   the little mixup with the two digits at the

24   beginning, were all accurate.

KURT MORALES

Page 126

1        Q.     Okay.  Let's continue playing.  By

2    the way, up to this point, we're 18 minutes

3    into this --

4               MR. HURLEY:  Strike that,

5        Ms. Franco.  Strike that.

6               Play the rest of the recording.

7                       - - -

8               (Listening to recording.)

9                       - - -

10   BY MR. HURLEY:

11       Q.     Now, Mr. Morales, you would agree

12   with me that at no point in that call did

13   anyone mention Amtrust, correct?

14       A.     There wasn't any company name

15   provided in that call.

16       Q.     I understand, but I'd like you to

17   just answer the direct question if you could.

18   You would agree with me that nowhere on that

19   call did anyone mention Amtrust, correct?

20       A.     Correct.  No company was listed.

21       Q.     You would agree with me that

22   nowhere on that call did anyone mention

23   Northcoast, correct?

24       A.     Again, no company was listed.

KURT MORALES

1          Q.     But, again, for purposes of the

2     record, I just want to make sure that you're

3     answering the question that I'm asking.  You

4     would agree with me that nowhere on that call

5     did anyone mention Northcoast Warranty

6     Services, correct?

7          A.     Correct.  Yes.

8          Q.     Correct?

9          A.     Yes.  Can you hear me?

10         Q.     Now I could.  I couldn't hear.  It

11    was the swallowing answer thing we talked about

12    earlier.  Correct, right?

13         A.     Yes.

14         Q.     Okay.  I now want to go back to

15    your -- your Declaration.

16              MR. HURLEY:  And I want to go to --

17         Matt, if you could bring that back up.

18         Matt, please bring up Mr. Morales'

19         Declaration with exhibits.  And I'd like

20         to go to Exhibit A.

21              MR. RAMIN:  (Complies.)

22              MR. HURLEY:  Go down one page

23         please.  Please increase the size of this

24         page.

KURT MORALES

Page 128

1    BY MR. HURLEY:

2        Q.    Okay.  So you produced this email

3    here in litigation.  And you would agree with

4    me that this has a date of March 6th, 2020 at

5    11:26 a.m. on it, correct?

6        A.    Yes.

7        Q.    And the subject is VIN/Miles,

8    correct?

9        A.    Yes.

10       Q.    And you would agree with me that at

11   the end of the call that we just listened to,

12   you were asked to provide a VIN number and

13   exact mileage of your vehicle, correct?

14       A.    I can't remember the mileage, but,

15   yeah, it was -- never gave a VIN number.

16       Q.    Okay.  I'll represent to you that

17   the last thing that you were in colloquy with

18   with the last speaker was providing the VIN and

19   the miles.  This email comes from someone named

20   Edwina Chandler, who is asking for you to send

21   your VIN and exact mileage of your vehicle.

22           Were there any other pieces to this

23   email that were edited out before it was turned

24   over?

KURT MORALES

Page 129

1          A.     I don't believe so.  This should be
2     a direct, you know, open up gmail, print email.
3          Q.     Okay.
4          A.     Not sure if it would capture
5     attachments if they were on there.  I'm not
6     sure how well Google is with that stuff.
7          Q.     Okay.  So as of the 6th, it appears
8     that you had not yet provided a VIN number,
9     correct?
10         A.     Correct.
11         Q.     You haven't provided any email
12    correspondence in this matter where you
13    responded to this email from Edwina, correct?
14         A.     I don't recall the other exhibits.
15         Q.     I'll represent to you that there's
16    no email that you've presented to us or
17    presented in discovery where you responded to
18    this person in written form and provided a VIN
19    number.  Did you provide a VIN number by email?
20         A.     I didn't provide a VIN number ever.
21         Q.     You didn't provide a VIN number
22    ever?
23         A.     I don't recall.  Pretty sure I
24    didn't --

KURT MORALES

Page 130

1          Q.     You don't recall providing a VIN

2     number?

3               MR. JAVITCH:  Can you wait until he

4          answers, Leo?

5     BY MR. HURLEY:

6          Q.     Sure.  Did you provide a VIN

7     number?

8          A.     I'm fairly confident I never

9     provided a VIN number.

10         Q.     Okay.

11              MR. HURLEY:  Can we go to Exhibit

12         B, please?

13              MR. RAMIN:  (Complies.)

14    BY MR. HURLEY:

15         Q.     This is a letter addressed to you,

16    correct?

17         A.     Yes.

18         Q.     And it's from National Car Cure,

19    correct?

20         A.     Yeah.

21         Q.     Did you also receive a copy of this

22    by email?

23         A.     Yeah.  I think so.

24         Q.     Do you still have that email?

KURT MORALES

```
 1          A.    I should.  Not sure if the PDF link

 2     is still good.

 3          Q.    It has the incorrect address that

 4     you provided at ███████████████, correct?

 5          A.    Yeah.

 6          Q.    Okay.

 7          A.    3105.

 8          Q.    Okay.  Next page.

 9               MR. HURLEY:  Please increase the

10          size here.  Go up, please.

11               MR. RAMIN:  (Complies.)

12     BY MR. HURLEY:

13          Q.    This indicates Kurt Morales as the

14     contract holder, correct?

15          A.    Yes.

16          Q.    It indicates a street address of

17     ████████████████████, which is the address

18     that you provided on the call, correct?

19          A.    Yeah.

20          Q.    Carrollton, Texas 75006, that's the

21     city, state and zip you provided on the call,

22     correct?

23          A.    I believe so, yeah.

24          Q.    The phone number is the one you
```

KURT MORALES

Page 132

1       provided on the call, correct?

2              A.      Yes.

3              Q.      The contract purchase date is the

4       date that you spoke with these folks on the

5       call, correct?

6              A.      Yes, confirmed payment.

7              Q.      The odometer of 25,001 is roughly

8       what you provided in your estimate for the

9       odometer, correct?

10             A.      Yes.

11             Q.      This indicates a year, make and

12      model of 2018 Honda CRV, which is the name of

13      the fake car or the model, year, make -- and

14      make of the fake car, correct?

15             A.      Yes.

16             Q.      This has a VIN number associated

17      with it correctly, right?

18             A.      There's a VIN number there, yeah.

19             Q.      Well, you had to call and provide

20      them with a VIN number, or email them a VIN

21      number to release this to you, correct?

22             A.      No.

23             Q.      No?

24             A.      I believe I received this -- they

KURT MORALES

Page 133

1    gave the -- the provisional loan was sent out

2    before I replied with the VIN number, I think.

3         Q.    You mean there just so happens to

4    be a VIN number inserted there?

5         A.    Yeah.

6         Q.    Mr. Morales, I want to remind you

7    of something --

8              MR. JAVITCH:  Leo, did you wait for

9         him to answer?

10             THE WITNESS:  Please.

11    BY MR. HURLEY:

12        Q.    Go ahead, Mr. Morales.

13        A.    Like I said, I don't recall ever

14    providing a VIN number.

15        Q.    Mr. Morales, I want to remind you

16    of something, and it's the instruction that I

17    gave you at the beginning of this proceeding

18    that it's as if you're sitting in a courtroom.

19    Okay?

20             MR. JAVITCH:  You've already

21        provided that.

22             MR. HURLEY:  I'm reiterating that.

23             THE WITNESS:  Yes.  I'm aware.

24

KURT MORALES

Page 134

```
1    BY MR. HURLEY:

2         Q.     There's a VIN number inserted here,

3    sir.  You were directly asked to provide a VIN

4    number, telephonically or otherwise.  If I were

5    to tell you that this VIN number matches

6    directly with a 2018 Honda CRV that at the time

7    was up for sale in South Carolina, would that

8    surprise you?

9         A.     Yeah.

10         Q.     Mr. Morales, you promised on the

11    call to provide a VIN at the end of the call.

12         A.     No.

13         Q.     Where did you -- you did.  You said

14    you'll definitely be hearing from me about the

15    VIN.

16         A.     No.  I said you'd definitely be

17    hearing from me about this call.

18         Q.     Where did you get the VIN number?

19               MR. JAVITCH:  Leo, you didn't wait

20         for him to answer.

21    BY MR. HURLEY:

22         Q.     Where did you get the VIN number?

23               MR. JAVITCH:  He had a previous

24         answer.  You interrupted him.
```

KURT MORALES

Page 135

1                MR. HURLEY:  Ms. Franco can read it
2          back.
3                COURT REPORTER:  What do you want
4          read back?
5                MR. HURLEY:  His last answer.
6                        - - -
7                (The court reporter read back the
8          pertinent testimony.)
9                        - - -
10               MR. HURLEY:  Please replay the
11         final 20 seconds, Mr. Ramin.  Let's make
12         it the final 30.
13                       - - -
14               (Listening to audio.)
15                       - - -
16    BY MR. HURLEY:
17         Q.    Now you hadn't received the policy
18    that you've attached as -- attached as Exhibit
19    B at the time that you received the email
20    that's attached as Exhibit A, correct?
21         A.    I don't recall when I received the
22    PDF.
23         Q.    Tell me what steps you took to look
24    through your emails related to correspondence

KURT MORALES

Page 136

1    about this VSC.

2         A.    I'm sorry?

3         Q.    Were you instructed to look through

4    your emails for all correspondence about this

5    vehicle service contract?

6         A.    Possibly.  I know I probably

7    searched for vehicles after the fact signing on

8    with Mr. Javitch.  Or are you just talking

9    about after this call, just looking in the

10   email waiting for something to pop up?

11        Q.    No.  I'm sorry.  Talking about

12   vehicles with Mr. Javitch, what do you mean?

13        A.    Sorry.  Repeat that.

14             MR. HURLEY:  Read back his last

15        answer, Ms. Franco.

16                  - - -

17             (The court reporter read back the

18        pertinent testimony.)

19                  - - -

20   BY MR. HURLEY:

21        Q.    I know I searched for vehicles

22   after the fact along with Mr. Javitch.  Were

23   you looking for a 2018 Honda CRV that you could

24   provide to SunPath?

KURT MORALES

Page 137

1              MR. JAVITCH:  Object to the form.

2              THE WITNESS:  Yeah.  I'm --

3    BY MR. HURLEY:

4        Q.     Did you spend time after you had --

5    after you indicated to the people on this call

6    that you had a 2018 Honda CRV, did you begin

7    looking for 2018 Honda CRVs?

8        A.     I don't think so.

9        Q.     You don't think so?

10       A.     I --

11       Q.     Mr. Morales, you're under oath.

12   Did you go and try and find -- did you go and

13   try and find a 2018 Honda CRV VIN number?

14       A.     I don't think so, no.  I don't

15   recall doing anything like that.

16       Q.     Did you have anyone assist you in

17   trying to find one?

18       A.     No.

19       Q.     What are the odds that the VIN

20   number that would appear in this document

21   happens to be one for a 2018 Honda CRV?

22       A.     I don't know the processes of the

23   company you're representing.

24       Q.     The process -- forget about the

KURT MORALES

1      company I'm representing.  I'm asking you

2      questions.

3            A.    I know.  I'm saying --

4                  MR. JAVITCH:  Leo, can you lower

5            your voice, please, Leo.

6                  MR. HURLEY:  No.  My voice is

7            perfectly fine, Mark.  My voice is

8            perfectly fine.

9                  MR. JAVITCH:  Can you please be

10           more respectful of the witness?

11                 MR. HURLEY:  I'm being quite

12           respectful.

13     BY MR. HURLEY:

14           Q.    You -- you didn't receive the

15     vehicle service contract or had not received it

16     at the time you were asked for a VIN number,

17     correct?

18           A.    On the call, I don't think so.

19           Q.    Email?

20           A.    I don't recall when I received the

21     PDF.

22           Q.    Do you have access to your email?

23           A.    Yeah.  Yes.

24           Q.    Did you search your email for all

KURT MORALES

Page 139

1      correspondence regarding this vehicle service

2      contract related to this litigation?

3           A.    Yeah.  I believe I made an attempt.

4      I know I received emails from multiple domains

5      regarding this.

6           Q.    Multiple domains regarding this?

7           A.    Yeah.

8           Q.    Would you believe that you've only

9      turned over two emails in this case, one of

10     which relates to you being asked about a VIN

11     number?

12               MR. HURLEY:  Mr. Javitch, have

13          there been emails that have not wound up

14          on a privilege log that have not been

15          turned over here?

16               MR. JAVITCH:  I'm happy to meet and

17          confer about a privilege log.

18               MR. HURLEY:  I'm happy -- I want to

19          understand because if there's a privilege

20          being asserted here regarding this email

21          or it doesn't exist, I'm happy to have

22          someone tell me it doesn't exist.

23               MR. JAVITCH:  I think he's already

24          answered he searched already.

KURT MORALES

Page 140

1    BY MR. HURLEY:

2        Q.    Do you have an email that delivers

3    you the vehicle service contract, yes or no?

4        A.    Yeah.  I believe I received an

5    electronic copy through email.

6        Q.    Do you have access to your email

7    account right now?

8        A.    Yes.

9        Q.    Can you look in your email account

10   to see if you have that email that came in?

11       A.    I --

12            MR. JAVITCH:  No.  We're not going

13       to have him look at his email right now.

14            MR. HURLEY:  I can have him do

15       that.  It's my deposition.  If he has

16       access to it, he can indicate if it exists

17       or it doesn't.

18            MR. JAVITCH:  We've already

19       responded to your document requests and

20       produced --

21            MR. HURLEY:  Mr. Javitch, he's

22       indicated that there's an email that's

23       germane.  I can have him --

24            MR. JAVITCH:  He produced -- he

KURT MORALES

Page 141

1          produced the emails.  He searched --

2                  MR. HURLEY:  No.  He did not

3          produce this email.

4                  MR. JAVITCH:  That's what he just

5          said.  Yes.  He just said he produced --

6          he searched and he produced the emails.

7                  MR. HURLEY:  No.  He did -- I'm

8          asking about a particular email, and you

9          and I both know it wasn't produced.

10                 MR. JAVITCH:  You don't know what

11         email he got the PDF on.

12                 MR. HURLEY:  I'm asking him to

13         verify.  He can verify it right now.

14                 MR. JAVITCH:  He already said he

15         doesn't recall the exact timing of the

16         PDF.

17                 MR. HURLEY:  That's why he has

18         access to his email and he can confirm it

19         for us right now.

20     BY MR. HURLEY:

21         Q.    Do you still have access to your

22     email?

23                 MR. JAVITCH:  We're not searching

24         his email.  We'll consider your document

KURT MORALES

Page 142

1          request.

2                    MR. HURLEY:  It's not a document

3          request.

4     BY MR. HURLEY:

5          Q.    Do you have it or do you not?

6                    MR. HURLEY:  It's not a document

7          request.  It's a question of a witness.

8     BY MR. HURLEY:

9          Q.    Do you have that document or do you

10    not?

11                   MR. JAVITCH:  What document?

12                   MR. HURLEY:  Stop, Mr. Javitch.

13         Form or privilege.

14    BY MR. HURLEY:

15         Q.    Mr. Morales, do you have access to

16    your email, yes or no?

17         A.    Yes.

18         Q.    Do you have access to the email

19    conveying to you the vehicle service contract?

20         A.    It should still be in there.

21         Q.    Do you have access to your outbound

22    emails communicating with anyone about the

23    vehicle service contract?

24         A.    I should.

KURT MORALES

Page 143

1          Q.      Did you communicate with anyone in

2     an outbound fashion related to the vehicle

3     service contract?

4          A.      I don't recall.

5          Q.      Back to the vehicle service

6     contract, you would agree with me that there

7     was a VIN number included in this -- in this

8     contract, correct?

9          A.      Yes.

10         Q.      Would it be surprising to you to

11    know that that VIN number is associated with

12    a 2018 Honda CRV?

13         A.      I already answered this.  I think I

14    said yes.

15         Q.      That would be surprising to you?

16         A.      Surprising, unsurprising.  I don't

17    know if they just auto populated this or where

18    it came from.

19         Q.      Would -- would you providing them

20    with a VIN number from a Honda CRV that at the

21    time of this call was currently -- currently at

22    that time being sold on a used car lot, would

23    that be social engineering if you provided them

24    with that?

KURT MORALES

Page 144

1              MR. JAVITCH:  Object to the form.

2              THE WITNESS:  I'm not sure.  Like I

3         said, I'm not saying I didn't provide it.

4         I'm saying I have no recollection of

5         providing any VIN number.

6    BY MR. HURLEY:

7         Q.    So it's possible that you provided

8    this, correct?

9         A.    As far as I'm aware, it's auto

10   generated when they send out the provisional

11   contract just so that way they had something in

12   the spot.

13        Q.    How do you know that?

14        A.    I said as far as I'm aware.

15        Q.    What made you aware of that?

16   What's your source of information?

17        A.    Because I don't recall providing a

18   VIN, and there's a VIN on that document.

19        Q.    So it's speculation that it's auto

20   populated, but you also haven't ruled out the

21   possibility that you provided a VIN, correct?

22        A.    Sure.

23        Q.    And if you provided a VIN, of

24   course, it wouldn't have been a VIN from your

KURT MORALES

Page 145

1     car, correct?

2          A.     Correct.

3          Q.     It would have been a VIN that you

4     would have had to have found associated with

5     a 2018 Honda CRV, correct?

6          A.     Or a VIN from the internet.

7          Q.     Right, a VIN for someone else's

8     car.  Correct?

9          A.     Not necessarily.

10         Q.     Well, is this a VIN from your car?

11         A.     I don't recall the VIN on my 2003

12    CRV.

13         Q.     If I were to tell you that this VIN

14    is not associated with a 2003 Honda CRV, would

15    that surprise you?

16         A.     No.  Yes.

17         Q.     If I were to tell you that the VIN

18    is associated with a 2018 Honda CRV, would that

19    surprise you?

20         A.     I really have no reaction to it.

21         Q.     Now, if you provided a VIN for

22    a 2018 Honda CRV, that would add to the

23    existing lie you were telling, correct?

24              MR. JAVITCH:  Object to form.

KURT MORALES

Page 146

1    BY MR. HURLEY:

2         Q.    You can answer.

3         A.    Or providing any VIN.

4         Q.    But -- but one that was associated

5    with a 2018 Honda CRV would add with

6    particularity to the lie, correct?

7         A.    Sure.

8         Q.    And you don't rule out the fact

9    that you did that, correct?

10        A.    No, not complete -- not with

11   complete certainty, but I don't recall

12   providing or searching for a VIN.

13        Q.    But you don't recall -- you don't

14   rule out the fact that you provided that VIN in

15   response to those inquiries?

16        A.    No, not to my standards.

17        Q.    When is it okay to lie?

18        A.    You'll have to be way more specific

19   on that question.

20        Q.    I want to understand for Kurt

21   Morales when is it okay to lie?

22        A.    Again, I'm not going through every

23   single hypothetical.

24        Q.    I'm not asking you to go through a

KURT MORALES

Page 181

1          please, the Declaration?

2                    MR. HURLEY:  Matt, why don't you

3          pop up Exhibit-2 for Brion?

4                    MR. DOYLE:  I appreciate that, Leo.

5                    MR. RAMIN:  (Complies.)

6                    MR. DOYLE:  Yeah, and actually,

7          this is a great place to start.  This is

8          an attachment -- just getting a laptop

9          charger.  Thanks, guys.  I appreciate it.

10    BY MR. DOYLE:

11          Q.    This is an attachment to your

12    declaration.  You recognize it; don't you?

13          A.    Yes.

14          Q.    And under the finance company, the

15    name SunSimp is listed, S-U-N-S-I-M-P; do you

16    see that?

17          A.    Yeah.

18          Q.    Mepco is not listed anywhere in

19    this contract Declaration, in the vehicle

20    service contract or otherwise in your materials

21    provided to your Declaration; is it?

22          A.    I don't know.

23          Q.    All right.  Why don't you take a --

24    why don't you review it then?

KURT MORALES

Page 182

1          A.     Okay.  That's fine.  National Car

2     Cure, SunPath and Northcoast was --

3          Q.     Right.

4          A.     -- defined on my Declaration first

5     page.

6          Q.     Mepco is not listed with those

7     other entities; is it?

8          A.     Correct.

9          Q.     Why are you not a class rep,

10    representative, for the Mepco classes?

11         A.     You'd have to ask my attorney.

12         Q.     You don't know?

13         A.     I'm assuming I don't meet the

14    standards or requirements for the class.

15         Q.     Do you know why you are not a class

16    representative for the Mepco classes?

17         A.     No.

18         Q.     Do you know why you are a

19    representative for the other classes?

20         A.     I'm involved with them in some way

21    or another that meets a certain standard.

22         Q.     Can you be anymore specific than

23    that?

24         A.     More direct dealings, if I were to

KURT MORALES

Page 207

1    of the kind of going-ons (sic), respond to

2    these depositions, potentially go to trial,

3    wherever that may be, if it occurs or goes to

4    trial.  You know, called --

5        Q.    So you will be available if

6    testimony is needed?

7        A.    Yes.  It depends on the date and

8    going-ons, but yes.

9        Q.    Okay.  And have you -- have you

10   reviewed any of the documents produced by the

11   defendants in this case?

12       A.    I'm not certain.

13       Q.    Okay.  And just to recap, you

14   are -- you are not aware of -- right now, you

15   do not have any personal knowledge that

16   Affordable Auto Services -- or Affordable Auto

17   Shield, sorry, was involved in the phone call

18   that you recorded or any other such phone

19   calls?

20       A.    I don't believe so.  As I stated

21   for Mr. Leo, the phone call, as we heard

22   earlier, no names were given.

23       Q.    And same question with regard to

24   Pelican Investment Services, you -- I'm sorry,

KURT MORALES

Page 208

1      Pelican Investment Holdings, you don't have any

2      knowledge right now that they are in any way

3      connected to the phone call that was recorded

4      or the dozens of phone calls before that that

5      you allege to have received?

6              A.      Yes and no.  In the same sense

7      National Car Cure might not have been directly

8      involved outside of funding and being aware of

9      these calls, but as far as, you know, someone

10     from Pelican picking up the phone or pressing

11     the button for the auto-dialer to connect me to

12     a call center, I don't believe that occurred.

13             Q.      Are you guessing?

14             A.      Yeah.  I don't believe or have any

15     knowledge to the fact that Pelican did anything

16     like that.

17             Q.      Okay.  Do you have any knowledge to

18     think that Pelican did anything else related to

19     the phone call?

20             A.      To the phone call, no.

21             MR. DARGITZ:  I have no further

22         questions of this witness.

23             MR. JAVITCH:  Thank you.

24         Plaintiffs have no further questions as

Page 211

CERTIFICATE

1

2

3          I do hereby certify that I am a Notary

4    Public in good standing, that the aforesaid

5    testimony was taken before me, pursuant to

6    notice, at the time and place indicated; that

7    said deponent was by me duly sworn to tell the

8    truth, the whole truth, and nothing but the

9    truth; that the testimony of said deponent was

10   correctly recorded in machine shorthand by me

11   and thereafter transcribed under my supervision

12   with computer-aided transcription; that the

13   deposition is a true and correct record of the

14   testimony given by the witness; and that I am

15   neither of counsel nor kin to any party in said

16   action, nor interested in the outcome thereof.

17

18          WITNESS my hand and official seal this

19   24th day of January, 2025.

20

21

22

23          _Theresa F. Franco_

             Theresa F. Franco

24           Notary Public

```
                                                      Page 212
1    Mark Javitch, Esq.

2    mark@javitchlawoffice.com

3                              January 24, 2025.

4    RE: Morales, Kurt II, Et Al  v. Sunpath LTD, Et Al

5         1/21/2025, Kurt Morales (#7122956)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-ny@veritext.com.

16    Return completed errata within 30 days from

17   receipt of testimony.

18      If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                    Yours,

23                    Veritext Legal Solutions

24
```

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit 7



**Planet Depos**
We Make It *Happen*™

# Transcript of Gustav Renny, Corporate Designee

**Date:** September 18, 2024
**Case:** Morales II, et al. -v- Suhpath LTD., et al.

**Planet Depos**
**Phone:** 888.433.3767 **| Email:** transcripts@planetdepos.com
**www.planetdepos.com**
Michigan #8598 | Nevada #089F | New Mexico #566

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1              IN THE UNITED STATES DISTRICT COURT FOR
2                   THE DISTRICT OF DELAWARE

3   KURT MORALES II, et al.,      )

4   individually, and on          )

5   behalf of all others          )

6   similarly situated,           )

7              Plaintiffs,    )Case No.: 20-cv-1376-JLH-SRF

8        v.                       )

9   SUNPATH LTD., et al.,         )

10             Defendants.    )

11  _____)

12

13

14          Deposition of AFFORDABLE AUTO SHIELD, INC.,

15          by and through GUSTAV RENNY

16                  Conducted Virtually

17            Wednesday, September 18, 2024

18                     9:04 a.m. CST

19

20

21

22

23  Job No.: 552459

24  Pages: 1 - 249

25  Transcribed by:  Jerome E. Harris, Stenographer.

1          Deposition of AFFORDABLE AUTO SHIELD, INC., by

2   and through GUSTAV RENNY, conducted virtually.

3

4

5

6

7

8          Pursuant to Notice, before Ky Shanklin, Notary

9   Public in and for the State of Illinois.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    3

1                    A P P E A R A N C E S

2    ON BEHALF OF THE PLAINTIFFS:

3            JEFFREY D. BLAKE, ESQUIRE

4            ZIMMERMAN LAW OFFICES P.C.

5            77 West Washington Street

6            Suite 1220

7            Chicago, Illinois 60602

8            (312) 440-0020

9

10           MARK L. JAVITCH, ESQUIRE

11           JAVITCH LAW OFFICE

12           3 East 3rd Avenue

13           Suite 200

14           San Mateo, California 94401

15           (650) 781-8000

16

17

18   ON BEHALF OF THE DEFENDANT, AFFORDABLE AUTO SHIELD, INC.

19           STEPHEN D. DARGITZ, ESQUIRE

20           O'HAGAN MEYER

21           1717 Arch Street

22           Suite 3910

23           Philadelphia, Pennsylvania 19103

24           (215) 461-3300

25

```
 1

 2    ON BEHALF OF THE DEFENDANT, SING FOR SERVICE (MEPCO):

 3          BRION B. DOYLE, ESQUIRE

 4          JUSTIN A. ALLEN, ESQUIRE

 5          VARNUM LLP

 6          333 Bridge Street Northwest

 7          Suite 1700

 8          Grand Rapids, Michigan 49504

 9          (616) 336-6000

10

11

12    ON BEHALF OF THE DEFENDANT, AMTRUST:

13          LEO J. HURLEY, JR., ESQUIRE

14          CONNELL FOLEY LLP

15          185 Hudson Street

16          Suite 2510

17          Jersey City, New Jersey 07311

18          (201) 521-1000

19

20

21

22

23

24

25
```

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                              5

```
 1                    C O N T E N T S

 2    Examination of GUSTAV RENNY                  PAGE

 3       By Mr. Blake                                7

 4

 5                    EXHIBITS (Retained.)

 6    AAS'

 7    Exhibit 1        Notice of Deposition          8

 8    Exhibit 2        Application for registration  25

 9    Exhibit 3        Pledge & Security Agreement   28

10    Exhibit 4        Forte Software Service Agreement  42

11    Exhibit 5        Email thread                  63

12    Exhibit 6        Forte document                72

13    Exhibit 7        Phone bill Star2Star          76

14    Exhibit 8        Integrity Application         95

15    Exhibit 9        Marketing Agreement          114

16    Exhibit 10       Call Center Marketing Agreement  132

17    Exhibit 11       SING For Service Dealer Agreement  140

18    Exhibit 12       Direct Marketer Application Form  150

19    Exhibit 13       Standards of Conduct         156

20    Exhibit 14       Mailers                      164

21    Exhibit 15       Response to Plaintiffs' Discovery  197

22    Exhibit 16       Traceback document           205

23    Exhibit 17       Order protection             210

24    Exhibit 18       Notice of class action settlement  213

25    Exhibit 19       Ohio v. Pelican Investments  216
```

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    6

1    Exhibit 20        Notice of Suspension        220

2    Exhibit 21        Email thread               223

3    Exhibit 22        Email thread               228

4    Exhibit 23        Call Detail Report Logs    241

5    Exhibit 24        Call Detail Report Logs    244

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2           THE COURT REPORTER: I'm a notary authorized to
 3   administer oaths, and this deposition will be recorded
 4   by electronic means.
 5           All parties understand and agree that any
 6   certified transcript produced from the recording of this
 7   proceeding is intended for all uses permitted under
 8   applicable procedural and evidentiary rules and laws,
 9   and shall constitute written stipulation.
10           The parties stipulate to the use and
11   certification of this testimony consistent with
12   applicable laws of such.
13           Hearing no objection, I will now swear the
14   witness.
15           Would you please raise your right hand, sir.
16   Whereupon,
17                    GUSTAV RENNY,
18   being first duly sworn or affirmed to testify to the
19   truth, the whole truth, and nothing but the truth, was
20   examined and testified as follows:
21           THE COURT REPORTER: You may proceed, Counsel.
22           EXAMINATION BY COUNSEL FOR THE PLAINTIFFS:
23   BY MR. BLAKE:
24       Q   Good morning.  Can you please state and spell
25   your name for the record.
```

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    8

1        A    Gustav Renny.  G-U-S-T-A-V, last name

2    R-E-N-N-Y.

3        Q    All right.  I'm going to share a document on my

4    screen, Mr. Renny.  Give me just one second so that I

5    can pull that up.

6             You should be able to see a document.  Do you

7    see this document?

8        A    Yes.

9             (Exhibit 1, Notice of Deposition, was marked

10    for identification and is retained by counsel.)

11        Q    Notice of Deposition -- it's right here; I'll

12    highlight it for you -- Notice of Deposition pursuant to

13    Federal Rules of Civil Procedure 30(b)(6) to Defendant,

14    Affordable Auto Shield, Inc.

15             This is a deposition -- a notice that we served

16    on the Defendant, Affordable Auto Shield, and basically,

17    the company has to designate an individual to testify on

18    behalf of the company.  So the testimony that's given

19    today is testimony of the company.  And have you been

20    designated as the corporate representative of Affordable

21    Auto Shield, Inc.?

22        A    I have been asked to be here today, yes.

23        Q    And have you reviewed this document prior to

24    your deposition today?

25        A    I have.  I have it in front of me.

1        Q    Okay.  And did you review all the topics that

2    are listed on the Notice?

3        A    All 27 questions.

4        Q    And do you agree to be deposed on these 27

5    topics on behalf of Affordable Auto Shield, Inc. today?

6        A    Yes, it's my understanding that it's limited to

7    these questions, correct?

8        Q    Not necessarily --

9        A    Okay.

10       Q    But we will cover these topics, so --

11       A    Sure.

12       Q    -- let's -- let's start by going through some

13   of the ground rules of the deposition.

14            Now, I understand, Mr. Renny, I recall that you

15   were deposed earlier in this case.  You've sat for

16   deposition before then?

17       A    Yes.

18       Q    How many?

19       A    How many times for this case?

20       Q    How many times in general overall in your life?

21       A    Oh, I don't know.  15.  10, 15.

22       Q    Okay.  10, 15?

23            So you know the ground rules.  If you ever need

24   a break, that's fine, just let me know.  I just ask that

25   if a question is pending, that you answer the question

1    fully before we go on break.

2            Your attorneys or some other of the attorneys

3    from the other parties may voice objections to my

4    questions.  Most of the time, unless they instruct you

5    not to answer the question, then, you should still

6    answer the question.

7            If you don't understand anything I'm asking,

8    please, you know, ask me to rephrase it.  I'm happy to

9    do so.  If I do ask you a question, and you answer the

10   question, I'm going to assume that you understood what I

11   asked.  Is that fair?

12       A   Yes, sir.

13       Q   All right.  And this is under oath, so anything

14   that you testify to today is just like testimony in

15   court.

16       A   Yes, sir.

17       Q   With that being said, where are you presently

18   employed?

19       A   I'm self-employed.

20       Q   Do you have a -- are you -- are you organized

21   under a company?

22       A   No.

23       Q   So you are a self proprietor; is that right?

24       A   Yes, I have -- I have been.

25       Q   Do you have any other engagements besides being

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    11

1    a self proprietor?

2         A    Do I have any other engagements?

3         Q    Yeah, let me -- let me rephrase that.  Do you

4    have any work for which you submit 1099s?

5         A    Yeah, I do consulting.

6         Q    Okay.  And who are the companies or

7    organizations or individuals for which you submit 1099s?

8         A    I do -- well, I did one for AAS.  Was a -- was

9    consulting.

10        Q    And by AAS you're referring to the Defendant on

11   whose behalf you are testifying today, Affordable Auto

12   Shield, Inc. -- Incorporated?

13        A    Yes.

14        Q    So throughout the deposition, that entity we're

15   going to refer to as AAS?

16        A    Sure.

17        Q    So you said AAS gives you 1099?

18        A    Yeah, they will, yeah.

19        Q    Have they in the past?

20        A    No.

21        Q    Okay.  Any other current organizations or

22   persons that you perform consulting work for?

23        A    Not that I could think of at the moment.

24        Q    Have you ever worked for AmTrust North America

25   --

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    12

1           A    No.

2           Q    -- Incorporated.

3                Have you ever worked for one of its affiliates

4      or subsidiaries?

5           A    I don't know their affiliates or subsidiaries,

6      so I don't know, I don't think so.

7           Q    Not to your knowledge?

8           A    Yes, not to my knowledge.

9           Q    How about SING For Service LLC or Mepco is what

10     it goes by, have you ever worked for Mepco?

11          A    Are you asking me as an individual or the

12     company?

13          Q    Have you personally ever done any work for SING

14     For Service, Mepco, 1099, W-2, whatever?

15          A    No.

16          Q    Have you ever worked for Sunpath?

17          A    No.

18          Q    Have you ever worked for Forte Data Systems?

19          A    No.

20          Q    Have you ever worked for Fastel?

21          A    I don't know who they are, so no.

22          Q    Have you ever worked for a company that

23     operates VICIdial?

24          A    No.

25          Q    Have you ever worked for Market Management

1    Solutions?

2        A    No.

3        Q    Okay.  I'd like to get some background about

4    you now.  If we can go back.  Where did you go to --

5    where did you finish your highest level of education?

6        A    Wait, am I supposed to --

7             THE WITNESS: Steve, am I supposed to answer

8    these, because I thought it was about the company, not

9    about me?  Are we gonna go through this again?

10            MR. DARGITZ: No.

11            THE WITNESS: I already did - I already did

12   this.

13            MR. DARGITZ: These -- these questions are fine.

14   It's just for background.

15            THE WITNESS: Okay.

16       A    I left school in ninth grade.

17       Q    So the ninth grade is your highest level of

18   education?

19       A    Yes, sir.

20       Q    When did you start selling Vehicle Service

21   Contracts?

22       A    I don't remember.  Like maybe like 2010ish.

23   Not exactly sure.

24       Q    How did you get involved in selling Vehicle

25   Service Contracts?

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    14

1          A    Mutual friend.

2          Q    And the friend recommended that you start a

3    business selling Vehicle Service Contracts?

4          A    Something like that, yeah.

5          Q    Why don't you explain to me what it was.  Did

6    -- who is the friend?

7          A    It was William Burns.

8          Q    How did you know William Burns?

9          A    Just from -- just from around town.

10         Q    Does he have an expertise in selling Vehicle

11   Service Contracts?

12         A    I don't know.  You'd have to ask him.

13         Q    You don't know?  Did he say he did?

14         A    Well, I don't know what you mean by expertise.

15   Like did he sell them?  Yes.  Was he an expert in it? I

16   don't know.

17         Q    Okay so he had prior experience selling Vehicle

18   Service Contracts when you met him?

19         A    Yes.

20         Q    And what was the company that William Burns

21   worked for?

22         A    I don't -- I don't remember.

23         Q    Did he work for Sunpath?

24         A    No.

25         Q    Has he ever worked for Sunpath?

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    15

```
 1      A    You'd have to ask him.

 2      Q    You don't know?

 3      A    I don't know.

 4      Q    Where is William Burns right now?

 5      A    I don't know.

 6      Q    When was the last time you saw William Burns?

 7      A    Five, six years ago.  Maybe longer.

 8      Q    Okay.  So was William Burns involved in any of

 9 the work you did for a company called Pelican Investment

10 Holdings, LLC?

11      A    No.

12      Q    What about National Auto Protection Corp.?

13      A    No.

14      Q    What about National Car Care, Inc. or LLC?

15      A    I've never done business with him, if that

16 helps you.

17      Q    Okay.

18      A    Yeah.

19      Q    Fair enough.  Fair enough.  Thanks.

20      A    Yes.

21      Q    What is your position in AAS?

22      A    I was doing compliance.

23      Q    Is that your job title, compliance?

24      A    Yeah.

25      Q    And you have a contract with AAS?
```

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    16

1          A    Just a verbal.

2          Q    Do you have an ownership interest in AAS?

3          A    I do not.

4          Q    Who do you report to?

5          A    I did report to Robert Stecher.

6          Q    How to you spell Stecher?

7          A    Yeah, S-T-E-C-K-E-R.  Steckter, Stec --

8          Q    Steckter, is that how you say it?

9          A    Yeah.

10         Q    Okay.  You said you used to.  Who do you report

11    to now?

12         A    Nobody.  The company no longer does business.

13    Mr. Stecher had a massive heart attack, he's in -- still

14    in the hospital, and probably doesn't have too much

15    longer to live.

16         Q    I'm sorry to hear that.  That's awful.

17         A    That's life.  But thank you.

18         Q    All right.  So you say AAS no longer does

19    business?

20         A    Correct.

21         Q    That brings us to some of our topics, you'll be

22    happy to learn.

23              So going down this list here.

24         A    Sure.

25         Q    Okay.  I'm looking at this list on what I've

1  marked as Exhibit 1, which I should say the Notice of

2  Deposition is an exhibit I've marked as AAS Depo Exhibit

3  1.

4          And the 17th item here and the 18th item asked

5  for the dates where AAS first offered VSCs for sale and

6  the date AAS last offered VSCs for sale.

7      A    The first date was 3/23/22.

8      Q    So that's March 23rd, 2022.

9      A    Yes, sir.

10     Q    Okay.  And then, 18, the date AAS last offered

11 VSCs for sale?

12     A    3/19/24.

13     Q    March 19th, 2024.  Almost exactly two years,

14 right?

15     A    Yes, sir.

16     Q    Okay.  And number 19 asked for the number of

17 VSCs AAS has sold to date?

18     A    Yeah, that was a hard one because some of the

19 contracts it -- the -- the CRM that was being used

20 switched to another CRM, and we lost some data, but what

21 we were able to piece together was roughly 891.  That

22 and -- and it's pretty close.  I just -- I just want to

23 let you know in case it doesn't come up with exact

24 that's what happened.

25     Q    So you say it's 891, but you're not sure that

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    18

1    it's 891, but you say it's close to 891 even if it's not

2    891.  So what would be the range?

3        A   I think it's -- I think it's pretty close, only

4    because it's a -- those are total policy sold.

5    Sometimes when you cancel a policy, it drops off, and

6    then, when we switch to the -- to the new CRM, it you

7    know, we may have lost one or two in the transition, so

8    it's really close.  But those are total policies that

9    were sold.

10       Q   Okay.  So tell me about the CRM switch.  What

11   CRM did you switch from and what CRM did you switch to?

12       A   It went from Forte to then -- was it Moxie or

13   Inline?  I think it was Inline.  Or it may have been

14   Moxie I think it was Inline.

15       Q   Inline?

16       A   Yeah.

17       Q   And why -- why would it -- why are you unsure

18   about which one it was?

19       A   I just remember going back and forth, back and

20   forth.  I don't do a lot of work in the CRM, so I don't

21   -- just don't remember.

22       Q   Okay.

23       A   I'm 99 percent sure it was Inline.

24       Q   So who at AAS would be the person who worked

25   with the CRM?

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    19

1          A    It would be any of the sales associates.

2          Q    Okay.  Name who was a supervisor of the sales

3    associates?

4          A    For AAS, the supervisor would have been Dan --

5    I think -- I don't know how to pronounce it, but it's

6    like Moose -- Moosefessa is his last name.  Moosefessa.

7          Q    What was Jason Colapietro's position?

8          A    He was gone before AAS.

9          Q    Okay.  When did he terminate his employment or

10   you terminated his employment, or whatever?

11         A    I don't know.  I don't -- I don't recall.

12         Q    But you recall it was before AAS?

13         A    Yeah.

14         Q    Was it before Pelican?

15         A    No, he worked -- he worked for Pelican.

16         Q    Okay.  All right.  Why did you switch CRMs to

17   Inline?

18         A    Forte was bought on.

19         Q    But why did they -- did they require that you

20   switch?

21         A    Yes and no.  So it was bought by Car Shield, a

22   big competitor in the field, and most people didn't want

23   them to have access to their data.

24         Q    Okay.  Was that the reason that AAS decided not

25   to stick with Forte?

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    20

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Any other reasons? |
| 3 | A | No. |
| 4 | Q | Sorry, give me a moment, I'm just looking for |
| 5 | | something? |
| 6 | A | I'm in no rush, sir.  You got me all day. |
| 7 | | (Pause.) |
| 8 | | MR. BLAKE: Okay.  Sorry about that. |
| 9 | Q | So did you ever have a written contract with |
| 10 | | AAS? |
| 11 | A | No. |
| 12 | Q | Were you ever an employee of AAS? |
| 13 | A | No. |
| 14 | Q | Did you ever own all or a part of AAS? |
| 15 | A | Yes. |
| 16 | Q | Okay.  So did you form AAS? |
| 17 | A | I formed it, yes. |
| 18 | Q | Okay.  And then, you sold AAS? |
| 19 | A | Yes. |
| 20 | Q | Who did you sell it to? |
| 21 | A | To Robert. |
| 22 | Q | Okay.  How much did you sell it for? |
| 23 | A | I sold it for consideration in other things. |
| 24 | Q | Okay.  Not money?  Is that what you're saying? |
| 25 | A | Yeah.  Well, I -- you -- well, time.  You could |

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                      21

1  -- timeout.  It is somewhat money because I get paid for

2  doing the compliance.  That was part of it.  That was

3  part of the deal.

4       Q   I see.  So you sold your interest to Robert

5  Stecher, in an exchange he agreed to hire you as a

6  compliance consultant and pay you for your work on

7  behalf of AAS?

8       A   Correct.

9       Q   Okay.  Any other consideration?

10      A   No, not -- no, not really, no.  It was really

11 just -- so I'll explain it to you so you can see why it

12 doesn't seem so crazy.

13          So Robert wanted to get into the business

14 because he wanted to do something, wanted to keep, you

15 know, keep busy.  He -- he knows sales and everything,

16 so he wanted me to teach him the business.  So for a

17 while, I formed the company, and I taught him the

18 business a little bit, and then, he took it over.  And

19 then, that was part of the consideration, and then, the

20 contract was also some of the consideration.

21      Q   Okay.  So you showed him the ropes?

22      A   Yes, sir.

23      Q   Okay.  And -- okay.  When you found AAS, did

24 you have -- did you draw like a salary?

25      A   No.

1         Q    Did you pay other people salaries?

2         A    Yes.

3         Q    As a consultant for AAS, do you still handle

4    that aspect of AAS until it ended, I should say?

5         A    No, I -- but I do -- if somebody has a question

6    or a question regarding compensation or how it's

7    derived, I help them just from my knowledge of the

8    business.

9         Q    Okay.  Who are the directors of AAS?

10        A    I think it's just Robert.

11        Q    Have you ever participated in any meetings of

12   the board of directors for AAS?

13        A    No.

14        Q    Are you aware of any such meetings taking

15   place?

16        A    No.

17        Q    Do you know whether the board of directors of

18   AAS ever authorized the verbal agreement between you and

19   AAS regarding serving as the consultant?

20        A    I was approved to do so, so I would assume, but

21   I don't know for sure.

22        Q    And is AAS -- has it formally dissolved as a

23   company?

24        A    I don't know the absolute answer to that.  I

25   know that it ceased doing business, and it was in the

1    runoff period as far as like keeping it -- the merchant

2    account open for charge backs so people can get their

3    money back and things like that until it runs out -- you

4    know, until it runs off.

5         Q    Okay.  I see.  Is the fact that AAS no longer

6    in business, is that a breach of the agreement between

7    you and Robert Stecher?

8         A    He's dying.

9         Q    I understand that.  But is -- is that --

10        A    No, it's not.

11        Q    -- part of agreement?

12        A    No.

13        Q    And why not?

14        A    Because there was no term in our agreement.

15        Q    Okay.  How many employees work for AAS?

16        A    I don't know.

17        Q    Do you know if more than 50 employees work at

18   AAS?

19        A    I don't know.

20             MR. DARGITZ: Objection to form.

21        Q    Do you know if more than five work at AAS?

22        A    I don't know.

23             MR. DARGITZ: Objection to form.

24        Q    Who else at AAS oversees compliance-related

25   activities?

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    24

```
1              MR. DARGITZ: Objection to form.

2       A    Nobody.

3       Q    Just you?

4       A    Yes.

5       Q    How many call center agents are currently

6    employed by AAS?

7       A    None.

8       Q    How many were employed in March 2022?

9       A    I don't know.

10      Q    Where is the call center for AAS?

11             MR. DARGITZ: Objection to form.

12      A    It's nowhere now.

13      Q    Where was it before it stopped doing business?

14      A    The last place was at 1300 Old Congress Avenue.

15      Q    Where does AAS do its banking?

16             MR. DARGITZ: Objection to form.

17      A    I think Chase is the -- I think Chase is the

18   only bank.

19      Q    Is that JP Morgan Chase?

20      A    Yeah.

21      Q    Okay.

22      A    That's the only one I know of.

23      Q    Yeah, me too.  I just wanted to make sure.

24      A    Oh, no, I mean it's the only bank that I know

25   of, not the only JP.
```

1       Q    All right.

2       A    Sorry about that.

3       Q    I got you.  I understood what you said?

4       A    Oh.

5       Q    So all right.  All right.

6            MR. BLAKE: Am I sharing my screen still or did

7    I stop that?  I think I may have stopped that.

8       A    You did.

9       Q    Okay.  Am I showing you a document now that if

10   you look on the bottom, it's designated as AAS Depo

11   Exhibit 2.

12      A    Yes.

13           (Exhibit 2, Application for registration, was

14   marked for identification and is retained by counsel.)

15      Q    Can you see that?

16      A    Yes.

17      Q    Do you recognize this document?

18      A    Vaguely, but yes.

19      Q    Okay.  Is this your signature in section 3?

20      A    Yes, it is.

21      Q    Is this your email address?

22      A    Yes, it is.

23      Q    GusRenny@me.com?

24      A    Yes, sir.

25      Q    Okay.  And this is a Application for

1    Registration of Fictitious Name, is it not?

2        A    Yes.

3        Q    And the name that the application is

4    registering is AAP; is that correct?

5        A    Yes.

6        Q    And the address for AAP is 1300 North Congress

7    Avenue?

8        A    Correct.

9        Q    And the owner of the fictitious name is Pelican

10   Investment Holdings Group, LLC in section 2?

11       A    Yes, sir.

12       Q    Did you complete --

13       A    I did.

14       Q    What was your position at Pelican at this time?

15       A    What's the date on that?

16       Q    Looks like you signed it on the 15th of 20 --

17   February 15th, 2021?  I can zoom in if you'd like?

18       A    No, I see it, I see it.  I can't answer that

19   because I don't recall the date that I sold out of

20   Pelican, so I don't -- I can't answer that.

21       Q    Did you have authority to sign this document on

22   behalf of Pelican?

23       A    Yes.

24       Q    Did you have different roles at Pelican

25   throughout your time working there?

1      A   Yes, sir.

2      Q   Okay.  What were your various roles?

3      A   So in the beginning, I was a partner.  And

4  then, very shortly thereafter, I got out of the

5  partnership and took a role of just doing compliance,

6  some things like this, some administrative work for --

7  for licensing and stuff.  Various things like that.

8      Q   Were you an employee at that time?

9      A   No.

10     Q   A consultant?

11     A   Yes.

12     Q   Did you have a written contract?

13     A   I -- I think.  I think part of my sale

14  agreements might have referenced employment.  I'm not a

15  hundred percent sure.

16     Q   Has AAS ever -- I'm talking about AAS now.

17     A   Yes, sir.

18     Q   Have they ever used the name, AAP, in their

19  business?

20     A   No.

21     Q   Okay.  I'm showing you another document now.

22  Can you see this?

23     A   Yes.

24     Q   All right.  This is a document I have marked as

25  AAS Depo Exhibit 3.

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    28

```
1                (Exhibit 3, Pledge & Security Agreement, 1 was
2      marked for identification and is retained by counsel.)
3           Q    Do you recognize this document?
4           A    Yes.
5           Q    What is this document?
6           A    I think that was part of my sales agreement.
7           Q    All right.  So if I look here, I see the date
8      is October 21st, 2021.  Is that when the agreement was
9      entered into roughly?
10          A    Yes, roughly, yes.
11          Q    All right.  And this is between Pelican
12     Investment Holdings, LLC and Pelican Endeavors?
13          A    Right.
14          Q    What's Pelican Endeavors, Inc.?
15          A    It's just a company that I have.  It's like a
16     holding company.
17          Q    Is that the company that is the consultant for
18     whom you worked?
19          A    No.
20          Q    So Pelican Endeavors doesn't submit 1099s, it's
21     you personally?
22          A    Yes.  I believe so.  I'd have to check with my
23     CPA on that.
24          Q    All right.  And on the bottom of all of these
25     pages, is one of these initials your initials?
```

```
 1        A    Yeah, the one on the right.

 2        Q    Okay.  This one here that I'm highlighting?

 3        A    Yes.

 4        Q    That's yours.  Okay.  So who's identified as a

 5   consultant in this agreement?

 6        A    If it's in there -- if it is in there, I think

 7   it's me.  Yeah, at the bottom there, Gus Renny.

 8        Q    All right.  So I'm going to page 6 in this --

 9   in this document, which is page 1 of the consulting

10   agreement, and I'm looking at the top here where it

11   starts, This agreement.

12        A    Uh-hum.

13        Q    Who is the consultant in this consulting

14   agreement?

15        A    It says Falcon Endeavors.  That's incorrect

16   though.

17        Q    That's incorrect.  It's supposed to be?

18        A    It's supposed to be me, because then if you

19   look at the bottom, it says, Consultant Gus Renny.  So

20   yeah, that's probably a screw-up, but yeah.

21        Q    And in consideration -- so I'm looking at the

22   bottom here in section 4, it says, Consulting fee in

23   consideration.  In consideration of the services to be

24   performed during the term, the consultant shall be

25   entitled to receive and accept consulting fees and
```

1    commissions payable as follows.

2              And it says, Consultant Gus Renny and any other

3    corporate entity identified by consultant shall receive

4    20 percent of any and all monetary distributions made by

5    the company.

6        A    Yeah, that was -- yeah.

7        Q    Okay.  So you said you were a partner in

8    Pelican before you got out of the ownership, right?

9        A    Yes, sir.

10       Q    How many partners were there?

11       A    At the time I was a partner, there was five.

12       Q    Okay.  So in exchange for selling your interest

13   in the company, you signed this agreement, which

14   entitled you to 20 percent of distributions?

15       A    Yeah, and yes, at the time that this was

16   signed, yes.

17       Q    Okay.  Did that change?

18       A    Yeah, I -- I no longer -- it changed to a -- a

19   floating monthly dollar amount because I -- I didn't

20   want to be part of distribution.

21       Q    Floating dollar amount.  Can you explain what

22   that means?

23       A    So like depending on the amount of work that I

24   had to do for like the compliance of it, so it started

25   out at like I think it was -- I don't recall the exact

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    31

1    amount.  I think it started like 6,000 a month, and

2    then, it went up to like 9,000 a month.

3         Q   And what kind of work were you doing as a

4    consultant for Pelican?

5         A   I did -- like I said earlier, I did -- I

6    handled any TCPA issues that came in, I handled the --

7    helping them get approvals for any marketing material

8    going out, some administrative work, some hiring and

9    firing of people, making sure that they, you know, they

10   signed an employee agreement, and when they left, they,

11   you know, got everything that they needed when they were

12   leaving, and everybody left harmoniously.

13        Q   Correct me if I'm wrong, did you mention

14   getting approvals for making marketing materials?

15        A   Yes, so all I did was, I mean, that's a very

16   loose way of saying getting approvals.  So they would

17   make something, and I would send it to their, you know,

18   their lawyer, and just get it -- an approval from a

19   lawyer, and then, I made sure that if -- if -- if said

20   piece was approved, that was the approved, that was the

21   piece that was being sent out.

22        Q   Okay.  So I'm going to go up to section 3 here

23   in this page 1 of the consulting agreement, which is

24   page 6 in this PDF, and it says, The engagement of

25   consulting services, and it describes a little bit of

1    the consultant services.  I'm not going to read it at

2    length, but is this -- does this contain a description

3    of the services the consultant, you, performed on behalf

4    that of Pelican?

5         A    I don't know.  Let me read it.

6         Q    Go ahead.

7         A    I mean, it doesn't really -- it doesn't really

8    say anything.  It's you know, that -- no, it doesn't

9    really say anything.

10        Q    Okay.  Were there any statements of work or any

11   other documents that more specifically set forth what

12   the services were?

13        A    No.

14        Q    All right.  Let's move down this document here.

15   Is this -- so I'm looking at page 4 of the consulting

16   agreement now, which is page 9 of the document.  You can

17   see that on the right-hand side.  I want to look at this

18   Notices section here that I've just highlighted.

19   Section E of -- subsection E of section 12, General

20   Provisions.  And it says, Notices, if the company --

21   we're just going to skip all that -- all that writing

22   here.

23             Notices, If the company, TVD, if the

24   consultant -- which is you, correct?

25        A    Yeah.

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    33

1        Q    1300 Old Congress Road; is that right?

2        A    Yeah.

3        Q    Okay.  Is that correct?

4        A    No.

5        Q    It's not correct?

6        A    No.

7        Q    What should it have been?

8        A    The street that I'm on is it's very weird.

9    Some postal services notice it as Old Congress Road,

10   some of them notice it as just North Congress Avenue,

11   and some of them look at it as Old Congress Avenue.

12   Why, I don't know because it's like a service road, like

13   I don't -- I don't get it, but that's what happens.

14       Q    Um.  Okay.  But either way, whatever address

15   this Congress Road address all goes to the same

16   building, right?

17       A    Yes, sir.

18       Q    Okay.

19       A    Hopefully.

20       Q    As far as you know.  All right.

21            So fi I go down a little bit more down this

22   contract here, I and get to page 12 of the file, which

23   is page 7 of the consulting agreement.  And the

24   individual who signs on behalf of Pelican Investment

25   Holdings, LLC is an individual named -- and I'm going to

1   to try this name, correct me if I'm wrong -- Vajira

2   Samararatne?

3       A   It's Vajira Samararatne.

4       Q   Samararatne.  Vajira Samararatne.  Okay.

5       A   Yes, sir.

6       Q   Mr. Samararatne signs it -- is he -- who is he

7   with respect to Pelican?  What's his role?

8       A   I don't know, but when I was part of it, he was

9   one of the -- he was one of the however they -- however

10  they formed it after that, I don't know, but

11  shareholder, member, partner, whatever word you want to

12  put on it.

13      Q   Did -- did the other partners of Pelican

14  approve of this contract?

15      A   I believe so.

16      Q   Is there minutes of a board meeting anywhere

17  where that's evidenced?

18      A   I wouldn't know.

19      Q   Well, weren't you a partner at this time before

20  this contract was signed?

21      A   I was before this was signed, yeah.

22      Q   Do you recall ever participating in a board

23  meeting where the partners voted, I'm going to go

24  through with this contract?

25      A   No.

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    35

1        Q    Was the -- was Sunpath made aware of this
2    transaction, this agreement?
3        A    I don't know.
4        Q    All right.  If I go down here, I get to a
5    document called Membership Interest Purchase Agreement.
6    Do you recognize this document?
7        A    Yeah.
8        Q    Okay.  And this is the aspect of the
9    transaction where you're selling your interest in the
10   company, correct?
11       A    I guess so.
12       Q    And who did you sell it to?
13       A    I sold it to -- I forget the name of the
14   company.  But I sold it to a company.
15       Q    It's up at the top there.  Was it MB Holding
16   Group?
17       A    Yeah.
18       Q    And the seller is Falcon Endeavors?
19       A    Yeah.
20       Q    Was that right?
21       A    Not -- as for the membership was originally
22   held in Falcon, then I think it was transferred to me
23   personally, but yeah, it doesn't matter.
24       Q    Okay.  So MB Holdings -- and scrolling down to
25   the bottom here.  Oh, this is upside down for some

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                36

1    reason.  I hope that wasn't my mistake.

2          MB Holdings, there's Mr. Samararatne's name.

3    He signs on behalf of MB Holding Group; is that right?

4          A    I guess so, yeah.  Apparently.

5          Q    Well, is that who you were selling the shares

6    to?

7          A    Yeah, to MB Holdings, yeah.

8          Q    Section 4.4 of this agreement talks about a

9    termination of a personal guarantee of Gus Renny.

10         A    Yeah.

11         Q    What was that?

12         A    So when we formed Pelican, we had to apply for

13   finance terms from a finance company.  Part of that

14   finance agreement is a -- is a personal guarantee.

15         Q    All right.  So this is Mepco, that's SING For

16   Service LLC; is that right?

17         A    I don't know the correlation, but I know that

18   they are -- that they are together in some capacity.  I

19   don't know the exact capacity.  They are together.

20         Q    So this provision here, section 4.4, refers to

21   a personal guarantee that was executed by you, Mr.

22   Renny, dated December 10, 2020, correct?

23         A    Yeah, that was when we started Pelican.

24         Q    Okay.  So you started Pelican, you need

25   funding, Mepco provides you funding, you get a personal

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    37

1    guarantee that any amounts that the company owes, you

2    are ultimately guaranteeing paying those back, right?

3        A   Yes.  Not -- funding for the policies, not

4    funding for -- not funding like to start the company.

5    Just funding for the policies.

6        Q   Funding for the policies.  So they -- so it's

7    basically like a -- they advanced all the money, that's

8    the purchase price of the VSC?

9        A   Sure.

10       Q   Did you -- and did you obtain this termination

11   of the personal guarantee?

12       A   I believe so.

13       Q   How did you do that?

14       A   I don't recall.  I think my lawyer did it.

15       Q   Did you have to pay money?

16       A   No.

17       Q   Did you have to find somebody else to sign a

18   guarantee?

19       A   I did.  Vajira.

20       Q   Okay.  I see.  So you had the guarantee when

21   you sold the shares, Samararatne came in and signed the

22   guarantee at that time?

23       A   I don't know if he signed the guarantee when we

24   did this, but I know that he signed the guarantee when

25   we originally formed the company, so I think that

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    38

1   whatever I think that his guarantee just included mine.

2   At the end.

3       Q   Okay.  Nobody else signed a new guarantee, an

4   additional person?

5       A   No.

6       Q   Okay.  All right.  So we kind of talked about

7   this a little bit, but I'm looking at Schedule A here to

8   the consulting agreement, right?  Yes, to the consulting

9   agreement.  So at the bottom of the consulting

10  agreement, there's a Schedule A, and Schedule A has a

11  number 1 that says Services of Consultant.  Was that --

12  did you ever see a completed version of this?

13      A   I don't believe so.

14      Q   So this is what it looked like when you signed

15  it whenever it is you signed it?

16      A   Is my signature at the bottom of that.

17      Q   Well --

18      A   Scroll down.

19      Q   Yeah.

20      A   Yeah.

21      Q   Okay.  Was there ever any amendment to this

22  agreement at all?

23      A   Not that I recall.

24      Q   All right.  So we've been going over this

25  contract which involves you selling your interest in

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                          39

1    Pelican in exchange for I guess an agreement that you

2    would be paid one-fifth of whatever distribution the

3    company made.  And I'm just wondering what was the

4    reason for this -- this arrangement?

5         A    I don't recall.

6         Q    You don't recall?  I mean, you had to be paying

7    a lot of -- a lot of money in attorneys' fees to get all

8    these contracts written up and negotiated.  Surely there

9    was a compelling reason for this arrangement.

10        A    What do you consider a lot of money?

11        Q    Okay.  Well, all right.  I mean, you paid some

12   money, didn't you?

13        A    I don't know if I paid for that, but probably

14   paid a couple bucks.  Yeah.

15        Q    Okay.  Just so I understand, as a partner of

16   Pelican, you owned 20 percent of the company.  Is that

17   -- is that right?

18        A    No.

19        Q    Did you own more?

20        A    No.  As a partner, there were five partners,

21   but two of the partners are brothers that held it under

22   the same, so yeah, I think it was more.  To think it --

23   I think originally it might have been more.  I don't

24   recall exactly.  I think -- I think it might have been

25   four entities that owned it but five partners.  If I --

1    but I don't recall exactly.

2        Q    As a partner, what was the percentage, what was

3    the portion that you owned?

4        A    I don't recall.  It might have been 25, but I

5    don't recall if -- if it was.  I don't remember the

6    structure off the top off of my head.

7        Q    Do you recall when signing this agreement

8    thinking that you are entering into something less than

9    what you would otherwise be entitled to as an owner?

10        A    I don't remember.

11        Q    You don't remember?

12        A    No.

13        Q    When -- so talking about AAS now.  When you

14    sold your ownership interest in AAS to Mr. Stecher, did

15    you engage in this similar series of transactions?

16        A    No.

17        Q    Did you have any written contract at all

18    transferring the ownership interest to Robert Stecher?

19        A    I think we did.  I just don't remember exactly

20    what it was, but it wasn't -- it wasn't anything like

21    this, though.

22        Q    Do you know what happened to that writing?

23        A    I don't.

24        Q    Was it lost?

25        A    I don't know.

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    41

1        Q    Do you think you can locate a copy of it?

2        A    I don't know.

3        Q    Did you -- have you tries looking for it?

4        A    I looked for -- I just went down this list and

5    looked for anything, so if it's on this list, I did.

6    But I guess I didn't find it if it's on there.  If it

7    was one of the things I was supposed to look for, then I

8    didn't find it.

9        Q    If -- can I ask you to look for it and produce

10   it to us?

11       A    Yeah, would you mind if I write it down to

12   remind myself.

13       Q    Sure, yeah, that would be great, I appreciate

14   it?

15       A    And what exactly is it that you want?

16       Q    So we're talking about any writing evidencing

17   the transaction between you, Mr. Renny, or any company

18   you own, and Robert Stecher transferring the interest in

19   AAS from you or your company, to Mr. Stecher.  You

20   understand?

21       A    Yes, sir.

22       Q    Thank you.  All right.  Moving along.  We --

23   we've been going for about an hour now.  You want to

24   take a break?

25       A    No.

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    42

1        Q   Okay.  Fair enough.

2            I am showing a new document now.  Do you see it

3    on the screen?

4        A   Yes, sir.

5        Q   All right.  This is a document I've marked as

6    AAS Depo Exhibit 4.

7            (Exhibit 4, Forte software service agreement

8    was marked for identification and is retained by

9    counsel.)

10       Q   And let me just bring it up a little bit.  I

11   don't know, can you see the whole document because I --

12       A   Yes, it's cut off on the right side.

13       Q   Okay.  It is cut off on the right side.  Just

14   give me a second.  I'll try to fix that.  Is that

15   better?

16       A   No, I think what you need to do is close the

17   instrument panel on the left side of the screen where it

18   says, All tools.

19       Q   Can I see what you guys see, because I don't

20   see that.  Let me -- let me -- hold on a sec.

21       A   Now -- now it just opened and it says -- and I

22   can see the entire agreement.

23       Q   Okay.  Good.  All right.  Okay.  Perfect.

24           All right.  Do you recognize this document?

25       A   Vaguely, yes.

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                                    43

1          Q     All right.  What is it?

2          A     That's the agreement, software serer agreement,

3     between Forte and Assured Auto Group.

4          Q     And this is dated the 23rd day of July 2018?

5          A     Uh-hum.  Yes.

6          Q     And is that your signature at the bottom?

7          A     Yes.

8          Q     On behalf of Assured Auto Group?

9          A     Yes.

10         Q     And you are a partner of Assured Auto Group at

11    the time?

12         A     I was.

13         Q     And you signed this agreement in July of 23rd,

14    2018; is that right?

15         A     That's what it says.

16         Q     Any reason to dispute that date?

17         A     No.

18         Q     All right.  I'm scrolling down to page 2 here.

19    Can you see that?

20         A     Uh-hum.  Yes.

21         Q     Let me just scroll down to the next one here.

22               All right.  I'm showing you page 6 of this

23    file.  Do you recognize this document?

24         A     Yes, it's the same type of agreement.

25         Q     A Software Server Access Agreement?

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    44

1        A    Yes.

2        Q    All right.  And this is dated February 2020?

3        A    Yes.

4        Q    And signed by Mindi Gruby on behalf of

5    Affordable Car Care?

6        A    Yes.  That's what it says.

7        Q    And if I scroll down to page 2 here, it

8    identifies Principal number 1 as Gustav Renny; is that

9    right?

10       A    Yes.

11       Q    So you were the principal of Affordable Car

12   Care, Inc.?

13       A    Yes.

14       Q    Did you authorize Mindi Gruby to sign this

15   document on behalf of Affordable Car Care?

16       A    I don't recall, but I'm sure I did.

17       Q    And this is your email address here on the

18   right column?  Sorry, I have everything highlighted.  I

19   just want to --

20       A    Yes.

21       Q    -- unhighlight it.

22       A    Yes.

23       Q    Gusrenny@me.com is your email address.

24            And Mindi Gruby is identified as the office

25   manager here, and her email is

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    45

1    mindy@affordablecarcare.com?

2         A    Yes.

3         Q    And Devin Castro is identified as the technical

4    individual.  And his email is devin@napcauto.com?

5         A    Yeah.

6         Q    All right.  And it says the type of phone

7    system is VICI.  Is that -- am I saying that right,

8    VICI?

9         A    Yes, sir.

10        Q    Okay.  What is VICI?

11        A    It's an open source dialer.

12             Is it okay if I disappear for one second and

13   grab a drink out of my refrigerator?  It's right here.

14        Q    No problem.

15        A    I can turn the camera so you see I'm not going

16   anywhere.

17        Q    Okay.

18        A    Thank you.

19        Q    No problem.

20             Okay.  And I just have a question about this

21   2600 number here.  It says, Default markup request 2600.

22             What's the significance of that?

23        A    I don't know.  Default -- I don't know.

24        Q    Okay.  Scrolling down here a little bit more.

25   We come across another software server agreement.  Do

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    46

1    you recognize this document?

2         A    Yes.

3         Q    And this is same kind of document; is that

4    right?

5         A    Yes.

6         Q    Same kind of contract, and this one is signed

7    on January 27th, 2022?

8         A    Yes.

9         Q    And this is between a customer called

10   Affordable Auto Shield Inc.?

11        A    Yes.

12        Q    And this one is also signed by Ms. Mindi Gruby?

13        A    Yes.

14        Q    Did you authorize Ms. Gruby to sign this

15   document on behalf of AAS?

16        A    Yes.

17        Q    All right.  And this identifies that at that

18   time, you were the principal; is that right?

19        A    Yes.

20        Q    It's got your email address, it's got that's

21   Jason Colapietro is the general manager?

22        A    Yes, that's incorrect, but yeah.

23        Q    That's incorrect?

24        A    He wasn't here.  He wasn't here in the

25   beginning.

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    47

1        Q    Okay.  Did you review this document before it
2   was signed?

3        A    I don't -- I don't know.

4        Q    Okay.  So --

5        A    Standard probably not.  It's probably -- yeah,
6   I don't know.  I don't recall.

7        Q    Was this something like yo just told Ms. Gruby
8   to fill out a server access agreement and she said okay
9   and she handled it?

10       A    Yeah, the reason why we do these -- these -- a
11  bunch of these different agreements is we keep them all
12  separated depending on what kind of marketing you're
13  gonna do so that nothing gets come -- nothing gets, you
14  know, convoluted, so that's why there's like a bunch of
15  them.  So -- so yeah, this is just like kind of rinse
16  and repeat, I'm sure.

17       Q    Okay.  So who was the general manager if it
18  wasn't Mr. Colapietro?

19       A    I don't know -- I don't know who it was in the
20  beginning.  I can't remember what we did in the from the
21  time that Jason left to -- to hiring somebody else.  I
22  don't know if we really designated one.

23       Q    Was - did Ms. Gruby have to take over his
24  duties?

25       A    Yeah, yeah, I mean kind of.  You know, she's,

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                              48

1    you know, yeah, I mean, it's a call center, right, I

2    mean, it's not Google, right.  So it's like, you know,

3    somebody sits in a chair and if the phone rings, they

4    answer it, right.  It's not so much that goes into it.

5         Q    Okay.  All right.  I've scrolled down to page

6    18 of this file, and this is a -- it looks a little

7    different from the prior ones, but it's still called a

8    Software Server Access Agreement.  Do you recognize

9    that?

10        A    Yes.

11        Q    Okay.  And this is a Software Server Access

12   Agreement that's signed on July 24, 2015?

13        A    Yes, sir.

14        Q    And let me scroll down here so we can see who

15   signed this one.  The customer is -- well, the customer

16   is not identified, but is that your signature?

17        A    Yes.

18        Q    Okay.  So you're -- you're identified as a

19   partner of -- let's scroll back up so we can see.

20        A    NAPC.

21        Q    Okay.  I see your name and PC in the corner.

22   What's that?

23        A    I assumed you wrote that.

24        Q    No, I didn't write that.

25        A    Oh.

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    49

1        Q    Did you write that?

2        A    No.

3        Q    Okay.

4        A    I wish my handwriting was that good.

5        Q    All right.  All right.  So do you know what

6    company, then, that this was an agreement for, the

7    customer number?

8        A    No.

9        Q    You don't know?  NAPC, what does that mean to

10   you?

11       A    That was the acronym for National Auto

12   Protection.

13       Q    Okay.  So coming down to this next page here on

14   information sheet, and it says the company name is

15   National Auto Protection Corp.  Do you recognize that

16   name?

17       A    Yes.  That was the first, yeah, first company.

18       Q    All right.  Your first one.  All right.  And so

19   this identifies you, sir, and William T. Finneran as

20   principals?

21       A    Yes, sir.

22       Q    And the type of phone system is a Spitfire?

23       A    Yes, sir.

24       Q    Is that right, was that accurate?

25       A    Yes.

1      Q    It wasn't VICI?

2      A    It was not.

3      Q    When did you -- when did you start using VICI?

4      A    I don't know.  We went through a lot of

5   different dialers.

6      Q    Which one is the best?

7      A    Depends on what you're asking for the best is.

8      Q    What does VICI do the best?

9      A    VICI is very good for like my part of the

10  business where you can block phone numbers to, you know,

11  to ensure the via -- the ability to actually do

12  compliance, you know, as right as possible.  Some

13  dialers don't have that capability, and even if they do,

14  it doesn't really work as well.

15     Q    All right.  And this address for NAPC is 1665

16  Palm Beach Lakes Boulevard?

17     A    Yes, sir.

18     Q    Is that a correct address?

19     A    It was, yes.

20     Q    Okay.  When did you move to Congress Avenue?

21     A    I think it was 2020.

22     Q    2020?  Okay.

23     A    When was COVID?

24     Q    2020.

25     A    So right about then.

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    51

1        Q    All right.  I think we just got a couple more

2    here, so now we're down to the next one here, and this

3    looks like the original ones that we saw.  This is

4    another software access agreement?

5        A    Yes.

6        Q    Okay.  The Software Server Access Agreement.

7    This one is dated March 20 th, 2019?

8        A    Yes.

9        Q    And this one, if I go to the bottom here, it's

10   signed by you?

11       A    Yes.

12       Q    As a member of a company called Zander Collins

13   Smith?

14       A    Yes.

15       Q    Why is what funny?

16       A    This -- this Zander Collins Smith has been like

17   one of the bane of my existences.  Nobody knows where it

18   came from.  It -- and then, it was on -- it was on a

19   company -- it was on another company, we didn't know it

20   was on there, then we would get documents like this that

21   has Zander Collins Smith on it, we signed it, and I

22   think either this -- either this -- this agreement or

23   another agreement at the same time signing these things

24   was what brought it to our attention.  We fixed it with

25   this -- I think it's called the Secretary of State in

1    California.  I don't know what it's referred to if it --

2    if that's it, that's what it is.  To get it removed

3    saying nobody knows what it is.  And it literally won't

4    go away.  I have signed probably 70 documents to remove

5    it from its existence, and for some reason, it's still

6    there, and it keeps coming up.

7            And -- and where it stems from was I believe,

8    what we believe is that our original CPA who formed our

9    company had a massive stroke and passed away, and I --

10   we think that it started there, and that's why nobody

11   knows what it is.  If that makes sense.

12      Q    Okay.  So on March 18th, 2020 when you signed

13   this document, did you look to see who the customer name

14   was?

15      A    Probably not.  That looks like a DocuSign or

16   something like that.  And it was signed in 2019, not

17   2020.

18      Q    Oh, correct, yeah, I was looking at the 20

19   here.  You're right.

20      A    I wasn't trying to be rude, I wasn't trying to

21   be disrespectful.  I just wanted to make sure it's

22   right.

23      Q    No, absolutely, correct me if I got something

24   wrong.  Please do.  I appreciate it.

25            All right.  It's good for the record as well.

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    53

1          So March 20, 2019, you signed this document,

2    and what was the real company name for this?

3      A   I don't know.  Can you maybe scroll down to the

4    second page?

5      Q   Fair.

6      A   National Car Care.

7      Q   All right.  So how do you know that?

8      A   It says it right there.  Doing business as

9    National Car Care.

10     A   Well, it says company name Zander Collins Smith

11   doing business as National Car Care, right?

12     A   Yes, so that's how I know it's National Car

13   Care.

14     Q   So what's the company's name?

15     A   National Car Care.

16     Q   LLC?

17     A   I don't recall how that was formed.

18     Q   All right.  And you're Principal Number 1 here?

19     A   Yes.

20     Q   And that's your email address?

21     A   Yes.

22     Q   And we've got a couple other principals;

23   William Thomas Finneran, and William Tyler Farrington.

24     A   Correct.

25     Q   All right.  So you guys were three -- three

1    owners?

2        A    Yes.

3        Q    And the general manager here was Jason

4    Colapietro again?

5        A    Yes.

6        Q    Mindi Gruby is the accountant?

7        A    Yes.

8        Q    Is she your CPA?

9        A    She is not a CPA.

10       Q    Okay.  And then, Devin Castro would be your

11   technical again?

12       A    Yes, sir.

13       Q    All right.  And this website here,

14   napcauto.com; is that correct?

15       A    I would assume so, yes.

16       Q    And the type of phone system is now in 2019

17   VICI?

18       A    Yes, sir.

19       Q    Okay.  When you realized there was an issue

20   with the name of this company, did you go back and

21   re-sign an agreement with National Car Care, LLC and

22   like one of these?

23       A    So, I -- I'm not a hundred percent sure, but I

24   think when -- I think we -- I think we did correct it,

25   because I remember -- the only reason why I think is

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                                55

1    because I remember that when we were doing business, it

2    was coming up Zander Collins Smith, it didn't make

3    sense, so we had to change it so it came up as National

4    Car Care.  So I'm assuming that we changed it and fixed

5    it.

6         Q    So if we ever see a reference to Zander Collins

7    Smith, that should be a reference to National Car Care?

8         A    Yes.

9         Q    Or NCC?

10        A    Yes, sir.

11        Q    Okay.  Did you ever sign any articles of

12   incorporation or filings forming a company called Zander

13   Collins Smith?

14        A    No.

15        Q    Okay.  Moving right along here to this next

16   Software Server Access Agreement, this one signed on

17   December 7th, 2020; is that right?

18        A    Yes.

19        Q    And this is if we go to the bottom here, the

20   customer is Pelican Investment Holdings, LLC, and is

21   that your signature on behalf of Pelican Investments

22   Holding, LLC?

23        A    Yes, sir.

24        Q    And you signed this document on December 7th,

25   2020?

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    56

1        A    Yes, sir.

2        Q    And this identifies the principals as you, Mr.

3   Renny, Mr. Samararatne, and Ronald Eddington?

4        A    Yes.  There might be another one on -- there

5   might be more on the page, on another page.

6        Q    Correct.  And the general manager is you?

7        A    Yeah.

8        Q    All right.  What happened to Jason?

9        A    I don't think that he was available for

10  signature, so I listed myself as the general manager.

11       Q    Right, but so you're saying Mr. Colapietro was

12  the general manager at this time?

13       A    Yeah, he did work for -- he did work for

14  Pelican, yes.

15       Q    All right.  And the office manager is Mr.

16  Samararatne?

17       A    Sure.

18       Q    And the accountant is Mindi Gruby again?  That

19  should be Mindi Gruby, right?

20       A    Mindi Gruby, yeah.

21       Q    Same person.

22       A    What did I say; Mind?  Yeah, that's a mistake.

23       Q    All right.  And the phone system is VICI. Was

24  that right?

25       A    Yes.

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    185

```
 1        Q   So you knew Volar from the Pelican days?
 2        A   Might have been a little bit before that, but
 3   yeah, but right around that.
 4        Q   Right.  Did Pelican and AAS have the same kind
 5   of relationship with Volar or did they have different --
 6        A   I don't know.
 7        Q   -- arrangements.
 8        A   I don't know.
 9        Q   What was the -- what was the arrangement with
10   -- what was the association, so to speak, with MMS and
11   AAS?
12        A   What was the association?  Any time they had an
13   interested party from one of our mailers, they would --
14   they would let us know and -- and we'd try to close the
15   deal.
16        Q   So they transferred a call to you?
17        A   They would -- no, they would not -- no, they
18   didn't transfer call.  They would just give us -- they
19   would give us a lead.
20        Q   So you sent out the mailer, and then -- and
21   then, what happens?
22        A   So you want the marketing strategy for AAS?  Is
23   that what you're asking?
24        A   Yeah, that's what I'm asking.  Thanks for the
25   better question there.
```

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024

186

1        A    Okay.

2        Q    What's the -- how does it work?

3        A    Okay.  So you would send out a mailer,

4   obviously whoever calls in, you take their call and try

5   to give them information that they want and -- and sell

6   them a policy.

7        Q    Can I interrupt you right there.

8        A    Sure.

9        Q    Who were they -- who were they calling?  Are

10  they calling AAS at that moment?

11       A    Yes, they're calling directly into AAS.

12       Q    Okay.  So that's a number on the mailer, they

13  call that number, they go straight through to a AAS

14  sales agent?

15       A    Correct.

16       Q    Got it.

17       A    So then, over the course of, let's say, a

18  month -- I'm just making it up, right.  But over a

19  month, you get a bunch of people that have called in and

20  either -- either they don't buy, or it's like let me ask

21  my husband, I'll call you back, or any -- something like

22  that.  And then, we would compile those numbers, and we

23  would have a company like MMS call it back and set

24  appointments.  They called in a couple weeks -- you

25  called in a couple weeks ago, said you had to ask your

```
1    wife, can we set up a time to call back.
2         Q    Sure.  And so MMS would follow up with those
3    people?
4         A    Yes.
5         Q    How would AAS communicate those phone numbers
6    to MMS?
7         A    So -- so it would be a disposition report.
8         Q    Yeah.
9         A    And I think that's -- I think that -- that that
10   number got transferred to them immediately.  I think
11   that's how it works.  I think it goes to them directly
12   once we're off the call, and then, they keep track of
13   it.
14        Q    Is that -- is that why MMS logs into VICIdial?
15        A    I don't think they logged into our VICIdial.
16        Q    So are you emailing reports with those numbers
17   or --
18        A    No, it's -- I think it's a SIP transfer.
19        Q    SIP transfer.  So the number -- the consumer's
20   number then calls to MMS?
21        A    No.
22        Q    How does that work?
23        A    I -- I don't want to speak out of turn, so I'm
24   not sure.  You have to ask MMS the technology of that.
25   All I know is that they put a button that would send it
```

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024                    188

1    to them and -- and that's all I -- that's about the

2    extent of the technology part how I know it works.

3        Q    And that's the sort of technology that's

4    incorporated into VICI software?

5        A    No, that's a MMS software.

6        Q    How did -- how does MMS reach into AAS' systems

7    and get the numbers out?

8        A    It's a button -- they don't reach in.  It's a

9    button that -- that would transfer it to them.

10       Q    A live transfer?

11       A    It's not a live transfer.  The call, it's just

12   a transfer of that -- of that phone number.

13       Q    Okay.  So all the phone numbers that MMS was

14   getting and calling were numbers that were given to it

15   by AAS?

16       A    Yeah, so like I mean, I can't really -- I mean,

17   I'm gonna give it to you in the most like layman's terms

18   because that's for me, not for you, obviously.

19            So like if you're on the phone, if a customer

20   would call in, right, from a mailer, their information

21   pops up on our screen because we have their information

22   from the mailer.  Follow me?

23       Q    Yep.

24       A    Okay.  If Jeff said, I have to ask my wife, we

25   would copy and paste, and we would paste it into their

Transcript of Gustav Renny, Corporate Designee
Conducted on September 18, 2024

240

1    relationship to identify whether that was their number,

2    such as MMS?

3         A    Yes, we -- we call -- we sent these numbers to

4    see if there was a -- if there was a potential lead

5    generated lead from somebody else, and --

6         Q    Okay.

7         A    -- nothing.

8         Q    Okay.  All right.

9         A    But we did not -- we did not call it.  But just

10   to be clear, we did not call it because we do not have a

11   legal opt-in and the right to call it.

12        Because if you really want to get technical

13   about it, the reason why we're even sitting here right

14   now is because your boys plant phone numbers to make you

15   guys try to get a little money so you can earn a living.

16   And that could very well be one of those numbers which

17   are called honey pots, and this could be a reason for

18   you to want me to call them and -- and say, Oh, look,

19   he's still calling that number.  So I would not call

20   anything without an opt-in.  Or a prior business

21   relationship.   Anything that falls within the TCPA.

22        So -- so I would -- I would -- I would

23   respectfully request that you rescind what you just said

24   to my attorney because that is not true.  And if you,

25   like your -- like your clients are gonna make bullshit

```
1            CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

2            I, Ky Shanklin, the officer

3     before whom the foregoing proceedings were

4     taken, do hereby certify that any witness(es) in

5     the foregoing proceedings were fully sworn;

6     that the proceedings were recorded by me and

7     thereafter reduced to typewriting by a

8     qualified transcriptionist; that said digital

9     audio recording of said proceedings are a

10    true and accurate record to the best of my

11    knowledge, skills, and ability; and that I am

12    neither counsel for, related to, nor employed

13    by any of the parties to this case and have

14    no interest, financial or otherwise, in its

15    outcome.

16

17

18

19    _____

20    KY SHANKLIN, NOTARY PUBLIC

21    FOR THE STATE OF ILLINOIS

22

23

24

25
```

1                    CERTIFICATE OF TRANSCRIBER

2              I, Jerome E. Harris, do hereby certify that

3    this transcript was prepared from the digital audio

4    recording of the foregoing proceeding; that

5    said transcript is a true and accurate record of

6    the proceedings to the best of my knowledge, skills,

7    and ability; and that I am neither counsel for,

8    related to, nor employed by any of the parties to

9    the case and have no interest, financial or

10   otherwise, in its outcome.

11

12   *Jerome E. Harris*

13   _____

14   JEROME E. HARRIS, STENOGRAPHER

15   SEPTEMBER 30, 2024

16

17

18

19

20

21

22

23

24

25

# Exhibit 8

# PAYMENT PLAN AGREEMENT

*20211074894264*

Payment Plan Provider provided by:
**SING For Service, LLC d/b/a MEPCO**
205 N. Michigan Avenue, Suite 2200, Chicago, IL 60601
Fax: 866.656.6518          Telephone: 800.397.6767

| Purchaser: | | Seller: | CODE: S100617 |
|---|---|---|---|
| NAME: ANA CALLIER | | LEGAL NAME: AAP | |
| | | DBA: | |
| ADDRESS: ▮ | | ADDRESS: 1300 OLD CONGRESS ROAD | |
| CITY: EL PASO   ST: TX   ZIP: 799128154 | | CITY: WEST PALM BEA   ST: FL   ZIP: 33409 | |
| PHONE: ▮   FAX: | | PHONE: 888-678-0697   FAX: | |
| E-MAIL: ▮ | | E-MAIL: | |
| | | SALESPERSON: | |

## Payment Plan Terms
### All dollar amounts are in U.S. dollars

Total Sales Price ▮

Down Payment ▮

**Balance of Sales Price** ▮

Number of Payments
(cannot be more than 42 or less than 2)      24

Amount of Each Payment
(Balance of Sales Price divided by      ▮

Payment Date (each month)      11/5/2021
(First due date no more than 30 days
from sale date)

Final Payment Date      10/5/2023
(Date of last payment)

This Payment Plan Agreement ("Agreement") is between Purchaser and SING For Service, LLC d/b/a Mepco ("MEPCO"), a Seabury Asset Management Company. Purchaser has purchased a service ("Contract") from Seller that is issued by SUNPATH LTD.
("Administrator"). This Agreement is entered into to enable Purchaser to pay for the Contract pursuant to an installment payment program.

Contract: VSC and/or PROD WAR   Contract # SAF203189

Administrator: SUNPATH LTD.

| Vehicle Information | Contract and Payment Plan Effective Date | |
|---|---|---|
| Make: LEXUS | Model: RX350 | Odometer: VEHICL |
| Year: 2013 | Coverage Term: (in months) 60 | Coverage Mileage: (in Miles) 100000 |

Refer to the Contract for the terms and conditions regarding the Contract.

In consideration of Purchaser being afforded the opportunity to pay for the Contract under the installment payment program, the Purchaser and MEPCO acknowledge and agree as follows:

Purchaser has paid to Seller for its account in cash the down payment disclosed under "Payment Plan Terms" towards the Total Sales Price of the Contract. The Balance of Sales Price shall be paid by Purchaser to MEPCO. Subject to the Cancellation provisions on Page 2 hereof, Purchaser promises to pay MEPCO, the Balance of Sales Price in accordance with the payment method selected by Purchaser from the options set forth below.

[X] **Payment Option 1: Authorization for Credit Card Payment**
The Balance of Sales Price may be paid by Purchaser through, and Purchaser hereby authorizes MEPCO to make, the applicable number of consecutive monthly charges to Purchaser's credit card account listed below, in the amounts and on the dates disclosed under the Payment Plan Terms, until such time as the Balance of Sales Price, together with the applicable charges described on page 2 hereof (the "Applicable Charges"), are fully paid, or until such time as MEPCO has received written notification of termination

Credit Card Number ▮   Expiration Date (MM/YY) ▮   Type of Card (MC, Visa, Amex, Discover)

I authorize charges to my credit card account for payment of the Balance of Sales Price together with all Applicable Charges in accordance with

[ ] **Payment Option 2: Authorization for Bank Account Direct Debit**
The Balance of Sales Price may be paid by Purchaser through, and Purchaser hereby authorizes MEPCO to instruct Purchaser's financial institution described below to make, the applicable number of consecutive monthly payments in the amounts and on the dates disclosed under Payment Plan Terms, from the account listed below, by electronic automatic debit of Purchaser's checking or savings account. This authority will remain in effect until such time as the Balance of Sales Price, together with all applicable Charges, are fully paid, or until such time as MEPCO has received written notification of termination ("Bank Account Direct Debit Termination Notice") from Purchaser in time to

Name of Financial Institution   Routing Number (Must be 9 digits long)   Account Number   [ ] Checking   [ ] Savings

I authorize charges to my bank account for the payment of the Balance of Sales Price together with all Applicable Charges in accordance with this Agreement.

[ ] **Payment Option 3: Monthly Bill**
The Balance of Sales Price may be paid directly by Purchaser in accordance with the Payment Plan Terms listed above. Purchaser shall receive a monthly bill and shall make payment on or before the Payment Date of each consecutive month until the Balance of Sales Price, together with all Applicable Charges, are fully paid, or until such time as MEPCO has received written notification of termination ("Monthly Bill Termination Notice") from Purchaser. Purchaser shall send such payments to MEPCO at such address as MEPCO provides to Purchaser

PURCHASER SHALL HAVE THE RIGHT, AT ANY TIME, TO CANCEL THE CONTRACT BY NOTICE TO MEPCO ("Termination Notice") OR BY NONPAYMENT. PURCHASER SHALL HAVE NO OBLIGATION TO MAKE ANY INSTALLMENT PAYMENTS AFTER CANCELLATION. Subject to the Cancellation provisions on Page 2 hereof, unless MEPCO shall previously have received a Bill Termination Notice, (i) a late payment fee may be imposed in the amount of the lesser of 5% of the late payment or $5.00 in respect of any payment not received by MEPCO within five days of the scheduled Payment Date therefor (the "Late Charge"), and (ii) in the event that any scheduled payment is not made on or before the scheduled Payment Date, as provided in the Payment Plan Terms above, MEPCO is authorized by Purchaser (without notice thereof to Purchaser) to direct Administrator or Seller to cancel Purchaser's Contract and this Agreement at any time for nonpayment. Purchaser hereby assigns to MEPCO all of Purchaser's right, title and interest in and to the Contract, including Purchaser's rights to cancel the Contract, receive all unearned and refund amounts under the Contract and Purchaser's right to make a direct claim for indemnity against the Insurance Company. Purchaser represents to MEPCO that Purchaser's decision to purchase the Contract from Seller under the payment program did not result in Seller charging Purchaser a different Total Sales Price than Purchaser would have paid if Purchaser had decided instead to pay the purchase price of the Contract in full at the time this Agreement was executed. The content and format of this Agreement have been adopted to provide Purchaser with important

[ ] By signing below, I agree I have had the opportunity to review, accept, and correct any errors contained in this Agreement.
Purchaser understands that the personal information regarding Purchaser that is provided by Purchaser in connection with this Agreement will not be used or shared with any other party other than for the purpose of the services provided in this Agreement and the Contract and as required or permitted by applicable law.

**PURCHASER**
By: _____

Date: 10/5/2021

Its hjk

Exhibit 18

[ ] This Agreement sets forth the terms and conditions of the payment plan authorized by Purchaser by phone or other electronic means. See page 2 for instructions to cancel.

See Page 2 for additional terms and conditions

Payment Plan Agreement, Page 2

**PROMISE TO PAY:**

In consideration of the sale of the Contract to Purchaser, Purchaser promises to pay to MEPCO, on behalf of Mepco, the Balance of Sales Price and all Applicable Charges shown under Payment Plan Terms, subject to the provisions of this Agreement. Purchaser shall not have any right to reduce any amount owed to MEPCO pursuant to this Agreement for any reason whatsoever.

**CANCELLATION:**

Purchaser has the right to cancel this Agreement at any time. Purchaser may cancel this Agreement at any time by (i) electing not to make the next payment due pursuant to this Agreement or (ii) sending MEPCO a Termination Notice. In the event that (a) Purchaser elects not to make the next payment due pursuant to this Agreement, (b) MEPCO receives a may cancel the Contract and this Agreement. After the effective date of Cancellation, Purchaser shall have no further obligation to make installment **IMPORTANT**

**Cancelling this Agreement does not immediately cancel your Contract; It only cancels your payment plan. Coverage under your Contract will eventually be cancelled (in accordance with the terms of this Agreement) based on your nonpayment. However, you should contact the Seller or Administrator in order to immediately cancel your Contract.**

Purchaser hereby assigns to MEPCO all of Purchaser's right, title and interest in and to the Contract, including Purchaser's rights to receive all unearned and return amounts and to assert any rights to reinstate the Contract and all proceeds thereof, and Purchaser's right to make a direct claim for indemnity against the Insurance Company. In the event that Purchaser has made total payments to MEPCO in excess of the portion of the Total Sales Price plus Applicable Charges earned through the date of cancellation, Administrator or

**POWER OF ATTORNEY:**

Following any default hereunder, and subject to the Cancellation provisions above, Purchaser hereby irrevocably appoints MEPCO as its true and lawful attorney-in-fact, only for the limited purposes related to this Agreement set forth in the following sentence until all amounts payable hereunder are paid in full. MEPCO shall have full power under this power of attorney to (i) cancel the Contract, (ii) receive, demand, collect or sue any party for any amounts relating to the Contract, (iii) endorse or execute in Purchaser's name all checks issued and all other documents or instruments relating to the Contract, and (iv) take such other actions as are reasonably necessary to further the purposes of this

**APPLICABLE CHARGES:**

If any payment due hereunder is more than five days late, and except as prohibited by applicable law, Purchaser agrees to pay MEPCO the Late Charge. Nothing herein shall be considered to waive any default hereunder or to grant any grace period with respect to any default for failure to make any payment on the Payment Date. Notwithstanding anything herein to the contrary, in the event that any scheduled payment is not made on or before the Payment Date, MEPCO may, in its sole discretion, direct Administrator or Seller to cancel the Contract and this Agreement at any time for nonpayment. Except as prohibited by applicable law, Purchaser agrees to pay to MEPCO a fee of $25 for each check or each debit that is dishonored by Purchaser's bank. Purchaser consents to the payment of all of the Applicable Charges in accordance with the Payment Option

**DEFAULT PAYMENT OPTION:**  If Purchaser fails to select a Payment Option, Purchaser shall be deemed to have selected a Monthly Bill.

**PREPAYMENT:**  Purchaser shall have the right to prepay the entire unpaid Balance of Sales Price at any time, without penalty or discount.

**DEFAULT:**

If (i) Purchaser  fails to make any payment due hereunder or comply with any other provision hereof, (ii) Purchaser becomes the subject of any voluntary or involuntary bankruptcy proceedings, (iii) Purchaser has a receiver or trustee appointed for it or its property, or (iv) Purchaser makes an assignment for the benefit of its creditors or admits in writing that it is unable to pay its debts as they become due, an "Event of Default" shall be deemed to have occurred. Upon the occurrence of an Event of Default, MEPCO shall have the right to take such actions as are available to MEPCO hereunder at law or in equity. MEPCO shall be entitled to reimbursement for reasonable attorneys' fees and costs in enforcing MEPCO's rights hereunder.

**RELEASE:**

Purchaser hereby releases and discharges MEPCO from any liability for damages with respect to any action taken following an Event of Default by Purchaser and shall indemnify and hold MEPCO harmless from any liabilities, claims, damages or causes of action in connection with any such action by MEPCO.

**PAYMENTS AFTER CANCELLATION:**

Any payment made by Purchaser after the effective date of cancellation (or after a notice of cancellation is mailed to Purchaser) will **not** result in a reinstatement of the Contract but will be applied to Purchaser's outstanding obligations, if any, under this Agreement. Neither the acceptance nor the application of any such payments shall constitute an undertaking by MEPCO to take steps to attempt to reinstate such Contract or constitute a waiver of any Event of Default hereunder.

**ACCEPTANCE, RATIFICATION, ACCURACY:**

This Agreement shall be considered accepted by Purchaser and MEPCO upon the payment of the down payment and is effective as of Effective Date of Contract. Purchaser agrees that MEPCO shall have the authority to revise this Agreement to insert any provision omitted (including but not limited to the due date of the first installment) upon written notice to Purchaser. In addition, if the total payments due hereunder are increased due to underwriting considerations, MEPCO shall have the right, upon receipt of Purchaser's written authorization, to revise dollar amounts on the face of this Agreement. Any change by Purchaser (by way of deletion, modification, supplementation or otherwise), to any portion of this Agreement shall render the Agreement voidable, at MEPCO's option.

**ASSIGNMENTS:**

MEPCO may, with or without notice to Purchaser, assign or pledge its rights, title and interest in, to and under this Agreement and the power of attorney herein described. Upon written notice from any such assignee, Purchaser shall make all payments to such assignee without defense, offset or counterclaim.

**AGENTS OF SING For Service, LLC d/b/a**

Pursuant to one or more powers of attorney, MEPCO will, from time to time, appoint one or more third parties as its agent to take certain actions on its behalf in connection with this Agreement. The Purchaser is entitled to rely upon actions taken and statements made by such agents on behalf of, and in the name of, MEPCO to the same extent as if MEPCO had taken such actions or made such statements in its own name.

**LIMITED RESOURCE COVENANT:**

The Purchaser understands and agrees that: (i) Mepco's obligations are solely the obligations of Mepco and of no other Person, payable at any time only to the extent funds are available to Mepco, (ii) to the extent funds at any time are not available to Mepco to pay such obligations, any claims relating thereto shall not constitute a claim against Mepco but shall continue to accrue; (iii) the payment of any claim (as defined in Section 101 of Title 11 of the Bankruptcy Code) is expressly subordinated to the payment in full of all of Mepco's outstanding obligations to its lenders and the administrative agent; and (iv) prior to the date that is one year and one day after the payment in full of all of Mepco's outstanding obligations, the Purchaser will not institute against, or join with any other Person in instituting against, Mepco any bankruptcy, reorganization, insolvency or liquidation proceedings or similar proceeding under the laws of the United States or any state of the United States.

See Page 3 for additional terms and conditions

Payment Plan Agreement, Page 4

**WAIVERS, REMEDIES, ENTIRE AGREEMENT:**

MEPCO's failure to require strict performance of any provision hereof or to exercise any of its rights hereunder, shall not be construed as a waiver or relinquishment of any future rights under such provision, but the provision shall continue and remain in full force and effect.  The exercise of any rights or remedies by MEPCO under this Agreement is cumulative and shall not preclude MEPCO from exercising any other right or remedy it may have hereunder or at law.  Each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law.  If any provision hereof is held to be unenforceable or invalid under applicable law, the unenforceability or invalidity of such provision shall not impair the validity or enforceability of the remaining provisions hereof.  Time is of the essence in this Agreement.

**MANDATORY ARBITRATION:**

MEPCO and Purchaser mutually agree that (i) any one of them has the right to elect to resolve by binding arbitration:
any claim, dispute or controversy (whether in contract, tort or otherwise, whether pre-existing, present or future, and including statutory, common law, intentional tort, and equitable claims) arising from or relating to this Agreement or the Contract; (ii) if arbitration is chosen, it will be conducted with the American Arbitration Association (the "AAA") pursuant the AAA's Commercial Arbitration Rules: (iii) THERE SHALL BE NO AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED ON A CLASS ACTION  BASIS; (iv) AN ARBITRATION CAN ONLY DECIDE MEPCO'S OR PURCHASER'S CLAIM(S) AND MAY NOT CONSOLIDATE OR JOIN THE CLAIMS OF OTHER PERSONS WHO MAY HAVE SIMILAR CLAIMS; (v) ANY SUCH ARBITRATION HEARING WILL TAKE PLACE IN THE BOROUGH OF MANHATTAN, CITY OF NEW YORK, NEW YORK; (vi) Purchaser hereby waives any objection which it may now or hereafter have based on venue and/or forum non conveniens of any such arbitration; and (vii) this Agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act.

**GOVERNING LAW AND VENUE:**

This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to applicable conflict of law principles.  Purchaser hereby unconditionally and irrevocably waives any claim to assert that the law of any other jurisdiction governs this Agreement or the Contract.  Any legal suit, action or proceeding against MEPCO arising out of or relating to the Agreement or the Contract may only be instituted in Federal or State Court in the State of New York, Borough of Manhattan, City of New York, New York. Purchaser hereby waives any objection which it may now or hereafter have based on venue and/or forum non conveniens of any such suit, action or proceeding and Purchaser hereby irrevocably submits to the jurisdiction of any such court in any such suit.

**WAIVER OF CLASS ACTION:**

PURCHASER HEREBY WAIVES ANY RIGHT TO BRING ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT, THE CONTRACT OR ANY MATTER ARISING IN CONNECTION THEREWITH ON A CLASS ACTION BASIS.

**WAIVER OF JURY DEMAND:**

PURCHASER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY WITH REGARD TO THIS AGREEMENT, THE CONTRACT OR ANY OTHER ACTION ARISING IN CONNECTION HEREWITH OR THEREWITH.  MEPCO IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN THE EVENT OF ANY SUCH PROCEEDING.

FORM 77 PPA STANDARD 1.53 102706 (C) Mepco

UAAP-SUNPATH-MEP10052021_PARSED##2021-10-08-051531.MEPCO.XML

*77*

*20211074894264*

VAD
2101 Business Center Dr 200
Irvine, CA 92612
866-336-1769

**SunPath**
gosunpath.com

## Contract Declarations

| | |
|---|---|
| Contract Holder | Service Contract No. |
| Brandon Callier | MPF080223 |

| Street Address | |
|---|---|

| City, State, Zip | Phone |
|---|---|
| El Paso, TX 79912-8154 | |

| Year | Make | Model | VIN |
|---|---|---|---|
| 2013 | LEXUS | CT200H | |

| Odometer | Vehicle (Purchase Price) | Contract Purchase Date | Vehicle Class |
|---|---|---|---|
| 126,101 | | 02/12/2020 | 5 |

| Seller/Dealer/Vendor Name | I.D. |
|---|---|
| VAD | CEL0493 |

| Address | |
|---|---|
| 2101 Business Center Dr 200 | |

| City, State, Zip | Phone |
|---|---|
| Irvine, CA 92612 | 866-336-1769 |

| Finance Company | Payment Terms |
|---|---|
| SF INSTALLMENT AGREEMENT | |

| Plan Name | |
|---|---|
| Sunpath Mileage Plus Deluxe | |

| Plan Term | Plan Code | Deductible |
|---|---|---|
| Months 60 | Miles 75,000 | SPMPPD | $ 100.00 |

| * Validation Period | Surcharges | |
|---|---|---|
| 30 days and 1,000 miles | | |

| Contract Purchase Price | Options ** | |
|---|---|---|

The purchase of this contract is not required to either obtain financing or to purchase the motor vehicle. You have the right to transfer this Service Contract on the specified vehicle only to a subsequent private owner. Refer to the Transfer provision.

The undersigned purchaser of this Contract acknowledges that parts and labor benefits are subject to the validation period stated above *PER PHONE*

**Certification:** The undersigned Purchaser of this Service Contract has selected the above coverage and options and understands that depending upon the coverage plan selected that parts and labor benefits are subject to the validations stated above, I agree that I have read and understand the above Contract provisions and implied warranty disclosure.

| *02/12/2020*     PER PHONE | *Brian Jordan* |
|---|---|
| Date     Service Contract Purchaser/Signature | Seller/Dealer/Vendor Representative |

NWE-SP-MP-DLX (04-15)

DI

**Exhibit**
**19**

---

Brandon Callier
6336 Franklin Trail Dr
El Paso, TX 79912-8154

Congratulations! Your valuable mechanical breakdown protection is detailed in the enclosed contract booklet. Please look it over and call with any questions you may have. Thank you for your purchase; we look forward to servicing your protection needs. Please call us for a quote on any other vehicle in your household. Vehicles under 150,000 miles may qualify for additional coverages, and multi-vehicle discounts are available.

Be sure to familiarize yourself with the coverage, maintenance requirements, and procedures in the event of a mechanical breakdown. Proper maintenance of your vehicle will contribute to a trouble free driving experience. You should follow your vehicle manufacturer's recommended maintenance for your driving habits.

We encourage you to store your new service agreement in your vehicle. This document contains important numbers needed in the event of a breakdown.

Welcome to our family of vehicle owners that have the peace of mind and financial security of mechanical breakdown protection.

**THANK YOU AGAIN!**

*Brian Jordan*
Protection Specialist

**IMPORTANT CONTACT NUMBERS:**

Claims: 888-990-7786

Roadside: 888-878-8259

CALLIER_001

W8TDM

**MILEAGE PLUS**
Coverage with Roadside Assistance
**888.990.7786**

## Deluxe Coverage Plan

This **SERVICE CONTRACT** is an agreement between **YOU and US. WE, US, OUR** and **PROVIDER** refer to Northcoast Warranty Services, Inc., who is the party responsible to **YOU** for the benefits under this SERVICE CONTRACT. **YOU, YOUR** and **CONTRACT HOLDER** refers to YOU, the purchaser of this SERVICE CONTRACT and the Vehicle described in the DECLARATION PAGE of this SERVICE CONTRACT. WE have contracted with SunPath, Ltd., 25 Braintree Hill Park, Suite 100, Braintree, MA 02184, 888-990-7786, hereinafter referred to as **ADMINISTRATOR,** to administer this SERVICE CONTRACT. All inquiries should be directed to the ADMINISTRATOR. Toll-free assistance is available at 888-990-7786.

In Florida this SERVICE CONTRACT is between YOU and SunPath LTD Corp. d/b/a SunPath LTD Corp of Delaware, Florida Certificate of Authority No.: 19943. SunPath LTD Corp. d/b/a SunPath LTD Corp of Delaware is also the SERVICE CONTRACT ADMINISTRATOR and handles all administrative functions of this SERVICE CONTRACT. All inquiries should be directed to SunPath LTD Corp. of Delaware at 888-990-7786.

## DEFINITIONS

- AUTHORIZED REPAIR(S). APPROVED REPAIR(S): All repairs must be approved and authorized by the ADMINISTRATOR as a condition of COVERAGE. Repairs performed without the prior approval or authorization from the ADMINISTRATOR will not be covered, except as provided for under Emergency Repairs.

- BREAKDOWN, MECHANICAL BREAKDOWN, MECHANICAL FAILURE: Defects in materials and workmanship of a COVERED PART to perform the function for which it was designed by its manufacturer.

- COVERAGE: The coverage afforded to YOU for YOUR VEHICLE is determined by the PLAN TYPE selected on the DECLARATION PAGE and more fully described in the PLAN COVERAGE section of this SERVICE CONTRACT.

- COVERED PART(S): Parts or components listed under the PLAN COVERAGE and subject to YOUR responsibilities for VEHICLE maintenance under the YOUR OBLIGATIONS section and subject to conditions described under "EXCLUSIONS".

Administered by: SunPath Ltd.
Administrative Office:
25 Braintree Hill Park, Suite 100
Braintree, MA 02184
(888) 990-7786

This Contract is between You, the Purchaser and Northcoast Warranty Services, Inc., the Provider/Obligor.

800 Superior Avenue E., 21st Floor
Cleveland, OH 44114
(866) 927-3097

In Florida, the Provider/Obligor and Administrator is SunPath LTD Corp. d/b/a SunPath LTD Corp. of Delaware
FL License #19943, (888) 990-7786

NWS-SP-MP-DLX (04-15)

D2

1

NWS-SP-MP-DLX (04-15)

## NATIONAL CAR CURE
1665 Palm Beach Lakes Blvd., #215
West Palm Beach, FL 33401
800-261-0096

Ana Callier
6336 Franklin Trail Dr
El Paso, TX 79912-8154

Congratulations! Your valuable mechanical breakdown protection is detailed in the enclosed contract booklet. Please look it over and call with any questions you may have. Thank you for your purchase; we look forward to servicing your protection needs. Please call us for a quote on any other vehicle in your household. Vehicles under 150,000 miles may qualify for additional coverages, and multi-vehicle discounts are available.

Be sure to familiarize yourself with the coverage, maintenance requirements, and procedures in the event of a mechanical breakdown. Proper maintenance of your vehicle will contribute to a trouble free driving experience. You should follow your vehicle manufacturer's recommended maintenance for your driving habits.

We encourage you to store your new service agreement in your vehicle. This document contains important numbers needed in the event of a breakdown.

Welcome to our family of vehicle owners that have the peace of mind and financial security of mechanical breakdown protection.

THANK YOU AGAIN!

*Christopher Bowling*
Protection Specialist

**IMPORTANT CONTACT NUMBERS:**

Claims: 888-990-7766

Roadside: 888-878-8259

Exhibit 1

---

**SunPath**
gosunpath.com

## Contract Declarations

| Contract Holder | | Service Contract No. |
|---|---|---|
| Ana Callier | | SAF078460 |
| Street Address | | |
| | | Phone |
| City, State, Zip | | |
| El Paso, TX 79912-8154 | | |

| Seller/Dealer/Vendor Name | | I.D. |
|---|---|---|
| NATIONAL CAR CURE | | NCCA610 |
| Address | | |
| 1665 Palm Beach Lakes Blvd., #215 | | |
| City, State, Zip | | Phone |
| West Palm Beach, FL 33401 | | 800-261-0096 |

| Plan Name | | | |
|---|---|---|---|
| SunPath Secure Adv Platinum New | | | |

| Plan Term | | Plan Code | Deductible |
|---|---|---|---|
| Months 60 | Miles 100,000 | SPSAPN | $ 100.00 |
| *Validation Period | Surcharges | | |
| 30 days and 1,000 miles | 4WD | | |
| Contract Purchase Price | Options ** | | |

The purchase of this contract is not required to either obtain financing or to purchase the motor vehicle. You have the right to transfer this Service Contract on the specified vehicle only to a subsequent private owner. Refer to the Transfer provision.

The undersigned purchaser of this Contract acknowledges that parts and labor benefits are subject to the validation period stated above *PER PHONE*

**Certification:** The undersigned Purchaser of this Service Contract has selected the above coverage and options and understands that depending upon the coverage plan selected that parts and labor benefits are subject to the validations stated above. I agree that I have read and understand the above Contract provisions and implied warranty disclosure.

| 12/27/2019 | *PER PHONE* | *Christopher Bowling* |
|---|---|---|
| Date | Service Contract Purchaser Signature | Seller/Dealer/Vendor Representative |

MWS-ST-SA-PLATINUM (12-13)

D1

AAP

1300 Old Congress Road
West Palm Beach, FL 33409
888-678-0697

Ana Callier
6336 Franklin Trail Dr.
El Paso, TX 79912-8154

Jason S Weiss

Congratulations! Your valuable mechanical breakdown protection is detailed in the enclosed contract booklet. Please look it over and call with any questions you may have.

Thank you for your purchase; we look forward to servicing your protection needs. Please call us for a quote on any other vehicle in your household. Vehicles under 150,000 miles may qualify for additional coverages, and multi-vehicle discounts are available.

Be sure to familiarize yourself with the coverage, maintenance requirements, and procedures in the event of a mechanical breakdown. Proper maintenance of your vehicle will contribute to a trouble free driving experience. You should follow your vehicle manufacturer's recommended maintenance for your driving habits.

We encourage you to store your new service agreement in your vehicle. This document contains important numbers needed in the event of a breakdown.

Welcome to our family of vehicle owners that have the peace of mind and financial security of mechanical breakdown protection.

**THANK YOU AGAIN!**

*Brett Lynn*

Protection Specialist

**IMPORTANT CONTACT NUMBERS:**

Claims: 888-990-7796

Roadside: 888-878-8259

WISTD01

---

**Contract Declarations**

Service Contract No.
SAF203189

| Contract Holder | | | | |
|---|---|---|---|---|
| Ana Callier | | | | |
| Street Address | | | | Phone |
| City, State, Zip | | | | |
| El Paso, TX 79912-8154 | | | | |
| Year | Make | Model | VIN | |
| 2013 | LEXUS | RX350 | | |
| Odometer | Vehicle Purchase Price | | Contract Purchase Date | Vehicle Class |
| 55,173 | | | 10/05/2021 | 4 |
| Seller/Dealer/Vendor Name | | | | I.D. |
| AAP | | | | PEL4610 |
| Address | | | | |
| 1300 Old Congress Road | | | | |
| City, State, Zip | | | | Phone |
| West Palm Beach, FL 33409 | | | | 888-678-0697 |
| Finance Company | | | | Payment Terms |
| Mepco INSTALLMENT AGREEMENT | | | | |
| Plan Name | | | | |
| Surpath Secure Adv Platinum New | | | | |
| Plan Term | | Plan Class | | Deductible |
| Months  60 | Miles  100,000 | SPSAPN | | $ 100.00 |
| * Validation Period | | Surcharges | | |
| 30 days and 1,000 miles | | 4WD | | |
| Contract Purchase Price | | Options ** | | |

The purchase of this contract is not required to either obtain financing or to purchase the motor vehicle. You have the right to transfer this Service Contract on the specified vehicle only to a subsequent private owner. Refer to the Transfer provision. This Contract is not an insurance policy. This Contract is a service contract.

The undersigned purchaser of this Contract acknowledges that parts and labor benefits are subject to the validation period stated above.                                                                 PER PHONE

**Certification:** The undersigned Purchaser of this Service Contract has selected the above coverage and options and understands that depending upon the coverage plan selected that parts and labor benefits are subject to the validations stated above. I agree that I have read and understand the above Contract provisions and implied warranty disclosure.

| 10/05/2021 | PER PHONE | Brett Lynn |
|---|---|---|
| Date | Contract Purchase Signature | Seller/Dealer |

SPAO-SA-PLATINUM (02-20)

D1

CALLIER_004

From: <Verify@donotcall.gov>
Date: Fri, Jan 8, 2021 at 8:35 PM
Subject: National Do Not Call Registry - Your Registration Is Confirmed
To: ███████████████

Thank you for registering your phone number with the National Do Not Call Registry. You successfully registered your phone number ending in 4604 on December 13, 2007. Most telemarketers will be required to stop calling you 31 days from your registration date.

Visit https://www.donotcall.gov  to register another number or file a complaint against someone violating the Registry.

*********************************************************************************************************************************

Please do not reply to this message as it is from an unattended mailbox. Any replies to this email will not be responded to or forwarded. This service is used for outgoing emails only and cannot respond to inquiries.

CALLIER_005

M Gmail

## Fwd: TCPA Robocalls from AAP

1 message

From: Brandon Callier
Date: Mon, Dec 6, 2021 at 4:12 PM
Subject: Re: TCPA Robocalls from AAP
To: Jason S. Weiss

Hi Jason,

Nevermind about the settlement negotiations. No need to communicate further on this matter.

Thank you,

Brandon Callier

On Sun, Nov 21, 2021, 9:00 PM Brandon Callier
Jason,

We gonna work this out or should I file?

Thanks,

Brandon Callier

On Tue, Nov 9, 2021 at 1:19 PM Brandon Callier
I cannot take                        wrote:
am willing to settle this for
Mepco.
                        0. If we cannot reach an agreement I will just file suit against the AAP/Affordie, Mr. Renny, Sunpath and

Thanks,

Brandon Callier

On Mon, Nov 8, 2021 at 7:22 PM                        wrote:

CALLIER_006

I have been authorized to counter this with ▮ for any inconvenience that may have been experienced.



Jason S. Weiss, Esq.

Weiss Law Group, P.A.

5531 N. University Drive, Suite 103

Coral Springs, FL 33067

Tel: 954.573.2800

Fax: 954.573.2798

www.jswlawyer.com

www.linkedin.com/in/jason-s-weiss

STATEMENT OF CONFIDENTIALITY AND PRIVILEGE AND TAX ADVICE

The information contained in this e-mail communication may be confidential and privileged. It is intended only for the use of the individual or entity identified. If you are not the intended recipient, please do not disseminate, distribute, or copy. Instead, please notify us at 954-573-2800 and immediately delete this message.

Pursuant to Internal Revenue Service Circular 230, we are required to advise you that if there is any tax advice contained in this email, it was neither written nor intended by the sender or this firm to be used, and cannot be used, by the addressee, recipient, or any taxpayer, for the purpose of avoiding penalties that may be imposed by or under United States law, including but not limited to the Internal Revenue Code.

CALLIER_007

**From:** Brandon Callier
**Sent:** Tuesday, March 19, 2002 10:39 AM
**To:** Jason S. Weiss
**Subject:** Re: TCPA Robocalls from AAP



On Tue, Nov 2, 2021, 9:35 AM ▬▬▬▬▬▬ > wrote:

Sorry for the delay here. I am looking into this one.

What is your presuit demand?

This is for Settlement Discissions only and not an admission or a waiver.

WEISS-LAW-GROUP-FINAL-LOGO (002)

Jason S. Weiss, Esq.

Weiss Law Group, P.A.

5531 N. University Drive, Suite 103

Coral Springs, FL 33067

CALLIER_008

Tel: 954.573.2800

Fax: 954.573.2798

www.jswlawyer.com

www.linkedin.com/in/jason-s-weiss

STATEMENT OF CONFIDENTIALITY AND PRIVILEGE AND TAX ADVICE
The information contained in this e-mail communication may be confidential and privileged. It is intended only for the use of the individual or entity identified. If you are not the intended recipient, please do not disseminate, distribute, or copy. Instead, please notify us at 954-573-2800 and immediately delete this message.

Pursuant to Internal Revenue Service Circular 230, we are required to advise you that if there is any tax advice contained in this email, it was neither written nor intended by the sender or this firm to be used, and cannot be used, by the addressee, recipient, or any taxpayer, for the purpose of avoiding penalties that may be imposed by or under United States law, including but not limited to the Internal Revenue Code.

**From:** Brandon Callier
**Sent:** Tuesday, October 26, 2021 2:20 PM
**To:** Jason S. Weiss
**Subject:** TCPA Robocalls from AAP

Hi Jason,

Long time no speak.  I hope all is well with you.  I have a few (3) auto warranty robocalls from ███████████ according to the contract.  I purchased contract number SAF203189 as a result of the phone calls.

I was wondering if you would like to work this out without my having to file suit.  If not, I can just file and take it from there.

Thank you,

CALLIER_009

https://mail.google.com/mail/u/0/?ik=4bb8561fa8&view=pt&search=all&permthid=thread-f%3A1718516227074270576%7Cmsg-f%3A1718516227074270576&simpl=msg-f%3A1718516227074270576&...

12/7/21, 11:23 AM

Brandon Callier

Gmail - Fwd: TCPA Robocalls from AAP

**IUDGE FRANK MONTALVO**

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS

2020 APR 20 PM 3: 53

| | |
|---|---|
| **BRANDON CALLIER,**<br>**Plaintiff,**<br><br>v.<br><br>SunPath LTD, National Car Cure LLC,<br>Northcoast Warranty Services, Inc., and John<br>Does 1-4<br>**Defendants** | § § § § § § § § § |

**EP 20 CV0106**

### Plaintiff's Original Complaint

#### Parties

1. The Plaintiff is Brandon Callier, a natural person, and was present in Texas for all calls, in this case in El Paso County.

2. SunPath Ltd. is a Delaware corporation and can be served via registered agent Registered Agent Solutions, Inc., 155 Office Plaza Drive, Suite A, Tallahassee, Florida 32301.

3. Northcoast Warranty Services, Inc. is a Delaware corporation and can be served via registered agent Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

4. National Care Cure, LLC is a Florida corporation and can be served via registered agent Zander Collins & Smith, at 1665 Palm Beach Lakes BLVD STE 215, West Palm Beach, FL 33401.

5. John/Jane Does 1-4 are other liable parties currently unknown to the Plaintiff.

1

CALLIER_011

## JURISDICTION AND VENUE

6. <u>Jurisdiction</u>. This Court has federal-question subject matter jurisdiction over Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). This Court has supplemental subject matter jurisdiction over Plaintiff's claim arising under Texas Business and Commerce Code 305.053 because that claim arises from the same nucleus of operative fact, i.e., Defendants' telemarketing robocalls to Plaintiff; adds little complexity to the case; and doesn't seek money damages, so it is unlikely to predominate over the TCPA claims.

7. **Personal Jurisdiction.** This Court has general personal jurisdiction over the defendant because they have repeatedly placed calls to Texas residents, and derive revenue from Texas residents, and they sell goods and services to Texas residents, including the Plaintiff.

8. **Venue.** Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims—the calls and sale of goods and services directed at Texas residents, including the Plaintiff—occurred in this District and because the Plaintiff resides in this District. Residing in the Western District of Texas when he received a substantial if not every single call from the Defendants that are the subject matter of this lawsuit.

9. This Court has venue over the defendants because the calls at issue were sent by or on behalf of the above named defendants to the Plaintiff, a Texas resident.

CALLIER_012

**THE TELEPHONE CONSUMER PROTECTION ACT OF 1991, 47 U.S.C. § 227**

10. In 1991, Congress enacted the TCPA in response to a growing number of consumer complaints regarding telemarketing.

11. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

12. The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

13. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

14. Separately, the TCPA bans making telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

15. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

3

CALLIER_013

16. According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

17. The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

18. The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines. In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

19. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC

4

CALLIER_014

Rcd. 12391, 12397 ¶ 13 (1995).

20. The FCC confirmed this principle in 2013, when it explained that "a seller ... may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

21. Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 – 52 (9th Cir. 2009).

22. A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

### The Texas Business and Commerce Code 305.053

23. The Texas Business and Commerce code has an analogous portion that is related to the TCPA and was violated in this case.

24. The Plaintiff may seek damages under this Texas law for violations of 47 USC 227 or subchapter A and seek $500 in statutory damages or $1500 for willful or knowing damages.

5

CALLIER_015

## FACTUAL ALLEGATIONS

25. The Plaintiff has received at least ten calls over 60 days to his cell phone, 915-383-4604 without consent and not related to an emergency purpose, selling the products and services of SunPath Ltd. and National Car Cure, LLC for a car warranty through broker Northcoast Warranty Services, Inc.

26. The Plaintiff purchased a car warranty from the defendants and was mailed a policy in the mail to his home address. The Defendants are listed on page D1 (Exhibit 1) and D2 (Exhibit 2) of the policy.

27. Mr. Callier received multiple calls from a variety of spoofed caller ID's that contained a pre-recorded message and were initiated using an automated telephone dialing system. The calls were on behalf of SunPath LTD, National Car Cure, LLC, and Northcoast Warranty Services, Inc. The calls generally had a delay of 3-4 seconds of dead air before an audible tone connected the Plaintiff to a representative, indicating the calls were initiated using an ATDS. The Plaintiff received at least ten calls in 60 days.

28. Each and every call was initiated using a spoofed caller ID, and each and every telemarketer the Plaintiff spoke with failed to properly identify themselves and the parties they were calling on behalf of.

29. "Neighborhood spoofing" designed to trick consumers into picking up the call as it appears to be a local call. This call contained a pre-recorded message after a 3-4 second pause of dead air. Several of the calls used neighborhood spoofing tactics, others were real phone numbers from existing callers, innocent victims and businesses

6

whose phone numbers were wrongfully appropriated by the defendants.

30. Plaintiff received the following calls from the Defendants (Table A).

| Date | Time of Call | Phone Number | Name on Caller ID |
|------|--------------|--------------|-------------------|
| 19-Nov-19 | 10:25 AM | 915-383-5556 | NA |
| 21-Nov-19 | 12:46 PM | 915-383-1254 | NA |
| 11-Dec-19 | 3:47 PM | 915-383-2503 | Romero Chavarri |
| 16-Dec-19 | 2:28 PM | 915-383-4610 | Mari Villanueva |
| 18-Dec-19 | 11:14 AM | 915-383-1861 | Manuel Ochoa |
| 18-Dec-19 | 8:33 AM | 915-383-4742 | Maria Barraza |
| 19-Dec-19 | 1:11 PM | 915-383-5469 | INIGUEZ |
| 21-Dec-19 | 3:50 PM | 317-527-9965 | Skylar Long |
| 6-Jan-20 | 10:52 AM | 407-272-8548 | G Valentin |
| 21-Jan-20 | 12:59 PM | 915-383-5130 | Vasquez Cordero |

31. Each and every call was placed without the maintenance of an internal do-not-call policy. Each and every call failed to identify the telemarketers and parties they were calling on behalf of. Each and every call was placed without training their agents/employees on the use of an internal do-not-call policy.

32. Mr. Callier has a limited data plan. Incoming text messages chip away at his monthly allotment.

33. Mr. Callier has limited data storage capacity on his cellular telephone. Incoming telemarketing calls consumed part of this capacity.

34. No emergency necessitated the calls

35. Each call was sent by an ATDS.

36. None of the defendants ever sent Mr. Callier any do-not-call policy.

37. On information and belief, none of the defendants had a written do-not-call policy while it was sending Mr. Callier the unsolicited calls

38. On information and belief, none of the defendants trained its agents engaged in

7

CALLIER_017

telemarketing on the existence and use of any do-not-call list.

## Vicarious Liability of the Sellers

39. These parties are vicariously liable under the theories of actual authority, apparent authority, and ratification, and as well as liable because any other result would impair the underlying purpose of the TCPA.

40. SunPath Ltd., National Car Cure, LLC and Northcoast Warranty Services, Inc. are liable parties as the direct beneficiaries of the illegal telemarketing calls as they stood to gain the Plaintiff as a client and quoted the Plaintiff a contract offering their products and services.

41. The contract shows that the beneficial parties who were gaining customers were National Car Cure, LLC, SunPath Ltd., Northcoast Warranty Services, Inc.

## THE SELLERS SHOULD BE HELD LIABLE TO UPHOLD THE DETERRENT EFFECT AND PURPOSE OF THE TCPA

42. As the court ruled in Jackson v Caribbean Cruise Line, Inc., the defendant sellers should be held liable for their violations of the TCPA. Courts have looked at the purpose of the TCPA and found that not holding the sellers liable through vicarious liability would undermine the purpose of the TCPA.

43. Every entity in the contract for car warranty services should be deemed a beneficiary of the calls and held liable for damages under the TCPA under vicarious liability. Sellers are in the best position to monitor and police third party telemarketer's

CALLIER_018

compliance with the TCPA and to hold otherwise would leave consumers without an effective remedy for telemarketing intrusions.

## INJURY, HARM, DAMAGES, and ACTUAL DAMAGES AS A RESULT OF THE CALLS

**44.** Defendant's calls harmed the Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy."

**45.** Defendant's calls harmed the Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone.

**46.** Defendant's calls harmed the Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone line.

**47.** Defendant's calls harmed the Plaintiff by intruding upon Plaintiff's seclusion.

**48.** The Plaintiff has been harmed, injured, and damages by the calls including, but not limited to:

- Reduced Device Storage space
- Reduced data plan usage
- Invasion of privacy
- Lost time tending to text messages
- Decreased cell phone battery life
- More frequent charging of my cell phone resulting in reduced enjoyment and usage of my cell phone
- Reduced battery usage
- Annoyance

9

- Frustration

- Anger

## The Plaintiff's cell phone is a residential number

49. The calls were to the Plaintiff's cellular phone 915-383-4604, which is the Plaintiff's personal cell phone that he uses for personal, family, and household use. The Plaintiff maintains no landline phones at his residence and has not done so for at least 10 years and primarily relies on cellular phones to communicate with friends and family. The Plaintiff also uses his cell phone for navigation purposes, sending and receiving emails, timing food when cooking, and sending and receiving text messages. The Plaintiff further has his cell phone registered in his personal name, pays the cell phone from his personal accounts, and the phone is not primarily used for any business purpose.

## Violations of the Texas Business and Commerce Code 305.053

50. The actions of the defendants violated the Texas Business and Commerce Code 305.053 by placing automated calls to a cell phone which violate 47 USC 227(b). The calls by the defendants violated Texas law by placing calls with a pre-recorded message to a cell phone which violate 47 USC 227(c)(5) and 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e).

51. The calls by the defendants violated Texas law by spoofing the caller ID's per 47 USC 227(e) which in turn violates the Texas statute. IRST CLAIM FOR RELIEF

CALLIER_020

**(Non-Emergency Robocalls to Cellular Telephones, 47 U.S.C. § 227(b)(1)(A))**

**(Against All Defendants)**

1.      Mr. Callier realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

2.      The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of the TCPA, 47 U.S.C. § 227(b)(1)(A), by making non-emergency telemarketing robocalls to Mr. Callier's cellular telephone number without his prior express written consent.

3.      Mr. Callier is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(b)(3)(B).

4.      Mr. Callier is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(b)(3).

5.      Mr. Callier also seeks a permanent injunction prohibiting Defendants and their affiliates and agents from making non-emergency telemarketing robocalls to cellular telephone numbers without the prior express written consent of the called party.

## I.   SECOND CLAIM FOR RELIEF

**(Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d))**

**(Against All Defendants)**

6.      Mr. Callier realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

CALLIER_021

7.    The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of FCC regulations by making telemarketing solicitations despite lacking:

a.    a written policy, available upon demand, for maintaining a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(1);[2]

b.    training for the individuals involved in the telemarketing on the existence of and use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2);[3] and,

c.    in the solicitations, the name of the individual caller and the name of the person or entity on whose behalf the call is being made, in violation of 47 C.F.R. § 64.1200(d)(4).[4]

8.    Mr. Callier is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

9.    Mr. Callier is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5).

10.    Mr. Callier also seeks a permanent injunction prohibiting Defendants and their affiliates and agents from making telemarketing solicitations until and unless they (1) implement a do-not-call list and training thereon and (2) include the name of the individual caller and AFS's name in the solicitations.

---

[2] *See id.* at 425 (codifying a June 26, 2003 FCC order).

[3] *See id.* at 425 (codifying a June 26, 2003 FCC order).

[4] *See id.* at 425 – 26 (codifying a June 26, 2003 FCC order).

CALLIER_022

## II. THIRD CLAIM FOR RELIEF: Violations of The Texas Business and Commerce Code 305.053

11.     Mr. Callier realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

12.     The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of the **Texas Business and Commerce Code 305.053**, by making non-emergency telemarketing robocalls to Mr. Callier's cellular telephone number without his prior express written consent in violation of 47 USC 227 et seq. The Defendants violated 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e) by using an ATDS that does not comply with the technical and procedural standards under this subsection.

13.     Mr. Callier is entitled to an award of at least $500 in damages for each such violation. **Texas Business and Commerce Code 305.053(b)**

14.     Mr. Callier is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. **Texas Business and Commerce Code 305.053**(c).

## III. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brandon Callier prays for judgment against the defendants jointly and severally as follows:

A.     Leave to amend this Complaint to name additional DOESs as they are identified and to conform to the evidence presented at trial;

B.     A declaration that actions complained of herein by Defendants violate the TCPA and Texas state law;

13

CALLIER_023

    C.    An injunction enjoining Defendants and their affiliates and agents from engaging in the unlawful conduct set forth herein;

    D.    An award of $3000 per call in statutory damages arising from the TCPA intentional violations jointly and severally against the corporation and individual for seven calls.

    E.    An award of $1,500 in statutory damages arising from violations of the Texas Business and Commerce code 305.053

    F.    An award to Mr. Callier of damages, as allowed by law under the TCPA;

    G.    An award to Mr. Callier of interest, costs and attorneys' fees, as allowed by law and equity

    H.    Such further relief as the Court deems necessary, just, and proper.

April 20, 2020

Brandon Callier
Pro-se
6336 Franklin Trail
El Paso, TX 79912

14

CALLIER_024

IUDGE FRANK MONTALVO

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS

2020 APR 20 PM 3: 54

| | |
|---|---|
| **BRANDON CALLIER,**<br>**Plaintiff,**<br><br>v.<br><br>SunPath LTD, Northcoast Warranty Services,<br>Inc., and John Does 1-4<br>**Defendants** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§     **EP 20 CV0105** |

### Plaintiff's Original Complaint

### Parties

1. The Plaintiff is Brandon Callier, a natural person, and was present in Texas for all calls, in this case in El Paso County.

2. SunPath Ltd. is a Delaware corporation and can be served via registered agent Registered Agent Solutions, Inc., 155 Office Plaza Drive, Suite A, Tallahassee, Florida 32301.

3. Northcoast Warranty Services, Inc. is a Delaware corporation and can be served via registered agent Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

4. John/Jane Does 1-4 are other liable parties currently unknown to the Plaintiff.

### JURISDICTION AND VENUE

5. <u>Jurisdiction</u>. This Court has federal-question subject matter jurisdiction over Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal

I

statute. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). This Court has supplemental subject matter jurisdiction over Plaintiff's claim arising under Texas Business and Commerce Code 305.053 because that claim arises from the same nucleus of operative fact, i.e., Defendants' telemarketing robocalls to Plaintiff; adds little complexity to the case; and doesn't seek money damages, so it is unlikely to predominate over the TCPA claims.

6. **Personal Jurisdiction.**  This Court has general personal jurisdiction over the defendant because they have repeatedly placed calls to Texas residents, and derive revenue from Texas residents, and they sell goods and services to Texas residents, including the Plaintiff.

7. **Venue.**  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims—the calls and sale of goods and services directed at Texas residents, including the Plaintiff—occurred in this District and because the Plaintiff resides in this District.  Residing in the Western District of Texas when he received a substantial if not every single call from the Defendants that are the subject matter of this lawsuit.

8. This Court has venue over the defendants because the calls at issue were sent by or on behalf of the above named defendants to the Plaintiff, a Texas resident.

   **THE TELEPHONE CONSUMER PROTECTION ACT OF 1991, 47 U.S.C. § 227**

9. In 1991, Congress enacted the TCPA in response to a growing number of consumer complaints regarding telemarketing.

10. The TCPA makes it unlawful "to make any call (other than a call made for emergency

CALLIER_026

purposes or made with the prior express consent of the called party) using an automatic telephone dialing system (ATDS) or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

11. The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

12. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

13. Separately, the TCPA bans making telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

14. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

15. According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

16. The FCC also recognizes that "wireless customers are charged for incoming calls

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

3

CALLIER_027

whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

17. The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines. In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

18. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

19. The FCC confirmed this principle in 2013, when it explained that "a seller … may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28

4

FCC Rcd. 6574, 6574 ¶ 1 (2013).

20. Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 – 52 (9th Cir. 2009).

21. A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

### The Texas Business and Commerce Code 305.053

22. The Texas Business and Commerce code has an analogous portion that is related to the TCPA and was violated in this case.

23. The Plaintiff may seek damages under this Texas law for violations of 47 USC 227 or subchapter A and seek $500 in statutory damages or $1500 for willful or knowing damages.

### FACTUAL ALLEGATIONS

24. The Plaintiff has received at least eleven calls over 60 days to his cell phone, 915-383-4604 without consent and not related to an emergency purpose, selling the products and services of SunPath Ltd. and VAD for a car warranty through broker Northcoast Warranty Services, Inc.

5

CALLIER_029

25. The Plaintiff purchased a car warranty from the defendants and was mailed a policy in the mail to his home address. The Defendants are listed on page D1 (Exhibit 1) and D2 (Exhibit 2) of the policy.

26. Mr. Callier believes VAD is a subsidiary of SunPath LTD., but has been unable to locate registered agent information to include them in filing.

27. Mr. Callier received multiple calls from a variety of spoofed caller ID's that contained a pre-recorded message and were initiated using an automated telephone dialing system. The calls were on behalf of SunPath LTD, VAD, and Northcoast Warranty Services, Inc. The calls generally had a delay of 3-4 seconds of dead air before an audible tone connected the Plaintiff to a representative, indicating the calls were initiated using an ATDS. The Plaintiff received at least ten calls in 60 days.

28. Each and every call was initiated using a spoofed caller ID, and each and every telemarketer the Plaintiff spoke with failed to properly identify themselves and the parties they were calling on behalf of.

29. "Neighborhood spoofing" designed to trick consumers into picking up the call as it appears to be a local call. This call contained a pre-recorded message after a 3-4 second pause of dead air. Several of the calls used neighborhood spoofing tactics, others were real phone numbers from existing callers, innocent victims and businesses whose phone numbers were wrongfully appropriated by the defendants.

30. Plaintiff received the following calls from the Defendants (Table A).

CALLIER_030

| CALL NUMBER | DATE | TIME |
|---|---|---|
| 203-303-9394 | 3-Feb-20 | 12:47 |
| 203-303-9394 | 6-Feb-20 | 14:17 |
| 203-303-9394 | 7-Feb-20 | 9:13 |
| 203-303-9394 | 7-Feb-20 | 10:05 |
| 203-303-9394 | 7-Feb-20 | 12:22 |
| 203-303-9394 | 11-Feb-20 | 9:54 |
| 203-303-9394 | 12-Feb-20 | 12:41 |
| 203-303-9394 | 12-Feb-20 | 13:27 |
| 203-303-9394 | 13-Feb-20 | 9:34 |
| 203-303-9394 | 13-Feb-20 | 11:31 |
| 203-303-9354 | 13-Feb-20 | 13:11 |

31. Each and every call was placed without the maintenance of an internal do-not-call policy. Each and every call failed to identify the telemarketers and parties they were calling on behalf of. Each and every call was placed without training their agents/employees on the use of an internal do-not-call policy.

32. Mr. Callier purchased a car warranty policy from the Defendants on February 20, 2020.

33. Mr. Callier received four additional calls from the Defendant after purchasing the car warranty because the calls were automated and initiated by the ATDS.

34. Mr. Callier has a limited data plan. Incoming text messages chip away at his monthly allotment.

35. Mr. Callier has limited data storage capacity on his cellular telephone. Incoming

7

CALLIER_031

telemarketing calls consumed part of this capacity.

36. No emergency necessitated the calls

37. Each call was sent by an ATDS.

38. None of the defendants ever sent Mr. Callier any do-not-call policy.

39. On information and belief, none of the defendants had a written do-not-call policy while it was sending Mr. Callier the unsolicited calls

40. On information and belief, none of the defendants trained its agents engaged in telemarketing on the existence and use of any do-not-call list.

## Vicarious Liability of the Sellers

41. These parties are vicariously liable under the theories of actual authority, apparent authority, and ratification, and as well as liable because any other result would impair the underlying purpose of the TCPA.

42. SunPath Ltd., VAD and Northcoast Warranty Services, Inc. are liable parties as the direct beneficiaries of the illegal telemarketing calls as they stood to gain the Plaintiff as a client and quoted the Plaintiff a contract offering their products and services.

43. The contract shows that the beneficial parties who were gaining customers were SunPath Ltd., VAD, and Northcoast Warranty Services, Inc.

## THE SELLERS SHOULD BE HELD LIABLE TO UPHOLD THE DETERRENT EFFECT AND PURPOSE OF THE TCPA

44. As the court ruled in Jackson v Caribbean Cruise Line, Inc., the defendant sellers should be held liable for their violations of the TCPA. Courts have looked at the

8

CALLIER_032

purpose of the TCPA and found that not holding the sellers liable through vicarious liability would undermine the purpose of the TCPA.

45. Every entity in the contract for car warranty services should be deemed a beneficiary of the calls and held liable for damages under the TCPA under vicarious liability. Sellers are in the best position to monitor and police third party telemarketer's compliance with the TCPA and to hold otherwise would leave consumers without an effective remedy for telemarketing intrusions.

## INJURY, HARM, DAMAGES, and ACTUAL DAMAGES AS A RESULT OF THE CALLS

46. Defendant's calls harmed the Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy."

47. Defendant's calls harmed the Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone.

48. Defendant's calls harmed the Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone line.

49. Defendant's calls harmed the Plaintiff by intruding upon Plaintiff's seclusion.

50. The Plaintiff has been harmed, injured, and damages by the calls including, but not limited to:

* Reduced Device Storage space
* Reduced data plan usage
* Invasion of privacy
* Lost time tending to text messages

9

CALLIER_033

- Decreased cell phone battery life
- More frequent charging of my cell phone resulting in reduced enjoyment and usage of my cell phone
- Reduced battery usage
- Annoyance
- Frustration
- Anger

## The Plaintiff's cell phone is a residential number

51. The calls were to the Plaintiff's cellular phone 915-383-4604, which is the Plaintiff's personal cell phone that he uses for personal, family, and household use. The Plaintiff maintains no landline phones at his residence and has not done so for at least 10 years and primarily relies on cellular phones to communicate with friends and family. The Plaintiff also uses his cell phone for navigation purposes, sending and receiving emails, timing food when cooking, and sending and receiving text messages. The Plaintiff further has his cell phone registered in his personal name, pays the cell phone from his personal accounts, and the phone is not primarily used for any business purpose.

## Violations of the Texas Business and Commerce Code 305.053

52. The actions of the defendants violated the Texas Business and Commerce Code 305.053 by placing automated calls to a cell phone which violate 47 USC 227(b). The calls by the defendants violated Texas law by placing calls with a pre-recorded message to a cell phone which violate 47 USC 227(c)(5) and 47 USC 227(d) and 47

10

CALLIER_034

USC 227(d)(3) and 47 USC 227(e).

53. The calls by the defendants violated Texas law by spoofing the caller ID's per 47

USC 227(e) which in turn violates the Texas statute.

## I. FIRST CLAIM FOR RELIEF

### (Non-Emergency Robocalls to Cellular Telephones, 47 U.S.C. § 227(b)(1)(A))

### (Against All Defendants)

1. Mr. Callier realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

2. The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of the TCPA, 47 U.S.C. § 227(b)(1)(A), by making non-emergency telemarketing robocalls to Mr. Callier's cellular telephone number without his prior express written consent.

3. Mr. Callier is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(b)(3)(B).

4. Mr. Callier is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(b)(3).

5. Mr. Callier also seeks a permanent injunction prohibiting Defendants and their affiliates and agents from making non-emergency telemarketing robocalls to cellular telephone numbers without the prior express written consent of the called party.

CALLIER_035

## II. SECOND CLAIM FOR RELIEF

### (Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d))

### (Against All Defendants)

6.      Mr. Callier realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

7.      The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of FCC regulations by making telemarketing solicitations despite lacking:

a.      a written policy, available upon demand, for maintaining a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(1); [2]

b.      training for the individuals involved in the telemarketing on the existence of and use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2); [3] and,

c.      in the solicitations, the name of the individual caller and the name of the person or entity on whose behalf the call is being made, in violation of 47 C.F.R. § 64.1200(d)(4). [4]

8.      Mr. Callier is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

9.      Mr. Callier is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5).

10.      Mr. Callier also seeks a permanent injunction prohibiting Defendants and their affiliates and agents from making telemarketing solicitations until and unless they

---

[2] *See id.* at 425 (codifying a June 26, 2003 FCC order).

[3] *See id.* at 425 (codifying a June 26, 2003 FCC order).

[4] *See id.* at 425 – 26 (codifying a June 26, 2003 FCC order).

12

(1) implement a do-not-call list and training thereon and (2) include the name of the individual caller and AFS's name in the solicitations.

## III. THIRD CLAIM FOR RELIEF: Violations of The Texas Business and Commerce Code 305.053

11.     Mr. Callier realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

12.     The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of the **Texas Business and Commerce Code 305.053**, by making non-emergency telemarketing robocalls to Mr. Callier's cellular telephone number without his prior express written consent in violation of 47 USC 227 et seq. The Defendants violated 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e) by using an ATDS that does not comply with the technical and procedural standards under this subsection.

13.     Mr. Callier is entitled to an award of at least $500 in damages for each such violation. **Texas Business and Commerce Code 305.053(b)**

14.     Mr. Callier is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. **Texas Business and Commerce Code 305.053**(c).

## IV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brandon Callier prays for judgment against the defendants jointly and severally as follows:

A.     Leave to amend this Complaint to name additional DOESs as they are identified and to conform to the evidence presented at trial;

13

CALLIER_037

B.    A declaration that actions complained of herein by Defendants violate the TCPA and Texas state law;

C.    An injunction enjoining Defendants and their affiliates and agents from engaging in the unlawful conduct set forth herein;

D.    An award of $3000 per call in statutory damages arising from the TCPA intentional violations jointly and severally against the corporation and individual for seven calls.

E.    An award of $1,500 in statutory damages arising from violations of the Texas Business and Commerce code 305,053

F.    An award to Mr. Callier of damages, as allowed by law under the TCPA;

G.    An award to Mr. Callier of interest, costs and attorneys' fees, as allowed by law and equity

H.    Such further relief as the Court deems necessary, just, and proper.

April 20, 2020

Brandon Callier
Pro-se
6336 Franklin Trail
El Paso, TX 79912

14

CALLIER_038

# Exhibit 9

# IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF DELAWARE

| | |
|---|---|
| KURT MORALES II, BRANDON CALLIER, and LUCAS HORTON, individually, and on behalf of all others similarly situated, | Case No.: **20-cv-01376-RGA** |
| | **DECLARATION OF LUCAS HORTON** |
| Plaintiffs, | |
| v. | |
| SUNPATH LTD., a Delaware corporation, NORTHCOAST WARRANTY SERVICES, INC., a Delaware corporation, AMTRUST NORTH AMERICA, INC., a Delaware corporation, SING FOR SERVICE, LLC, a Delaware limited liability company, and PELICAN INVESTMENT HOLDINGS LLC, a Delaware limited liability company, AFFORDABLE AUTO SHIELD, INC., a Delaware limited liability company, | |
| Defendants. | |

I, Lucas Horton, hereby declare the following:

1.      I am over the age of eighteen and I am competent to testify in this matter if called upon.

2.      This declaration is based on personal knowledge of the matters set forth herein.

3.      On or about April 29, 2020, I received an unwanted phone call to my cell phone that played an artificial or prerecorded voice message.

4.      The artificial or prerecorded voice said that "your car warranty is about to expire" and to "press one to speak to a representative."

5.      I pressed "one" because I wanted to identify the caller, not because I was interested in the warranty. I was then connected to a sales agent who attempted to sell me a vehicle service contract from VAD, Sunpath and Mepco.

6.      A true and correct copy of pages of the vehicle service contract I purchased has been produced in this litigation as HORTON_001 to HORTON_002, HORTON_008, and HORTON_011 to HORTON_016 is attached hereto as Exhibit A.

7.      On or about March 16, 2022, I received an unwanted phone call to my cell phone soliciting vehicle service contracts.

8.      I answered the phone because I wanted to identify the caller, not because I was interested in the warranty. A sales agent answered who attempted to sell me a vehicle service contract from Auto Defender, Sunpath and Mepco.

9.      A true and correct copy of the email I received after this purchase has been produced in this litigation as HORTON_017 to HORTON_018, and is attached hereto as Exhibit B.

10.     A true and correct copy of the Mepco payment plan I received after this purchase has been produced in this litigation as HORTON_011 to HORTON_016, and is attached hereto as Exhibit C.

11.     I never gave my consent to be contacted in any manner by VAD, Auto Defender, Sunpath, Mepco, or to any other person or company regarding auto warranties or vehicle service contracts.

I declare under penalty of perjury that the foregoing is true and correct. This declaration is executed in Richardson, Texas.

Dated: 12/12/2024          By: _Lucas Horton_
                                C2733111CDD4AE
                                Lucas Horton

2

# Exhibit A



**p e a c e   o f   m i n d**

for that next bump in the road...

HORTON_001


gosunpath.com

## Contract Declarations

| Contract Holder | Service Contract No. |
|---|---|
| Lucas Horton | HZF082483 |

| Street Address | |
|---|---|
| ███████████ | |

| City, State, Zip | Phone |
|---|---|
| Buckingham, TX 75080-2917 | ██████████ |

| Year | Make | Model | VIN |
|---|---|---|---|
| 2016 | HYUNDAI | AZERA | ████████████ |

| Odometer | Vehicle Purchase Price | Contract Purchase Date | Vehicle Class |
|---|---|---|---|
| 42,478 | | 04/29/2020 | 1 |

| Seller/Dealer/Vendor Name | I.D. |
|---|---|
| VAD | CEL0493 |

| Address |
|---|
| 2101 Business Center Dr 200 |

| City, State, Zip | Phone |
|---|---|
| Irvine, CA 92612 | 866-336-1769 |

| Finance Company | Payment Terms |
|---|---|
| Mepco INSTALLMENT AGREEMENT | |

| Plan Name |
|---|
| Sunpath Horizon Diamond New |

| Plan Term | | Plan Code | Deductible |
|---|---|---|---|
| Months 60 | Miles 125,000 | SPHDN | $ 0.00 |

| * Validation Period | Surcharges |
|---|---|
| 30 days and 1,000 miles | |

| Contract Purchase Price | Options ** |
|---|---|
| ████████ | |

The purchase of this contract is not required to either obtain financing or to purchase the motor vehicle. You have the right to transfer this Service Contract on the specified vehicle only to a subsequent private owner. Refer to the Transfer provision.

The undersigned purchaser of this Contract acknowledges that parts and labor benefits are subject to the validation period stated above  *PER PHONE*

**Certification:** The undersigned Purchaser of this Service Contract has selected the above coverage and options and understands that depending upon the coverage plan selected that parts and labor benefits are subject to the validations stated above. I agree that I have read and understand the above Contract provisions and implied warranty disclosure.

| *04/29/2020* | *PER PHONE* | *Saan Banks* |
|---|---|---|
| Date | Service Contract Purchaser Signature | Seller/Dealer/Vendor Representative |

HORTON_008

Administered by: SunPath Ltd.
Administrative Office:
25 Braintree Hill Park, Suite 100
Braintree, MA 02184
(888) 990-7786

This Contract is between You, the Purchaser and
Northcoast Warranty Services, Inc., the Provider/Obligor.

800 Superior Avenue E., 21st Floor
Cleveland, OH 44114
(866) 927-3097

In Florida, the Provider/Obligor and Administrator is SunPath LTD Corp. d/b/a
SunPath LTD Corp. of Delaware
FL License #19943, (888) 990-7786

# Exhibit B

## Auto Defender - Purchase Confirmation

From:  **Auto Defender (cs@auto-defender.com)**

To:

Date:  **Wednesday, March 16, 2022, 11:11 AM CDT**



Toll Free Customer Service: (877) 789-2167 | www.auto-defender.com

### Extended Service Protection Purchase

Dear Lucas,

Congratulations! Your valuable mechanical breakdown protection is detailed in the attached contract booklet. Please look it over and call with any questions you may have. You will also be receiving this contract booklet in the mail within five to ten business days. Thank you for your purchase; we look forward to servicing your protection needs. Please call us for a quote on any other vehicle in your household. Vehicles with fewer than 150,000 miles may qualify for additional coverage, and multi-vehicle discounts are available.

Be sure to familiarize yourself with the coverage, maintenance requirements, and procedures in the event of a mechanical breakdown. Proper maintenance of your vehicle will contribute to a trouble free driving experience. You should follow your vehicle manufacturer's recommended maintenance for your driving habits.

Welcome to our family of vehicle owners that have the peace of mind and financial security of mechanical breakdown protection.

Sincerely,

Brian Best
Auto Defender
(877) 789-2165  Ext. 878
cs@auto-defender.com
www.auto-defender.com

**Vehicle**
Make: 2016 HYUNDAI
Model: AZERA
Odometer: 48,000
Vin:

**Coverage Plan**
Plan: Diamond
Expiration Date: 4/15/2027
Expiration Miles: 149,000
Deductible: $100.00

**Plan Cost**
Subtotal:
Tax:
Total:
Down Payment:
Payments:
Monthly Payment:
First Payment Date:

**Down Payment Confirmation**
Down Payment:
Payment Source:
Payment Account #:
Confirmation #:    ROIP000059IP

### Important Benefits



- Pays directly to the repair facility of YOUR Choice
- Accepted anywhere in the U.S. or Canada
- 30-Day Review
- Transferrable coverage
- Low deductible options
- Complimentary 24X7 Roadside-Assistance
- Complimentary Car Rental & Towing
- Complimentary Trip Interruption / Tire Protection
- 100% Money-Back Guarantee
- Lowest-prices Guarantee

## Email Sent To

Response Code: ROIP000059IP
Lucas Horton



Thank You for Your Vehicle Protection Purchase from Auto Defender.

HORTON_018

# Exhibit C

**THIS IS NOT A BILL**

# MEPCO

Providing Billing Services for Your Automotive Protection Plan
10 South LaSalle Street - Suite 2310 Chicago, Illinois 60603

## WELCOME LETTER

| ACCOUNT INFORMATION | 30220379178893 |
|---|---|
| Billing Account Number: | 30220379178893 |
| Seller Contract Number: | HZL022508 |

000001    0    Return Service Requested

Lucas Horton

Richardson, TX 75080-2917

Dear Valued Customer,

### Congratulations on your purchase of a service contract from        AUTO DEFENDER

We appreciate your business! Mepco is the company that will process your monthly payments for this contract. Mepco is not responsible for the marketing, sale, design, administration of claims, or payment of claims under this service contract.

Please carefully review the information on the next page and confirm your monthly payment method and the terms of your service contract. If you have any questions or if the terms are different than you agreed to, please call our office immediately.

You may access your account online at **www.mepco.com** to make payments and review important account details such as remaining balance, contract details, and more.

| MEPCO.COM LOGIN INFORMATION | |
|---|---|
| **User Name:** | 30220379178893 |
| **Password*:** | |
| *You will be prompted to change your password upon your first time logging in. | |

Thank you for your business.  We look forward to servicing your account.

Mepco

HORTON_011

*Intentionally Left Blank-Continues On Next Page*

HORTON_012

Rev.   06/2017

| **FACTS** | **WHAT DOES MEPCO DO WITH YOUR PERSONAL INFORMATION?** |
|---|---|
| **Why?** | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| **What?** | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br><br>■ Social Security number and Credit Card and/or Checking Account Information<br>■ Account Balance        and Account Transaction and Transaction History<br>■ Payment History        and Other Personally Identifiable Information<br><br>When you are *no longer* our customer, we continue to share your information as described in this notice. |
| **How?** | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Mepco chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Mepco share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes—** such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes—** to offer our products and services to you | No | We Don't Share |
| **For joint marketing with other financial companies** | No | We Don't Share |
| **For our affiliates' everyday business purposes—** information about your transactions and experiences | Yes | No |
| **For our affiliates' everyday business purposes—** information about your creditworthiness | No | We Don't Share |
| **For nonaffiliates to market to you** | No | We Don't Share |

| **Questions?** | Call 800-397-6767    or go to www.Mepco.com |
|---|---|

HORTON_013

**Page 2**

## Who we are

| | |
|---|---|
| Who is providing this notice? | Mepco |

## What we do

| | |
|---|---|
| How does **Mepco** protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
| How does **Mepco** collect my personal information? | We collect your personal information, for example, when you<br><br>■ Open An Account    or Give Us Your Contract Information<br>■ Use Your Credit Card    or Debit Card<br>■ Provide Account Information to Pay us by Check or ACH<br><br>We also collect your personal information from other companies. |
| Why can't I limit all sharing? | Federal law gives you the right to limit only<br><br>■ sharing for affiliates' everyday business purposes—information about your creditworthiness<br>■ affiliates from using your information to market to you<br>■ sharing for nonaffiliates to market to you<br><br>State laws and individual companies may give you additional rights to limit sharing. |

## Definitions

| | |
|---|---|
| Affiliates | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br><br>■ *Our affiliates include financial companies such as Seabury Capital.* |
| Nonaffiliates | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br><br>■ *Non-affiliates we share with can include the company that sold you your vehicle service contract and service contract administrators.* |
| Joint marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br><br>■ *Mepco does not jointly market.* |

## Other important information

For California residents, Mepco may collect personally identifiable information via your activity on our website, www.Mepco.com. We reserve the right to not respond to "Do Not Track" requests received as the information collected is for the purpose of, and used in the course of, reasonable business processes as described above. Please contact Mepco's Customer Service | Business Support Services department at (800) 397-6767 with any questions.

HORTON_014

**THIS IS NOT A BILL**

# MEPCO

Providing Billing Services for Your Automotive Protection Plan
10 South LaSalle Street - Suite 2310 Chicago, Illinois 60603

# CONFIRMATION OF PREAUTHORIZED ACH/CC

**BILLING ACCOUNT NUMBER**         30220379178893

## ACCOUNT AND CONTRACT INFORMATION

**BILLING OR PAYMENT QUESTIONS**

| | |
|---|---|
| Contact Mepco at: | (800)397-6767 |
| Billing Account Number: | 30220379178893 |
| Access your account online at: | WWW.MEPCO.COM |
| User Name: | 30220379178893 |

0      Return Service Requested

Lucas Horton

Richardson, TX 75080-2917

**QUESTIONS REGARDING THE PURCHASE OF THIS CONTRACT**

| | |
|---|---|
| AUTO DEFENDER | (877)789-2167 |
| Contract Number: | HZL022508 |

---

### PLEASE NOTE

Mepco is not responsible for the marketing, sale, design, administration of claims, or payment of claims under this service contract.

**COVERAGE, CLAIMS AND REPAIR QUESTIONS**

| | |
|---|---|
| SUNPATH LTD | (888)990-7786 |
| Contract Number: | HZL022508 |

---

Dear Valued Customer,

**IMPORTANT NOTICE:**

This letter is to confirm that you have arranged to make recurring payments to Mepco under your service contract. Pursuant to your Authorization Agreement for Recurring Direct Payments, Mepco will charge/debit your designated credit card or debit card/bank account in the amount of the monthly payments and fees you owe under your service contact and on or after the date indicated in your debit authorization, in each case subject to additional terms and conditions of your Authorization Agreement for Recurring Direct Payments.

Payment Method Used:   Credit Card
Truncated Account Number: ▮▮▮▮

**WHAT THIS MEANS:**

Each month your payment will be processed automatically by Mepco using the above account information.

**HOW TO UPDATE AUTOMATIC RECURRING PAYMENTS:**

Your recurring debit authorization will remain in effect until revoked by you in accordance with the terms below:

You may update your automatic recurring payment at any time by submitting an email to request to update recurring payments on our website at www.mepco.com, by mailing a written statement expressly revoking this authorization to Mepco, 10 South LaSalle Street - Suite 2310 Chicago, Illinois 60603, or by calling Mepco's Customer Service department at (800) 397-6767.

*** Please note, Mepco will require a reasonable time, but in no event less than 10 calendar days following the receipt of this authorization or any change to or revocation of this authorization, to act on the authorization, change or revocation.

**If you have not requested this change to automatic recurring payments, please contact our office immediately.**

If you have any questions regarding this notice please contact our Customer Service department at (800) 397-6767 Monday through Friday from 8:00 am to 5:00 pm CST.

Sincerely,

Mepco


HORTON_015

HORTON_016

# PAYMENT PLAN AGREEMENT

*30220379178893*

Payment Plan Provider provided by:
**SING For Service, LLC d/b/a MEPCO**
205 N. Michigan Avenue, Suite 2200, Chicago, IL 60601
Fax: 866.656.6518     Telephone: 800.397.6767

| Purchaser: | | | Seller: | | | CODE: S300175 |
|---|---|---|---|---|---|---|
| NAME: LUCAS HORTON | | | LEGAL NAME: DBA: | ROI NETWORK LLC DBA AUTO DEFEN | | |
| ADDRESS: | | | ADDRESS: 32 WILLIAMS AVE. 2F | | | |
| | | | CITY: MYSTIC | ST: CT | ZIP: 06355 | |
| CITY: RICHARDSON | ST: TX | ZIP: 75080 | PHONE: | | FAX: | |
| PHONE: | FAX: | | E-MAIL: | | | |
| E-MAIL: | | | SALESPERSON: BRIAN BEST | | | |

| **Payment Plan Terms**<br>All dollar amounts are in U.S. dollars | This Payment Plan Agreement ("Agreement") is between Purchaser and SING For Service, LLC d/b/a Mepco ("MEPCO"), a Seabury Asset Management Company. Purchaser has purchased a service ("Contract") from Seller that is issued by SUNPATH ("Administrator"). This Agreement is entered into to enable Purchaser to pay for the Contract pursuant to an installment payment program. |
|---|---|

| Total Sales Price | | Contract: VSC and/or PROD WAR | Contract No.: HZL022508 |
|---|---|---|---|
| Down Payment<br>(Minimum 3% of Total Sales Price) | | Administrator: SUNPATH | |

**Balance of Sales Price**

Number of Payments
(cannot be more than 42 or less than 2)

| **Vehicle Information** | | Contract and Payment Plan Effective Date | | |
|---|---|---|---|---|
| Make: HYUNDAI | | Model: AZERA | | Odometer: VEHICL |
| Year: 2016 | | Coverage Term: (in months) 60 | | Coverage Mileage: (in Miles) 100000 |
| VIN: | | | | |

Amount of Each Payment
(Balance of Sales Price divided by Number of Payments)

Payment Date (each month)
(First due date no more than 30 days from sale date)

Refer to the Contract for the terms and conditions regarding the Contract.

In consideration of Purchaser being afforded the opportunity to pay for the Contract under the installment payment program, the Purchaser and MEPCO acknowledge and agree as follows.

Final Payment Date
(Date of last payment)

Purchaser has paid to Seller for its account in cash the down payment disclosed under "Payment Plan Terms" towards the Total Sales Price of the Contract. The Balance of Sales Price shall be paid by Purchaser to MEPCO. Subject to the Cancellation provisions on Page 2 hereof, Purchaser promises to pay MEPCO, the Balance of Sales Price in accordance with the payment method selected by Purchaser from the options set forth below:

[X] **Payment Option 1: Authorization for Credit Card Payment**
The Balance of Sales Price may be paid by Purchaser through, and Purchaser hereby authorizes MEPCO to make, the applicable number of consecutive monthly charges to Purchaser's credit card account listed below, in the amounts and on the dates disclosed under the Payment Plan Terms, until such time as the Balance of Sales Price, together with the applicable charges described on page 2 hereof (the "Applicable Charges"), are fully paid, or until such time as MEPCO has received written notification of termination.

_____
Expiration Date (MM/YY)     Type of Card (MC, Visa, Amex, Discover)

I authorize charges to my credit card account for payment of the Balance of Sales Price together with all Applicable Charges in accordance with

[ ] **Payment Option 2: Authorization for Bank Account Direct Debit**
The Balance of Sales Price may be paid by Purchaser through, and Purchaser hereby authorizes MEPCO to instruct Purchaser's financial institution described below to make, the applicable number of consecutive monthly payments in the amounts and on the dates disclosed under Payment Plan Terms, from the account listed below, by electronic automatic debit of Purchaser's checking or savings account. This authority will remain in effect until such time as the Balance of Sales Price, together with all applicable Charges, are fully paid, or until such time as MEPCO has received written notification of termination ("Bank Account Direct Debit Termination Notice") from Purchaser. In time to

_____     _____     _____     [ ] Checking     [ ] Savings
Name of Financial Institution     Routing Number (Must be 9 digits long)     Account Number

I authorize charges to my bank account for the payment of the Balance of Sales Price together with all Applicable Charges in accordance with this Agreement

[ ] **Payment Option 3: Monthly Bill**
The Balance of Sales Price may be paid directly by Purchaser in accordance with the Payment Plan Terms listed above. Purchaser shall receive a monthly bill and shall make payment on or before the Payment Date of each consecutive month until the Balance of Sales Price, together with all Applicable Charges, are fully paid, or until such time as MEPCO has received written notification of termination ("Monthly Bill Termination Notice") from Purchaser. Purchaser shall send such payments to MEPCO at such address as MEPCO provides to Purchaser.

PURCHASER SHALL HAVE THE RIGHT, AT ANY TIME, TO CANCEL THE CONTRACT BY NOTICE TO MEPCO ("Termination Notice") OR BY NONPAYMENT. PURCHASER SHALL HAVE NO OBLIGATION TO MAKE ANY INSTALLMENT PAYMENTS AFTER CANCELLATION. Subject to the Cancellation provisions on Page 2 hereof, unless MEPCO shall previously have received a Bill Termination Notice, (i) a late payment fee may be imposed in the amount of the lesser of 5% of the late payment or $5.00 in respect of any payment not received by MEPCO within five days of the scheduled Payment Date thereof (the "Late Charge"), and (ii) in the event that any scheduled payment is not made on or before the scheduled Payment Date, as provided in the Payment Plan Terms above, MEPCO is authorized by Purchaser (without notice thereof to Purchaser) to direct Administrator or Seller to cancel Purchaser's Contract and this Agreement at any time for nonpayment. Purchaser hereby assigns to MEPCO all of Purchaser's right, title and interest in and to the Contract, including Purchaser's rights to cancel the Contract, receive all unearned and refund amounts under the Contract and Purchaser's right to make a direct claim for indemnity against the insurance Company. Purchaser represents to MEPCO that Purchaser's decision to purchase the Contract from Seller under the payment program did not result in Seller charging Purchaser a different Total Sales Price for the Contract than Purchaser would have paid if Purchaser had decided instead to pay the purchase price of the Contract in full at the time this Agreement was executed. The content and format of this Agreement have been adapted to provide Purchaser with important

[ ] By signing below, I agree I have had the opportunity to review, accept, and correct any errors contained in this Agreement.
Purchaser understands that the personal information regarding Purchaser that is provided by Purchaser in connection with this Agreement will not be used or shared with any other party other than for the purpose of the services provided in this Agreement and the Contract and as required or permitted by applicable law.

| **PURCHASER** | Date: |
|---|---|
| By: | 3/16/2022 |
| Its: hjk | |

[ ] This Agreement sets forth the terms and conditions of the payment plan authorized by Purchaser by phone or other electronic means. See page 2 for instructions to cancel.

See Page 2 for additional terms and conditions

*30220379178893*  *77*

CONFIDENTIAL

MEPCO00000097

**EXHIBIT HM2**

Payment Plan Agreement (cont'd)

**PROMISE TO PAY:**

In consideration of the sale of the Contract to Purchaser, Purchaser promises to pay to MEPCO, on behalf of Mepco, the Balance of Sales Price and all Applicable Charges shown under Payment Plan Terms, subject to the provisions of this Agreement. Purchaser shall not have any right to reduce any amount owed to MEPCO pursuant to this Agreement for any reason whatsoever.

**CANCELLATION:**

Purchaser has the right to cancel this Agreement at any time. Purchaser may cancel this Agreement at any time by (i) electing not to make the next payment due pursuant to this Agreement or (ii) sending MEPCO a Termination Notice. In the event that (a) Purchaser elects not to make the next payment due pursuant to this Agreement, (b) MEPCO receives a

may cancel the Contract and this Agreement. After the effective date of Cancellation, Purchaser shall have no further obligation to make installment **IMPORTANT**

**Cancelling this Agreement does not immediately cancel your Contract; it only cancels your payment plan. Coverage under your Contract will eventually be cancelled (in accordance with the terms of this Agreement) based on your nonpayment. However, you should contact the Seller or Administrator in order to immediately cancel your Contract.**

Purchaser hereby assigns to MEPCO all of Purchaser's right, title and interest in and to the Contract, including Purchaser's rights to receive all unearned and return amounts and to assert any rights to reinstate the Contract and all proceeds thereof, and Purchaser's right to make a direct claim for indemnity against the Insurance Company. In the event that Purchaser has made total payments to MEPCO in excess of the portion of the Total Sales Price plus Applicable Changes earned through the date of cancellation, Administrator or

**POWER OF ATTORNEY:**

Following any default hereunder, and subject to the Cancellation provisions above, Purchaser hereby irrevocably appoints MEPCO as its true and lawful attorney-in-fact, only for the limited purposes related to this Agreement set forth in the following sentence until all amounts payable hereunder are paid in full. MEPCO shall have full power under this power of attorney to (i) cancel the Contract, (ii) receive, demand, collect or sue any party for any amounts relating to the Contract, (iii) endorse or execute in Purchaser's name all checks issued and all other documents or instruments relating to the Contract, and (iv) take such other actions as are reasonably necessary to further the purposes of this

**APPLICABLE CHARGES:**

If any payment due hereunder is more than five days late, and except as prohibited by applicable law, Purchaser agrees to pay MEPCO the Late Charge. Nothing herein shall be considered to waive any default hereunder or to grant any grace period with respect to any default for failure to make any payment on the Payment Date. Notwithstanding anything herein to the contrary, in the event that any scheduled payment is not made on or before the Payment Date, MEPCO may, in its sole discretion, direct Administrator or Seller to cancel the Contract and this Agreement at any time for nonpayment. Except as prohibited by applicable law, Purchaser agrees to pay to MEPCO a fee of $25 for each check or each debit that is dishonored by Purchaser's bank. Purchaser consents to the payment of all of the Applicable Charges in accordance with the Payment Option

**DEFAULT PAYMENT OPTION:**   If Purchaser fails to select a Payment Option, Purchaser shall be deemed to have selected a Monthly Bill

**PREPAYMENT:**   Purchaser shall have the right to prepay the entire unpaid Balance of Sales Price at any time, without penalty or discount.

**DEFAULT:**

If (i) Purchaser  fails to make any payment due hereunder or comply with any other provision hereof, (ii) Purchaser becomes the subject of any voluntary or involuntary bankruptcy proceedings, (iii) Purchaser has a receiver or trustee appointed for it or its property, or (iv) Purchaser makes an assignment for the benefit of its creditors or admits in writing that it is unable to pay its debts as they become due, an "Event of Default" shall be deemed to have occurred. Upon the occurrence of an Event of Default, MEPCO shall have the right to take such actions as are available to MEPCO hereunder at law or in equity. MEPCO shall be entitled to reimbursement for reasonable attorneys' fees and costs in enforcing MEPCO's rights hereunder.

**RELEASE:**

Purchaser hereby releases and discharges MEPCO from any liability for damages with respect to any action taken following an Event of Default by Purchaser and shall indemnify and hold MEPCO harmless from any liabilities, claims, damages or causes of action in connection with any such action by MEPCO.

**PAYMENTS AFTER CANCELLATION:**

Any payment made by Purchaser after the effective date of cancellation (or after a notice of cancellation is mailed to Purchaser) will    **not**   result in a reinstatement of the Contract

but will be applied to Purchaser's outstanding obligations, if any, under this Agreement. Neither the acceptance nor the application of any such payments shall constitute an undertaking by MEPCO to take steps to attempt to reinstate such Contract or constitute a waiver of any Event of Default hereunder.

**ACCEPTANCE, RATIFICATION, ACCURACY:**

This Agreement shall be considered accepted by Purchaser and MEPCO upon the payment of the down payment and is effective as of Effective Date of Contract. Purchaser agrees that MEPCO shall have the authority to revise this Agreement to insert any provision omitted (including but not limited to the due date of the first installment) upon written notice to Purchaser. In addition, if the total payments due hereunder are increased due to underwriting considerations, MEPCO shall have the right, upon receipt of Purchaser's written authorization, to revise dollar amounts on the face of this Agreement. Any change by Purchaser (by way of deletion, modification, supplementation or otherwise), to any portion of this Agreement shall render the Agreement voidable, at MEPCO's option.

**ASSIGNMENTS:**

MEPCO may, with or without notice to Purchaser, assign or pledge its rights, title and interest in, to and under this Agreement and the power of attorney herein described. Upon written notice from any such assignee, Purchaser shall make all payments to such assignee without defense, offset or counterclaim.

**AGENTS OF SING For Service, LLC d/b/a**

Pursuant to one or more powers of attorney, MEPCO will, from time to time, appoint one or more third parties as its agent to take certain actions on its behalf in connection with this Agreement. The Purchaser is entitled to rely upon actions taken and statements made by such agents on behalf of, and in the name of, MEPCO to the same extent as if MEPCO had taken such actions or made such statements in its own name.

**LIMITED RESOURCE COVENANT:**

The Purchaser understands and agrees that: (i) Mepco's obligations are solely the obligations of Mepco and of no other Person, payable at any time only to the extent funds are available to Mepco, (ii) to the extent funds at any time are not available to Mepco to pay such obligations, any claims relating thereto shall not constitute a claim against Mepco but shall continue to accrue; (iii) the payment of any claim (as defined in Section 101 of Title 11 of the Bankruptcy Code) is expressly subordinated to the payment in full of all of Mepco's outstanding obligations to its lenders and the administrative agent; and (iv) prior to the date that is one year and one day after the payment in full of all of Mepco's outstanding obligations, the Purchaser will not institute against, or join with any other Person in instituting against, Mepco any bankruptcy, reorganization, insolvency or liquidation proceedings or similar proceeding under the laws of the United States or any state of the United States.

See Page 3 for additional terms and conditions

Payment Plan Agreement (Page 4)

**WAIVERS, REMEDIES, ENTIRE AGREEMENT:**

MEPCO's failure to require strict performance of any provision hereof or to exercise any of its rights hereunder, shall not be construed as a waiver or relinquishment of any future rights under such provision, but the provision shall continue and remain in full force and effect. The exercise of any rights or remedies by MEPCO under this Agreement is cumulative and shall not preclude MEPCO from exercising any other right or remedy it may have hereunder or at law. Each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law. If any provision hereof is held to be unenforceable or invalid under applicable law, the unenforceability or invalidity of such provision shall not impair the validity or enforceability of the remaining provisions hereof. Time is of the essence in this Agreement.

**MANDATORY ARBITRATION:**

MEPCO and Purchaser mutually agree that (i) any one of them has the right to elect to resolve by binding arbitration: any claim, dispute or controversy (whether in contract, tort or otherwise, whether pre-existing, present or future, and including statutory, common law, intentional tort, and equitable claims) arising from or relating to this Agreement or the Contract; (ii) if arbitration is chosen, it will be conducted with the American Arbitration Association (the "AAA") pursuant the AAA's Commercial Arbitration Rules; (iii) THERE SHALL BE NO AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED ON A CLASS ACTION BASIS; (iv) AN ARBITRATION CAN ONLY DECIDE MEPCO'S OR PURCHASER'S CLAIM(S) AND MAY NOT CONSOLIDATE OR JOIN THE CLAIMS OF OTHER PERSONS WHO MAY HAVE SIMILAR CLAIMS; (v) ANY SUCH ARBITRATION HEARING WILL TAKE PLACE IN THE BOROUGH OF MANHATTAN, CITY OF NEW YORK, NEW YORK; (vi) Purchaser hereby waives any objection which it may now or hereafter have based on venue and/or forum non conveniens of any such arbitration; and (vii) this Agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act.

**GOVERNING LAW AND VENUE:**

This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to applicable conflict of law principles. Purchaser hereby unconditionally and irrevocably waives any claim to assert that the law of any other jurisdiction governs this Agreement or the Contract. Any legal suit, action or proceeding against MEPCO arising out of or relating to the Agreement or the Contract may only be instituted in Federal or State Court in the State of New York, Borough of Manhattan, City of New York, New York. Purchaser hereby waives any objection which it may now or hereafter have based on venue and/or forum non conveniens of any such suit, action or proceeding and Purchaser hereby irrevocably submits to the jurisdiction of any such court in any such suit.

**WAIVER OF CLASS ACTION:**

PURCHASER HEREBY WAIVES ANY RIGHT TO BRING ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT, THE CONTRACT OR ANY MATTER ARISING IN CONNECTION THEREWITH ON A CLASS ACTION BASIS.

**WAIVER OF JURY DEMAND:**

PURCHASER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY WITH REGARD TO THIS AGREEMENT, THE CONTRACT OR ANY OTHER ACTION ARISING IN CONNECTION HEREWITH OR THEREWITH. MEPCO IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN THE EVENT OF ANY SUCH PROCEEDING.

FORM 77 PPA STANDARD 1.03 10F706 (C) Mepco

AOPN_0318220715_14#2022-03-18-071852.MEPCO.XML

# PAYMENT PLAN AGREEMENT

*30200460807775*

Payment Plan Provider provided by:
**SING For Service, LLC d/b/a MEPCO**
205 N. Michigan Avenue, Suite 2200, Chicago, IL 60601
Fax: 866.656.6518    Telephone: 800.397.6767

| Purchaser: | | | | Seller: | | CODE: S300163 |
|---|---|---|---|---|---|---|
| NAME: LUCAS HORTON | | | | LEGAL NAME: VAD DBA: | | |
| ADDRESS: | | | | ADDRESS: 2101 BUSINESS CENTER DR 200 | | |
| CITY: RICHARDSON | ST: TX | ZIP: 750802917 | | CITY: IRVINE | ST: CA | ZIP: 92612 |
| PHONE: | | FAX: | | PHONE: 866-336-1769 | FAX: | |
| E-MAIL: | | | | E-MAIL: | | |
| | | | | SALESPERSON: | | |

### Payment Plan Terms
### All dollar amounts are in U.S. dollars

**Total Sales Price**

**Down Payment**
(Minimum 3% of Total Sales Price)

**Balance of Sales Price**

**Number of Payments**
(cannot be more than 42 or less than)

**Amount of Each Payment**
(Balance of Sales Price divided by Number of Payments)

**Payment Date (each month)**
(First due date no more than 30 days from sale date)

**Final Payment Date**
(Date of last payment)

This Payment Plan Agreement ("Agreement") is between Purchaser and SING For Service, LLC d/b/a Mepco ("MEPCO"), a Seabury Asset Management Company. Purchaser has purchased a service ("Contract") from Seller that is issued by SUNPATH LTD ("Administrator"). This Agreement is entered into to enable Purchaser to pay for the Contract pursuant to an installment payment program.

Contract: VSC and/or PROD WAR    Contract No.: HZF082483

Administrator: SUNPATH LTD

| Vehicle Information | | | Contract and Payment Plan Effective Date | | |
|---|---|---|---|---|---|
| Make: HYUNDAI | | | Model: AZERA | | Odometer: VEHICL |
| Year: 2016 | | | Coverage Term: (in months) | 60 | Coverage Mileage: (in Miles) 125000 |
| VIN: | | | | | |

Refer to the Contract for the terms and conditions regarding the Contract.

In consideration of Purchaser being afforded the opportunity to pay for the Contract under the installment payment program, the Purchaser and MEPCO acknowledge and agree as follows.

Purchaser has paid to Seller for its account in cash the down payment disclosed under "Payment Plan Terms" towards the Total Sales Price of the Contract. The Balance of Sales Price shall be paid by Purchaser to MEPCO. Subject to the Cancellation provisions on Page 2 hereof, Purchaser promises to pay MEPCO, the Balance of Sales Price in accordance with the payment method selected by Purchaser from the options set forth below:

[X] **Payment Option 1: Authorization for Credit Card Payment**
The Balance of Sales Price may be paid by Purchaser through, and Purchaser hereby authorizes MEPCO to make, the applicable number of consecutive monthly charges to Purchaser's credit card account listed below, in the amounts and on the dates disclosed under the Payment Plan Terms, until such time as the Balance of Sales Price, together with the applicable charges described on page 2 hereof (the "Applicable Charges"), are fully paid, or until such time as MEPCO has received written notification of termination

Credit Card Number _____    Expiration Date (MM/YY) _____    Type of Card (MC, Visa, Amex, Discover)
I authorize charges to my credit card account for payment of the Balance of Sales Price together with all Applicable Charges in accordance with

[ ] **Payment Option 2: Authorization for Bank Account Direct Debit**
The Balance of Sales Price may be paid by Purchaser through, and Purchaser hereby authorizes MEPCO to instruct Purchaser's financial institution described below to make, the applicable number of consecutive monthly payments in the amounts and on the dates disclosed under Payment Plan Terms, from the account listed below, by electronic automatic debit of Purchaser's checking or savings account. This authority will remain in effect until such time as the Balance of Sales Price, together with all applicable Charges, are fully paid, or until such time as MEPCO has received written notification of termination ("Bank Account Direct Debit Termination Notice") from Purchaser in time to

Name of Financial Institution _____    Routing Number (Must be 9 digits long) _____    Account Number _____    [ ] Checking    [ ] Savings
I authorize charges to my bank account for the payment of the Balance of Sales Price together with all Applicable Charges in accordance with this Agreement

[ ] **Payment Option 3: Monthly Bill**
The Balance of Sales Price may be paid directly by Purchaser in accordance with the Payment Plan Terms listed above. Purchaser shall receive a monthly bill and shall make payment on or before the Payment Date of each consecutive month until the Balance of Sales Price, together with all Applicable Charges, are fully paid, or until such time as MEPCO has received written notification of termination ("Monthly Bill Termination Notice") from Purchaser. Purchaser shall send such payments to MEPCO at such address as MEPCO provides to Purchaser

PURCHASER SHALL HAVE THE RIGHT, AT ANY TIME, TO CANCEL THE CONTRACT BY NOTICE TO MEPCO ("Termination Notice") OR BY NONPAYMENT. PURCHASER SHALL HAVE NO OBLIGATION TO MAKE ANY INSTALLMENT PAYMENTS AFTER CANCELLATION. Subject to the Cancellation provisions on Page 2 hereof, unless MEPCO shall previously have received a Bill Termination Notice, (i) a late payment fee may be imposed in the amount of the lesser of 5% of the late payment or $5.00 in respect of any payment not received by MEPCO within five days of the scheduled Payment Date ("Late Charge"), and (ii) in the event that any scheduled payment is not made on or before the scheduled Payment Due Date, as provided in the Payment Plan Terms above, MEPCO is authorized by Purchaser (without notice thereof to Purchaser) to direct Administrator or Seller to cancel Purchaser's Contract and this Agreement at any time for nonpayment. Purchaser hereby assigns to MEPCO all of Purchaser's right, title and interest in and to the Contract, including Purchaser's rights to cancel the Contract, receive all unearned and refund amounts under the Contract and Purchaser's right to make a direct claim for indemnity against the insurance Company. Purchaser represents to MEPCO that Purchaser's decision to purchase the Contract from Seller under the payment program did not result in Seller charging Purchaser a different Total Sales Price for the Contract than Purchaser would have paid if Purchaser had decided instead to pay the purchase price of the Contract in full at the time this Agreement was executed. The consent and format of this Agreement have been adopted to provide Purchaser with important

[ ] By signing below, I agree I have had the opportunity to review, accept, and correct any errors contained in this Agreement.
Purchaser understands that the personal information regarding Purchaser that is provided by Purchaser in connection with this Agreement will not be used or shared with any other party other than for the purpose of the services provided in this Agreement and the Contract and as required or permitted by applicable law.

**PURCHASER**
By _____    Date: 4/29/2020

Its  hjk

[ ] This Agreement sets forth the terms and conditions of the payment plan authorized by Purchaser by phone or other electronic means. See page 2 for instructions to cancel.

See Page 2 for additional terms and conditions

*30200460807775*    *77*

**EXHIBIT**
**HM3**

Payment Plan Agreement (cont'd.)

**PROMISE TO PAY:**

In consideration of the sale of the Contract to Purchaser, Purchaser promises to pay to MEPCO, on behalf of Mepco, the Balance of Sales Price and all Applicable Charges shown under Payment Plan Terms, subject to the provisions of this Agreement. Purchaser shall not have any right to reduce any amount owed to MEPCO pursuant to this Agreement for any reason whatsoever.

**CANCELLATION:**

Purchaser has the right to cancel this Agreement at any time. Purchaser may cancel this Agreement at any time by (i) electing not to make the next payment due pursuant to this Agreement or (ii) sending MEPCO a Termination Notice. In the event that (a) Purchaser elects not to make the next payment due pursuant to this Agreement, (b) MEPCO receives a

may cancel the Contract and this Agreement. After the effective date of Cancellation, Purchaser shall have no further obligation to make installment    **IMPORTANT**

**Cancelling this Agreement does not immediately cancel your Contract; it only cancels your payment plan. Coverage under your Contract will eventually be cancelled (in accordance with the terms of this Agreement) based on your nonpayment. However, you should contact the Seller or Administrator in order to immediately cancel your Contract.**

Purchaser hereby assigns to MEPCO all of Purchaser's right, title and interest in and to the Contract, including Purchaser's rights to receive all unearned and return amounts and to assert any rights to reinstate the Contract and all proceeds thereof, and Purchaser's right to make a direct claim for indemnity against the Insurance Company. In the event that Purchaser has made total payments to MEPCO in excess of the portion of the Total Sales Price plus Applicable Changes earned through the date of cancellation, Administrator or

**POWER OF ATTORNEY:**

Following any default hereunder, and subject to the Cancellation provisions above, Purchaser hereby irrevocably appoints MEPCO as its true and lawful attorney-in-fact, only for the limited purposes related to this Agreement set forth in the following sentence until all amounts payable hereunder are paid in full. MEPCO shall have full power under this power of attorney to (i) cancel the Contract, (ii) receive, demand, collect or sue any party for any amounts relating to the Contract, (iii) endorse or execute in Purchaser's name all checks issued and all other documents or instruments relating to the Contract, and (iv) take such other actions as are reasonably necessary to further the purposes of this

**APPLICABLE CHARGES:**

If any payment due hereunder is more than five days late, and except as prohibited by applicable law, Purchaser agrees to pay MEPCO the Late Charge. Nothing herein shall be considered to waive any default hereunder or to grant any grace period with respect to any default for failure to make any payment on the Payment Date. Notwithstanding anything herein to the contrary, in the event that any scheduled payment is not made on or before the Payment Date, MEPCO may, in its sole discretion, direct Administrator or Seller to cancel the Contract and this Agreement at any time for nonpayment. Except as prohibited by applicable law, Purchaser agrees to pay to MEPCO a fee of $25 for each check or each debit that is dishonored by Purchaser's bank. Purchaser consents to the payment of all of the Applicable Charges in accordance with the Payment Option

**DEFAULT PAYMENT OPTION:** If Purchaser fails to select a Payment Option, Purchaser shall be deemed to have selected a Monthly Bill

**PREPAYMENT:** Purchaser shall have the right to prepay the entire unpaid Balance of Sales Price at any time, without penalty or discount.

**DEFAULT:**

If (i) Purchaser fails to make any payment due hereunder or comply with any other provision hereof, (ii) Purchaser becomes the subject of any voluntary or involuntary bankruptcy proceedings, (iii) Purchaser has a receiver or trustee appointed for it or its property, or (iv) Purchaser makes an assignment for the benefit of its creditors or admits in writing that it is unable to pay its debts as they become due, an "Event of Default" shall be deemed to have occurred. Upon the occurrence of an Event of Default, MEPCO shall have the right to take such actions as are available to MEPCO hereunder at law or in equity. MEPCO shall be entitled to reimbursement for reasonable attorneys' fees and costs in enforcing MEPCO's rights hereunder.

**RELEASE:**

Purchaser hereby releases and discharges MEPCO from any liability for damages with respect to any action taken following an Event of Default by Purchaser and shall indemnify and hold MEPCO harmless from any liabilities, claims, damages or causes of action in connection with any such action by MEPCO.

**PAYMENTS AFTER CANCELLATION:**

Any payment made by Purchaser after the effective date of cancellation (or after a notice of cancellation is mailed to Purchaser) will    **not**    result in a reinstatement of the Contract

but will be applied to Purchaser's outstanding obligations, if any, under this Agreement. Neither the acceptance nor the application of any such payments shall constitute an undertaking by MEPCO to take steps to attempt to reinstate such Contract or constitute a waiver of any Event of Default hereunder.

**ACCEPTANCE, RATIFICATION, ACCURACY:**

This Agreement shall be considered accepted by Purchaser and MEPCO upon the payment of the down payment and is effective as of Effective Date of Contract. Purchaser agrees that MEPCO shall have the authority to revise this Agreement to insert any provision omitted (including but not limited to the due date of the first installment) upon written notice to Purchaser. In addition, if the total payments due hereunder are increased due to underwriting considerations, MEPCO shall have the right, upon receipt of Purchaser's written authorization, to revise dollar amounts on the face of this Agreement. Any change by Purchaser (by way of deletion, modification, supplementation or otherwise), to any portion of this Agreement shall render the Agreement voidable, at MEPCO's option.

**ASSIGNMENTS:**

MEPCO may, with or without notice to Purchaser, assign or pledge its rights, title and interest in, to and under this Agreement and the power of attorney herein described. Upon written notice from any such assignee, Purchaser shall make all payments to such assignee without defense, offset or counterclaim.

**AGENTS OF SING For Service, LLC d/b/a**

Pursuant to one or more powers of attorney, MEPCO will, from time to time, appoint one or more third parties as its agent to take certain actions on its behalf in connection with this Agreement. The Purchaser is entitled to rely upon actions taken and statements made by such agents on behalf of, and in the name of, MEPCO to the same extent as if MEPCO had taken such actions or made such statements in its own name.

**LIMITED RESOURCE COVENANT:**

The Purchaser understands and agrees that: (i) Mepco's obligations are solely the obligations of Mepco and of no other Person, payable at any time only to the extent funds are available to Mepco, (ii) to the extent funds at any time are not available to Mepco to pay such obligations, any claims relating thereto shall not constitute a claim against Mepco but shall continue to accrue; (iii) the payment of any claim (as defined in Section 101 of Title 11 of the Bankruptcy Code) is expressly subordinated to the payment in full of all of Mepco's outstanding obligations to its lenders and the administrative agent; and (iv) prior to the date that is one year and one day after the payment in full of all of Mepco's outstanding obligations, the Purchaser will not institute against, or join with any other Person in instituting against, Mepco any bankruptcy, reorganization, insolvency or liquidation proceedings or similar proceeding under the laws of the United States or any state of the United States.

See Page 3 for additional terms and conditions

MEPCO00000095

Payment Sale Agreement (Master)

**WAIVERS, REMEDIES, ENTIRE AGREEMENT:**

MEPCO's failure to require strict performance of any provision hereof or to exercise any of its rights hereunder, shall not be construed as a waiver or relinquishment of any future rights under such provision, but the provision shall continue and remain in full force and effect. The exercise of any rights or remedies by MEPCO under this Agreement is cumulative and shall not preclude MEPCO from exercising any other right or remedy it may have hereunder or at law. Each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law. If any provision hereof is held to be unenforceable or invalid under applicable law, the unenforceability or invalidity of such provision shall not impair the validity or enforceability of the remaining provisions hereof. Time is of the essence in this Agreement.

**MANDATORY ARBITRATION:**

MEPCO and Purchaser mutually agree that (i) any one of them has the right to elect to resolve by binding arbitration:
any claim, dispute or controversy (whether in contract, tort or otherwise, whether pre-existing, present or future, and including statutory, common law, intentional tort, and equitable claims) arising from or relating to this Agreement or the Contract; (ii) if arbitration is chosen, it will be conducted with the American Arbitration Association (the "AAA") pursuant the AAA's Commercial Arbitration Rules; (iii) THERE SHALL BE NO AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED ON A CLASS ACTION BASIS; (iv) AN ARBITRATION CAN ONLY DECIDE MEPCO'S OR PURCHASER'S CLAIM(S) AND MAY NOT CONSOLIDATE OR JOIN THE CLAIMS OF OTHER PERSONS WHO MAY HAVE SIMILAR CLAIMS; (v) ANY SUCH ARBITRATION HEARING WILL TAKE PLACE IN THE BOROUGH OF MANHATTAN, CITY OF NEW YORK, NEW YORK; (vi) Purchaser hereby waives any objection which it may now or hereafter have based on venue and/or forum non conveniens of any such arbitration; and (vii) this Agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act.

**GOVERNING LAW AND VENUE:**

This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to applicable conflict of law principles. Purchaser hereby unconditionally and irrevocably waives any claim to assert that the law of any other jurisdiction governs this Agreement or the Contract. Any legal suit, action or proceeding against MEPCO arising out of or relating to the Agreement or the Contract may only be instituted in Federal or State Court in the State of New York, Borough of Manhattan, City of New York, New York. Purchaser hereby waives any objection which it may now or hereafter have based on venue and/or forum non conveniens of any such suit, action or proceeding and Purchaser hereby irrevocably submits to the jurisdiction of any such court in any such suit.

**WAIVER OF CLASS ACTION:**
PURCHASER HEREBY WAIVES ANY RIGHT TO BRING ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT, THE CONTRACT OR ANY MATTER ARISING IN CONNECTION THEREWITH ON A CLASS ACTION BASIS.

**WAIVER OF JURY DEMAND:**
PURCHASER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY WITH REGARD TO THIS AGREEMENT, THE CONTRACT OR ANY OTHER ACTION ARISING IN CONNECTION HEREWITH OR THEREWITH. MEPCO IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN THE EVENT OF ANY SUCH PROCEEDING.

FORM 77 PSA STANDARD 1.93 10F796 (C) Mepco

VSMS-SUNPATH-MEP05032070_PARSED4#2020-09-11-041019.MEPCO.XML

*77*

*30200460807775*

# Exhibit 10

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF DELAWARE

| | |
|---|---|
| KURT MORALES II, BRANDON CALLIER, and LUCAS HORTON, individually, and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>   v.<br><br>SUNPATH LTD., a Delaware corporation, NORTHCOAST WARRANTY SERVICES, INC., a Delaware corporation, AMTRUST NORTH AMERICA, INC., a Delaware corporation, SING FOR SERVICE, LLC, a Delaware limited liability company, and PELICAN INVESTMENT HOLDINGS LLC, a Delaware limited liability company, AFFORDABLE AUTO SHIELD, INC., a Delaware limited liability company,<br><br>          Defendants. | Case No.: 20-cv-01376-RGA<br><br>**DECLARATION OF KURT MORALES II** |

I, Kurt Morales II, hereby declare the following:

1.      I am over the age of eighteen and I am competent to testify in this matter if called upon.

2.      This declaration is based on personal knowledge of the matters set forth herein.

3.      On or about March 4, 2020, I received an unwanted phone call to my cell phone number ending in 2227 from 702-351-3030 that played an artificial or prerecorded voice message.

4.      The artificial or prerecorded voice said that "your car warranty is set to expire" and to "press one if you would like to extend or reinstate your car's warranty."

5.      I pressed "one" because I wanted to identify the caller, not because I was interested in the warranty. I was then connected to a sales agent who attempted to sell me a vehicle service contract from National Car Cure, Sunpath and Northcoast.

6.    A true and correct copy of the email I received after purchasing the vehicle service contract was produced in this litigation as MORALES_033 and is attached hereto as Exhibit A.

7.    A true and correct copy of the vehicle service contract I purchased was produced in this litigation as MORALES_001 to MORALES_025 and is attached hereto as Exhibit B.

8.    I recorded the call I received from National Car Cure, Sunpath and Northcoast. After the call, I deleted the part of the recording containing my personal payment information.

9.    A true and correct copy of the recording of this phone call that I made (after deleting my payment information) was produced in this litigation as MORALES_032 and is attached here as Exhibit C.

10.    I never gave my consent to be contacted in any manner by Gustav Renny, National Car Cure, Northcoast, or to any other person or company regarding auto warranties or vehicle service contracts.


I declare under penalty of perjury that the foregoing is true and correct. This declaration is executed on the date stated below in _____Dallas_____, Texas.


Dated: ___12/13/2024___            By: _____
                                                          Kurt Morales II

2

# Exhibit A

Page 1

| From: | "edwina napcauto,com" <edwina@napcauto,com> |
|---|---|
| To: | |
| Date: | 3/6/2020 11:26:18 AM |
| Subject: | VIN/MILES |

KURT MORALES,

At this time ,we need for you to send us your VIN number and exact mileage of your vehicle failure to do so will result in any claims you try to file to be denied. If your claim is denied then you are responsible for the cost of the repair. Please call our office at (800)-261-0096 with your VIN number and exact mileage. For your convenience you may also email us at custsvc@nationalcarcure.com    To avoid any disruption or laps in benefits, we must have this information as soon as possible.

Best Regards,
Edwina Chandler
Customer Service
(Toll) 800-261-0096
(Fax) 561-868-6532

MORALES_033

# Exhibit B

# NATIONAL CAR CURE

1665 Palm Beach Lakes Blvd., #215
West Palm Beach, FL 33401
800-261-0096

Kurt Morales

Carrollton, TX 75006

Congratulations!  Your valuable mechanical breakdown protection is detailed in the enclosed contract booklet.  Please look it over and call with any questions you may have. Thank you for your purchase; we look forward to servicing your protection needs.  Please call us for a quote on any other vehicle in your household.  Vehicles under 150,000 miles may qualify for additional coverages, and multi-vehicle discounts are available.

Be sure to familiarize yourself with the coverage, maintenance requirements, and procedures in the event of a mechanical breakdown.  Proper maintenance of your vehicle will contribute to a trouble free driving experience.  You should follow your vehicle manufacturer's recommended maintenance for your driving habits.

We encourage you to store your new service agreement in your vehicle.  This document contains important numbers needed in the event of a breakdown.

Welcome to our family of vehicle owners that have the peace of mind and financial security of mechanical breakdown protection.

**THANK YOU AGAIN!**

*Jasmine Whitfield*

Protection Specialist

**IMPORTANT CONTACT NUMBERS:**

Claims: 888-990-7786

Roadside: 888-878-8259

MORALES_001

WSTD01

**SunPath**
gosunpath.com

## Contract Declarations

| Contract Holder<br>Kurt Morales | | | | Service Contract No.<br><br>$$PROVISIONAL |
|---|---|---|---|---|
| Street Address | | | | |

| City, State, Zip<br>Carrollton, TX 75006 | | Phone |
|---|---|---|

| Year<br>2018 | Make<br>HONDA | Model<br>CR-V | VIN |
|---|---|---|---|

| Odometer<br>25,001 | Vehicle Purchase Price | Contract Purchase Date<br>03/04/2020 | Vehicle Class<br>1 |
|---|---|---|---|

| Seller/Dealer/Vendor Name<br>NATIONAL CAR CURE | I.D.<br>NCC4610 |
|---|---|

| Address<br>1665 Palm Beach Lakes Blvd., #215 |
|---|

| City, State, Zip<br>West Palm Beach, FL 33401 | Phone<br>800-261-0096 |
|---|---|

| Finance Company<br>Sunsimp INSTALLMENT AGREEMENT | Payment Terms |
|---|---|

| Plan Name<br>Sunpath Horizon Diamond New |
|---|

| Plan Term<br>Months 60    Miles 100,000 | Plan Code<br>SPHDN | Deductible<br>$ 100.00 |
|---|---|---|

| * Validation Period<br>30 days and 1,000 miles | Surcharges<br>TURBO |
|---|---|

| Contract Purchase Price | Options ** |
|---|---|

The purchase of this contract is not required to either obtain financing or to purchase the motor vehicle. You have the right to transfer this Service Contract on the specified vehicle only to a subsequent private owner. Refer to the Transfer provision.

The undersigned purchaser of this Contract acknowledges that parts and labor benefits are subject to the validation period stated above. PER PHONE

**Certification:** The undersigned Purchaser of this Service Contract has selected the above coverage and options and understands that depending upon the coverage plan selected that parts and labor benefits are subject to the validations stated above. I agree that I have read and understand the above Contract provisions and implied warranty disclosure.

| 03/04/2020 | PER PHONE | Jasmine Whitfield |
|---|---|---|
| Date | Service Contract Purchaser Signature | Seller/Dealer/Vendor Representative |

NWS-SP-HZN-DIAMOND (12-13)

MORALES_002

D1

Administered by: SunPath Ltd.
Administrative Office:
25 Braintree Hill Park, Suite 100
Braintree, MA 02184
(888) 990-7786


This Contract is between You, the Purchaser and
Northcoast Warranty Services, Inc., the Provider/Obligor.

800 Superior Avenue E., 21st Floor
Cleveland, OH 44114
(866) 927-3097


In Florida, the Provider/Obligor and Administrator is SunPath LTD Corp. d/b/a
SunPath LTD Corp. of Delaware
FL License #19943, (888) 990-7786

# Horizon Coverage DIAMOND
## 888.990.7786

This **SERVICE CONTRACT** is an agreement between **YOU** and **US. WE, US, OUR** and **PROVIDER** refer to Northcoast Warranty Services, Inc., who is the party responsible to **YOU** for the benefits under this SERVICE CONTRACT, except in any states where required by law, where WE, US, OUR and PROVIDER mean the DEALER from whom YOU purchased or leased the VEHICLE described on the DECLARATION PAGE. **YOU, YOUR and CONTRACT HOLDER** refers to YOU, the purchaser of this SERVICE CONTRACT and the Vehicle described in the DECLARATION PAGE of this SERVICE CONTRACT. WE have contracted with SunPath, Ltd., 25 Braintree Hill Park, Suite 100, Braintree, MA 02184, 888-990-7786, hereinafter referred to as **ADMINISTRATOR**, to administer this SERVICE CONTRACT. All inquiries should be directed to the ADMINISTRATOR. Toll-free assistance is available at 888-990-7786.

In Florida this SERVICE CONTRACT is between YOU and SunPath LTD Corp. d/b/a SunPath LTD Corp of Delaware, Florida Certificate of Authority No.: 19943. SunPath LTD Corp. d/b/a SunPath LTD Corp of Delaware is also the SERVICE CONTRACT ADMINISTRATOR and handles all administrative functions of this SERVICE CONTRACT. All inquiries should be directed to SunPath LTD Corp. of Delaware at 888-990-7786.

## DEFINITIONS

- AUTHORIZED REPAIR(S), APPROVED REPAIR(S): All repairs must be approved and authorized by the ADMINISTRATOR as a condition of COVERAGE. Repairs performed without the prior approval or authorization from the ADMINISTRATOR will not be covered, except as provided for under Emergency Repairs.
- BREAKDOWN, MECHANICAL BREAKDOWN, MECHANICAL FAILURE: Defects in materials and workmanship of a COVERED PART to perform the function for which it was designed by its manufacturer.
- COVERAGE: The coverage afforded to YOU for YOUR VEHICLE is determined by the PLAN TYPE selected on the DECLARATION PAGE and more fully described in the PLAN COVERAGE section of this SERVICE CONTRACT.
- COVERED PART(S): Parts or components listed under the PLAN COVERAGE and subject to YOUR responsibilities for VEHICLE maintenance under the YOUR OBLIGATIONS section and subject to conditions described under "EXCLUSIONS".

- CONTRACT NUMBER: YOUR "CONTRACT NUMBER" on the DECLARATION PAGE is a unique number that identifies YOU, YOUR VEHICLE and YOUR COVERAGE. Please refer to this number with any communication regarding YOUR coverage or when filing a claim.

- DECLARATION PAGE: The page of this CONTRACT that specifies YOUR information, SELLER/DEALER information, applicable lien holder information (if any), COVERAGE selected by YOU, and other information pertaining to YOUR CONTRACT.

- DEDUCTIBLE: The amount on the DECLARATION PAGE that YOU will have to pay when YOU have a claim.

- EXPIRATION: YOUR SERVICE CONTRACT expires in accordance with the CONTRACT TERM that YOU purchased.
  The CONTRACT TERM is listed on the DECLARATION PAGE of this CONTRACT.
  - o USED PLAN TERMS: All plans expire by time or mileage, whichever occurs first. Expiration by time is measured from the CONTRACT purchase date. Expiration by mileage is measured from the odometer mileage of YOUR VEHICLE on the CONTRACT purchase date.
  - o NEW PLAN TERMS: Expiration by time is measured from the CONTRACT purchase date. Expiration by mileage is measured from ZERO (0) odometer miles, and not from the odometer mileage of YOUR VEHICLE on the CONTRACT purchase date.

- FACTORY, FACTORY WARRANTY: The Manufacturer of the VEHICLE and all warranty coverage provided to YOU by the Manufacturer of the VEHICLE at no additional cost. The FACTORY WARRANTY covers repairs to YOUR VEHICLE to correct any defects in components or workmanship.

- LIMITS OF LIABILITY: The total amount of OUR liability to YOU for any covered claim, or the aggregate of covered claims paid, as set forth in this SERVICE CONTRACT.

- SERVICE CONTRACT, CONTRACT: This SERVICE CONTRACT issued to YOU and covering YOUR VEHICLE as listed on the DECLARATION PAGE.

- VALIDATION PERIOD: YOUR COVERAGE is subject to a VALIDATION PERIOD of time and mileage from the date of CONTRACT purchase. There is NO COVERAGE during the VALIDATION PERIOD. The length of the VALIDATION PERIOD is listed on the DECLARATION PAGE of this CONTRACT and YOUR COVERAGE is effective the day following the expiration of the VALIDATION PERIOD. The time and mileage contained in YOUR validation period will be added to the plan's term and mileage.

- VEHICLE, YOUR VEHICLE: YOUR eligible passenger VEHICLE (1 ton or less) listed on the DECLARATION PAGE of YOUR SERVICE CONTRACT.

• SELLER/DEALER: The SELLER OR DEALER from which YOU purchased the CONTRACT.

## OUR OBLIGATIONS

Vehicle Repairs: Subject to the terms and conditions set forth in this CONTRACT, WE will pay YOUR repair facility or reimburse YOU for the reasonable parts and labor charges to repair or replace any BREAKDOWN of a part listed in the Plan Coverage Section of the plan that YOU have selected on the DECLARATION PAGE. All repairs must be approved and authorized by the ADMINISTRATOR as a condition of COVERAGE. Repairs performed without the prior approval or authorization of the ADMINISTRATOR will not be covered, except as provided for under Emergency Repairs. The ADMINISTRATOR will be solely responsible for determining the method of repair and amount of repair authorization. **Replacement parts may be new, used, remanufactured, or replacement parts of like kind and quality ("lkq"). Authorization for approved part charges will be determined by available published retail pricing, or prevailing manufacturers' suggested retail price (M.S.R.P.) as determined by the ADMINISTRATOR.** Approved labor charges will be determined using nationally published flat-rate manuals. The ADMINISTRATOR, in its sole discretion, will determine the labor rate for authorized repairs based on the average labor rate of repair facilities in the area. The labor rate will not exceed the posted labor rate of the repair facility. In the event YOU have selected the Enhanced Labor Rate Option on the DECLARATION PAGE, the approved labor rate will be the posted rate of the repair facility.

• **Trip Interruption:** WE will reimburse YOU a maximum of two hundred forty dollars ($240.00) for lodging and meal expenses incurred by YOU should YOUR VEHICLE failure and covered repairs occur more than 100 miles from YOUR place of residence and YOU are stranded overnight. Reimbursement is limited to eighty dollars ($80.00) per day for charges incurred between the time YOUR VEHICLE failed and the time it is repaired.

• **Rental Vehicle Expense:** COVERAGE is calculated as follows: For every (7) hours of authorized labor approved by the ADMINISTRATOR, YOU qualify for one (1) day of reimbursement. Notwithstanding the foregoing, if an authorized claim requires more than four (4) hours of authorized labor, YOU will qualify for YOUR first day of reimbursement. If the ADMINISTRATOR requires an inspection which causes a delay, YOU will qualify for one additional day of reimbursement. At all times, the maximum benefit is $35.00 per day. In all cases, total reimbursement will not exceed $175.00. At no time will this benefit exceed the amount YOU were charged for vehicle rental, or otherwise include days that YOUR VEHICLE was not at the repair facility.

- **24 Hour Roadside Assistance:** YOUR VEHICLE will be covered over the term of YOUR SERVICE CONTRACT. Towing benefit is a maximum of one hundred dollars ($100.00) per occurrence and lock out service, fuel, fluid, or battery boost/jump (excluding the cost of fluids or fuel) up to a maximum of one hundred dollars ($100.00) per occurrence. If YOUR VEHICLE requires Roadside Assistance, YOU must contact the Roadside Service Processing Center for prior approval and assistance. YOU will be provided with YOUR Roadside Assistance number by the ADMINISTRATOR as part of YOUR fulfillment documentation. The use of this Roadside benefit is limited to one (1) service type during any seven (7) day period. Please Note: The 24 Hour Roadside Assistance benefit is not intended to provide reimbursement of service secured independently of this CONTRACT. Fees for services incurred independently are NOT covered.

## YOUR OBLIGATIONS

- **YOU or YOUR repair facility must obtain approval prior to having any work performed on YOUR VEHICLE that may be covered by this SERVICE CONTRACT.** If YOU believe the failure may be covered by this SERVICE CONTRACT, YOU must have YOUR repair facility call the ADMINISTRATOR at 888-990-7786. **The ADMINISTRATOR must authorize any work before the work is performed.** Repairs performed without the prior approval or authorization of the ADMINISTRATOR will not be covered, except as provided for under Emergency Repairs.

- **YOU must maintain YOUR VEHICLE in accordance with manufacturer's specifications and maintenance schedules. Keep all receipts and licensed repair facility records that demonstrate YOUR compliance with this provision.** Proof of maintenance may be required when YOU file a claim. Failure to follow the manufacturer's maintenance schedule for YOUR VEHICLE may result in the denial of COVERAGE. Maintenance receipts must identify YOUR VEHICLE, date and mileage at the time of service, parts and labor charges, and originate from a licensed repair facility. If maintenance has been provided by YOU, then a detailed log including all dates and services with corresponding sales receipts for parts will be required.

- YOU are responsible for authorizing any teardown or diagnosis time needed to determine if YOUR VEHICLE has a covered failure. If it is subsequently determined that YOUR VEHICLE has a covered failure, the ADMINISTRATOR will approve the claim and pay the charges in accordance with the terms of this SERVICE CONTRACT. YOU will be responsible for any charges if it is determined that the failure is not covered by the plan that YOU have selected or under the terms of YOUR SERVICE CONTRACT.

- YOU are responsible for paying the DEDUCTIBLE for any claim authorized by the ADMINISTRATOR. ONLY ONE DEDUCTIBLE WILL APPLY TO ANY CLAIM, although a claim may include multiple component groups or parts replacements that are part of the repair. The amount of YOUR DEDUCTIBLE is listed on YOUR DECLARATION PAGE. YOUR DEDUCTIBLE does not apply to Roadside or Trip Interruption benefits that may be included in the plan YOU selected. If YOU purchased this SERVICE CONTRACT from an Automotive DEALER and the same DEALER is performing the authorized repair then up to $100 of the DEDUCTIBLE will be waived. If YOUR VEHICLE is being repaired at a preferred Repair Shop of the ADMINISTRATOR then up to $100.00 of YOUR DEDUCTIBLE will be waived.

## GENERAL PROVISIONS

LIMITS OF LIABILITY: This CONTRACT has limits of liability. OUR liability for any claim shall in no event exceed the actual cash value (ACV) of YOUR VEHICLE as listed in the National Automobile Dealers Association (N.A.D.A.) Official Used Car Guide for YOUR region (excluding tax, title, and license fees) at the time of claim presentation. If at any time the ACV of YOUR VEHICLE equals or exceeds the sum of all claims paid pursuant to this CONTRACT, the limits of liability hereunder shall be considered satisfied and no further coverage shall be due. If YOUR CONTRACT reaches its limits of liability during the course of a claim, the ADMINISTRATOR will authorize the difference between YOUR VEHICLE's ACV at that time and the aggregate of paid claims as of that date pursuant to YOUR CONTRACT. Notwithstanding the foregoing, if at any time the ACV of YOUR VEHICLE is determined to be less than one hundred and fifty percent (150%) of the amount YOU paid for YOUR SERVICE CONTRACT then the maximum liability of YOUR SERVICE CONTRACT will be one hundred and fifty percent (150%) of the amount YOU paid.

TERMINATION: This CONTRACT will immediately terminate if YOUR VEHICLE is sold or traded unless YOU have transferred this

CONTRACT in accordance with the transfer provision listed in this CONTRACT.

## DIAMOND COVERAGE

**COVERS ALL VEHICLE PARTS EXCEPT:**

The services and parts that are described as part of the vehicles Maintenance Schedule as described by the Vehicle's Manufacturer and components that are subject to normal replacement and considered routine maintenance. Examples routine maintenance items not covered are:

| Oil/Filter Changes Routine Transmission flushes | Coolant Flushes Fluid Changes | Exhaust/Catalytic Converter Engine Tune Ups |
|---|---|---|
| Tire Rotations | Wheel Alignment Alignment | Weather Stripping |
| Wheel Balancing | Brake Pad/Lining Replacement | Belts/Hoses/Spark Plugs |

Examples of parts not covered are:

| Vehicle Manuals | Upholstery/Floor Mats | Convertible/Vinyl Tops |
|---|---|---|
| Light Bulbs/Sealed Beams | Keys/Fobs | Tires |
| Trim/Glass/Body Panels | Batteries/Electric Fuel/Cells | Paint/Bright Metals |
| Manual Clutch Components | Lenses | Wheels/Wheel Covers |

Other items and components not covered are:
- Any damage that is the result of collision or theft
- Damage from rust, corrosion or flooding
- Water or air leakage
- Any third party components or systems that were not installed by the manufacturer
- Active or Passive safety and restraint systems and the components and sensors that support those safety systems
- On-Star Systems
- Recreational vehicle equipment not normally installed in passenger cars and trucks. Examples: Food/Beverage refrigeration units, Beverage dispensers and microwaves,
- Failures or events listed in the EXCLUSIONS section of this contract.

Internal components like Timing belts are subject to normal wear but are covered if they have been maintained, serviced or replaced in accordance with the manufacturer's maintenance schedule.

MORALES_009

## OPTIONAL COVERAGE

- **ENHANCED LABOR OPTION: If** YOU have selected the Enhanced Labor option on YOUR DECLARATION PAGE and paid the additional charge, the ADMINISTRATOR will not determine the average labor rate of repair facilities in the area when adjudicating the claim. The maximum payable repair facility labor rate for a claim approved by the ADMINISTRATOR will be the publicly posted labor rate of YOUR authorized repair facility.

## MANDATORY SURCHARGES

- **Commercial Use: If** YOUR VEHICLE is used for commercial purposes, or is registered as a company vehicle, which includes but is not limited to transporting customers or employees, delivery service, business travel or is used by more than one driver, the Commercial Use Box must be checked on the DECLARATION PAGE. Vehicles with any of the following components/features ARE NOT eligible for commercial coverage at any time: 4X4 drivetrain, Oversized Tires/Wheels, Turbo/Supercharger(s), greater than ¾ ton capacity, greater than 8 passenger capacity, vehicles at any time equipped with a snow plow, fifth wheel, Interior Storage Racks or power take-off equipment. The following commercial usage/vehicles are specifically excluded from coverage: Taxis, Rental, Dumping, Cherry Pickers, Limousines, Shuttles, Police or Emergency Service and Towing/Wrecking Service.
- **Four (4) Wheel/All-Wheel Drive:** If YOUR VEHICLE is equipped with 4 Wheel/All Wheel Drivetrain, this surcharge must be selected on the DECLARATION PAGE. COVERED PARTS: All components in the Differential Assembly and Transfer Case including: Drive Chain, Drive Chain Gears, Planetary Gears, Ring Shift Forks, Bearing, Bushing, Oil Pump Output Shaft, Main Shaft Washers and all other internal lubricated parts, Seals and Gaskets, Differential Housing, Axle Shaft, Ring and Pinion, Bearing, Bushing, Washers, Differential Cover, 4 Wheel Drive Actuator, Locking Hubs and all other internal parts contained with the differential assembly with Seals and Gaskets.
- **Diesel: If** YOU have a Vehicle equipped with a diesel engine, this surcharge must be selected on the DECLARATION PAGE. COVERED PARTS: By mechanical failure only; fuel injector, fuel pump, pressure regulator and metering valve.
- **ONE (1) Ton Vehicle:** If YOUR VEHICLE has a one ton gross vehicle weight (GVW) capability; this surcharge must be selected on the DECLARATION PAGE. ONE TON VEHICLES ARE NOT ELIGIBLE FOR COMMERCIAL USE.

## VEHICLE BREAKDOWN

### Call the Administrator 888-990-7786

If YOUR VEHICLE has a MECHANICAL BREAKDOWN YOU must follow the following procedures:

1. Immediately take action to prevent any further damage. This may require that YOU to stop YOUR VEHICLE and call for Roadside Assistance to have YOUR VEHICLE towed. This CONTRACT will not cover damage caused by YOUR failure to observe warning lights, vehicle gauges, repair a failed component or take action to prevent further damage.

2. Take YOUR VEHICLE to a licensed repair facility of YOUR choice.

3. Instruct the repair facility to call the ADMINISTRATOR to obtain authorization for the claim. Repairs made without prior authorization by the ADMINISTRATOR will not be covered.

4. Provide US and/or the repair facility with a copy of reasonably required documentation. This may include a copy of this CONTRACT, receipts for car rental and lodging expenses, receipts for maintenance (which include dates of service, vehicle mileage, description of services and amount paid).

- Emergency Repairs: If a BREAKDOWN occurs outside of the ADMINISTRATOR's normal business hours and YOUR VEHICLE can be immediately repaired by a repair facility, the ADMINISTRATOR may waive the pre-authorization requirement under the following circumstances: (i) both the BREAKDOWN and the repair must have occurred within 24 hours of each other and occurred outside of the ADMINISTRATOR'S operating hours; and (ii) all documentation for the repair including dates, description of failure, part numbers and failed components must be available to the ADMINISTRATOR on the first business day following the repair. YOU must contact the ADMINISTRATOR on the first business day following the repair (365 days in Wisconsin) (as soon as reasonably possible in Utah). The repair will only be covered if the failure is for components that are covered by YOUR CONTRACT and would have been approved by the ADMINISTRATOR during normal business hours.

## CLAIMS PROCEDURES

- YOU may have YOUR VEHICLE repaired at any licensed repair facility of YOUR choice.
- YOU are responsible for authorizing the diagnosis and tear down of YOUR VEHICLE to the point where mechanical failure can be determined. If the failure is covered by this SERVICE CONTRACT, the reasonable cost of diagnosis and teardown will be authorized by the ADMINISTRATOR, in its sole discretion, as part of the claim. The amount of any authorization will be determined by nationally published parts and labor guides. NO payments will be approved or

MORALES_011

8

made for diagnosis or teardown for failures that are not covered by this SERVICE CONTRACT.

- NO failed components should be discarded or repairs performed until authorization is received from the ADMINISTRATOR. The ADMINISTRATOR reserves the right to inspect failed components at any time.

- The ADMINISTRATOR reserves the right to send an inspector to the repair facility to review and document mechanical failure prior to approving the claim.

- The ADMINISTRATOR will provide the repair facility with an authorization number when the claim is approved and the repair facility is authorized to begin repairs.

- When the work is complete the ADMINISTRATOR will require the repair shop to provide reasonable documentation that the repairs have been completed as authorized. The ADMINISTRATOR will then pay the repair shop directly for the amount approved, or can reimburse YOU. If YOU are seeking reimbursement, YOU will need to provide the ADMINISTRATOR with the reasonable documentation from the repair facility that the repairs were completed as authorized. The documentation must include the parts that were replaced, services performed, date work was performed, mileage at the time of repair and proof that YOU have paid for the repairs in full.

- When YOU pick up YOUR VEHICLE:
  o Review the work completed by the repair facility;
  o Pay YOUR DEDUCTIBLE listed on the DECLARATION PAGE;
  o Pay any charges not covered by this SERVICE CONTRACT;
  o Obtain a receipt for the repair and YOUR claim authorization number.

- If YOU are seeking reimbursement for a Rental Vehicle (Must be through a licensed Rental Vehicle Agency) or for Trip Interruption expenses, YOU must provide receipts that coincide with the dates of YOUR authorized repair and meet the terms of YOUR COVERAGE as provided for in this CONTRACT.

- Claims must be submitted to the ADMINISTRATOR within 6 months of a component failure (365 days in Wisconsin) (as soon as reasonably possible in Utah). Claims submitted after this timeframe will not be accepted.

**NOTICE:** OUR obligations under this SERVICE CONTRACT are backed by a service contract reimbursement insurance policy issued by **Wesco Insurance Company** If any valid claim is not paid within sixty (60) days (thirty (30) days in Arizona) after proof of loss has been filed with US, YOU may contact Wesco Insurance Company directly at **59 Maiden Lane, 43rd Floor, New York, NY 10038 or (866) 505-4048.**

## EXCLUSIONS (WHAT IS NOT COVERED BY THIS SERVICE CONTRACT)

1. ANY REPAIR OR REPLACEMENT OF ANY VEHICLE COMPONENTS MADE WITHOUT THE PRIOR AUTHORIZATION OF THE ADMINISTRATOR OF THIS SERVICE CONTRACT (Except as noted under Emergency Repairs).

2. Any breakdown caused by a lack of proper lubricants or the necessary amounts of coolants or lubricants.

3. Any breakdown caused by contamination of the VEHICLE'S fuel, fluids or lubricants, or damage caused by fuels containing more than 10% ethanol.

4. Any breakdown caused by a lack of maintenance including but not limited to oil changes, coolant flushes, alignments and other maintenance specified by the Manufacturer of the Vehicle.

5. Misuse, abuse, or if YOUR VEHICLE has been used for plowing snow, racing, competitive driving or towing a trailer in excess of two thousand pounds without a factory installed towing package. Towing a trailer which exceeds the specifications of YOUR VEHICLE or its towing package. Any use of the VEHICLE for purposes other than intended or approved of by the Manufacturer.

6. Any breakdown caused by overheating, regardless of cause.

7. Any fluids not required for the completion of an authorized repair.

8. Any breakdown caused by rust or corrosion.

9. Any breakdown caused by intervening events such as vandalism, fire, collision, theft, riot, or explosion.

10. Any breakdown caused by weather related damage such as freezing, earthquake, lightning, wind damage, hail, water, or flood.

11. Failure to protect YOUR VEHICLE from further damage when a breakdown has occurred. (Ex: Continued operation of YOUR VEHICLE when overheating)

12. Any breakdown that occurs while YOUR VEHICLE's odometer is disconnected or has been tampered with. If YOUR VEHICLE's odometer fails, YOU must promptly repair it. If YOU do not promptly repair a defective odometer this SERVICE CONTRACT is subject to cancellation.

13. Repair or replacement of components for the purpose of improving operating performance when a failure has not occurred or if YOUR VEHICLE is operating within acceptable tolerances. This includes, but is not limited to, work performed to improve engine compression or reduce oil consumption.

14. Repairs of bearings, valves or other components that are within the manufacturer's acceptable specification limits. Normal wear and tear will be covered to the extent that normal wear causes the failure of a covered component or component group to operate within the manufacturer's accepted tolerances.

15. Failures or conditions which existed prior to YOUR purchase of this SERVICE CONTRACT (pre-existing conditions) or which occur during this CONTRACT's validation period.

16. Any modifications which have been made to YOUR VEHICLE by parties other than the manufacturer, unless performed by the manufacturer's authorized DEALER utilizing manufacturer approved components, included but not limited to any frame or suspension modification; lift kits or oversized/undersized tires or wheels.

17. Any component, or prior repair, which is covered by or subject to a third party warranty. This includes, but is not limited to, any prior repair that requires subsequent correction or remediation, or that occurs as a result of negligence, poor workmanship, or installation of improper or defective components.

18. Any repair for which the responsibility is covered by any warranty, guarantee or extended warranty of the manufacturer or a repair facility, regardless of whether the manufacturer or repair facility is in business or operational.

19. Any repair which is subject to the manufacturer acknowledging a defect or potential defect through a factory service bulletin ("TSB") or a factory recall.

20. Any liability, costs or damages that YOU may incur to third parties other than those approved by the ADMINISTRATOR for the repair and replacement of covered components.

21. Any consequential losses YOU incur as a result of the failure of a non-covered component, including damage to an otherwise covered component. There is no coverage at any time for lost business opportunity, time or inconvenience.

22. Scheduled maintenance (ex: oil changes, coolant flushes, tire rotations, etc...), wear or friction components including but not limited to: belts, brake pads, brake rotors, exhaust systems, catalytic converter, hoses, light bulbs, lubricants, wiper blades, spark plugs and wires, tires, wheel balancing, remote controls, audio speakers and wiring, cassettes, DVD's or discs, oil sludge, and manual clutch components, burnt valves, core charges, wheels/rims. Shop supplies and storage fees.

23. INELIGIBLE VEHICLES: Any commercial vehicle (ex: taxis, buses, government vehicles and construction vehicles. Any Vehicle not listed on the classification chart for this CONTRACT at the time of sale, any vehicle that has been in a flood; vehicles with True Mileage Unknown (TMU); Vehicles that do not have a valid Vehicle Identification Number (VIN); Trucks over 1 ton classification or that have a fifth wheel; vehicles modified from manufacturer's specifications; Vehicles with salvage titles, vehicles purchased by a minor.

## SUBROGATION

YOU agree that WE, after honoring a claim on YOUR CONTRACT, have all rights of subrogation against those who may be responsible for YOUR MECHANICAL BREAKDOWN or FAILURE. YOU shall do whatever is necessary to secure such rights. YOU shall do nothing to prejudice such rights, and YOU shall execute and deliver to ADMINISTRATOR instruments and papers required to either secure or maintain such rights. All amounts recovered by YOU for which YOU were previously reimbursed under YOUR CONTRACT shall become OUR property or the property of OUR designee and shall be forwarded to the same by YOU, up to the total amount paid by US under YOUR CONTRACT.

## ARBITRATION

**Read the following arbitration provision carefully. It limits certain of YOUR rights, including YOUR right to obtain relief or damages through court action.**

Any legal dispute between YOU and ADMINISTRATOR relating to this CONTRACT shall be resolved by binding arbitration. To begin Arbitration, either YOU or WE must make a written demand to the other party for Arbitration. The Arbitration will take place before a single arbitrator. It will be administered in keeping with the Binding Pre-Dispute Arbitration Rules ("Rules") of the Better Business Bureau ("BBB") in effect when the Claim is filed. YOU may get a copy of the BBB's Rules by contacting BBB at (290 Donald Lynch Boulevard Suite 102 Marlborough, MA 01752), calling (508) 652-4800, or visiting www.bbb.org. The filing fees to begin and carry out arbitration will be shared equally between YOU and US. The Federal Arbitration Act, 9 U.S.C. § 1, et seq., will govern and not any state law on arbitration. YOU agree and understand that this arbitration provision means that YOU give up YOUR right to go to court on any Claim covered by this provision. YOU also agree that any arbitration proceeding will only consider YOUR Claims. Claims by, or on behalf of, other individuals will not be arbitrated in any proceeding that is considering YOUR Claims. Please refer to the Special State Disclosures section of this CONTRACT for any added requirements in YOUR state. In the event this Arbitration provision is not approved by the appropriate state regulatory agency, and/or is stricken, severed, or otherwise deemed unenforceable by a court of competent jurisdiction, YOU and WE specifically agree to waive and forever give up the right to a trial by jury. Instead, in the event any litigation arises between YOU and US any such lawsuit will be tried before a judge, and a jury will not be impaneled or struck.

## TRANSFER OF SERVICE CONTRACT

This SERVICE CONTRACT may be transferred (only by original CONTRACT purchaser) to another private party upon the sale of the VEHICLE. This CONTRACT may not be transferred to a DEALER or with the VEHICLE as part of a trade-in. The transfer must be made at the time of the VEHICLE

transfer. The ADMINISTRATOR must receive written confirmation of the transfer within fifteen (15) days of the transfer of the VEHICLE. A fee of $50.00 must be included with the request to transfer. The request must contain the following: the name, address and telephone number of the new VEHICLE owner and a copy of the Bill of Sale or Title showing transfer. Transfer of SERVICE CONTRACT does not include transfer of the 24-Hour Roadside Assistance Program. CONTRACTS being paid for as part of a payment plan must be paid in full prior to transfer. If the VEHICLE transfer causes any existing Manufacturer's warranty to become voidable then this CONTRACT is not eligible for transfer to the new owner.

## PAYMENT PLAN PROVISIONS

If YOU are paying for YOUR SERVICE CONTRACT on a payment or installment plan and YOU fail to make payments in full two (2) or more times during the term of YOUR installment plan, the ADMINISTRATOR may consider YOUR SERVICE CONTRACT terminated and modify the term of YOUR SERVICE CONTRACT to reflect the time and mileage that YOU have accrued and paid for. The ADMINISTRATOR will determine the amount YOU have paid less a $50.00 re-processing fee. The ADMINISTRATOR will apply the result to the original Purchase Date and Purchase Mileage of YOUR SERVICE CONTRACT to determine the revised Expiration Date and Expiration Mileage of YOUR SERVICE CONTRACT. Contact the ADMINISTRATOR at 888-990-7786 to receive the revised Expiration Date and Expiration Mileage of YOUR SERVICE CONTRACT.

## CANCELLATION OF SERVICE CONTRACT

**Cancellation by a Lienholder**

- In the event that YOUR VEHICLE and this SERVICE CONTRACT are financed, the lienholder on the DECLARATION PAGE may cancel this SERVICE CONTRACT for a default of the loan agreement or if YOUR VEHICLE is repossessed or declared a total loss due to an accident or theft.

**The ADMINISTRATOR reserves the right to cancel if:**

- YOUR VEHICLE meets any of the conditions listed under the "EXCLUSIONS" section of this CONTRACT or YOUR VEHICLE does not have a valid Vehicle Identification number (VIN).
- YOUR VEHICLE'S odometer fails during the term of this CONTRACT and YOU do not repair it and have it certified within 30 days of failure.
- The accurate mileage of YOUR VEHICLE cannot be determined at the time of a claim.
- Fraud or material misrepresentation is made at the time of CONTRACT purchase, or during the process of filing a claim.

- YOUR VEHICLE is stolen, totaled or repossessed.
- The ADMINISTRATOR is not paid for the SERVICE CONTRACT, or YOU fail to make timely payments to YOUR payment plan provider.
- YOUR VEHICLE is used in a manner for which it was not intended by the manufacturer, or in a manner that is not covered by the CONTRACT.

If the ADMINISTRATOR cancels this CONTRACT, YOU will receive a pro-rata refund of the CONTRACT charge paid, less any claims that have been paid or approved.

**YOU may cancel this CONTRACT by contacting the SELLER/DEALER or ADMINISTRATOR.**

- Requests received within 30 days of the CONTRACT purchase date will receive a full refund of the amount YOU paid for the CONTRACT, less any claim payments that have been paid or approved.
- Requests received after the first 30 days are subject to a pro-rated refund. The ADMINISTRATOR will calculate the total days and mileage that the CONTRACT was in force (whichever is greater) as compared to the total term of the CONTRACT. YOU will receive a refund of the unused portion of the CONTRACT less any claims that have been paid or approved and less a $50.00 cancellation fee. The amount of any refund due will be applied to any outstanding balance of the CONTRACT charge.

To initiate a cancellation YOU must contact the SELLER/DEALER or ADMINISTRATOR to complete and sign a cancellation form, or mail written notice to the ADMINISTRATOR which includes YOUR: CONTRACT Number, Full Name, Telephone number, reason for cancellation and YOUR signature. A notarized odometer statement or a receipt from a nationally recognized company that includes YOUR Vehicle Identification Number, current mileage of YOUR VEHICLE and the date of VEHICLE service must accompany YOUR request to cancel. The odometer statement or receipt that includes YOUR VEHICLEs mileage must be dated within 15 days of YOUR request to cancel (except in the case of repossessed, stolen or totaled vehicles. The ADMINISTRATOR may require supporting documentation under these circumstances).

When a Financial institution or a SELLER/DEALER has financed the purchase of this SERVICE CONTRACT the following will apply:

• If YOU cancel the SERVICE CONTRACT, the refund will be made payable to the lending institution.

• If YOUR VEHICLE is repossessed, totaled or not recovered due to theft, the refund will be made payable to the lienholder.

• Refunds not involving a lienholder will be made payable to the selling SELLER/DEALER or YOU based on the procedures of the ADMINISTRATOR.

MORALES_017

## STATE SPECIFIC DISCLOSURES

Terms of this CONTRACT which are in conflict with the statutes of the state in which this CONTRACT was purchased are hereby amended to conform to the minimum standards of those statutes. The following special state requirements and/or disclosures apply if this CONTRACT was purchased in the following state:

**TEXAS:** SunPath Ltd. SERVICE CONTRACT ADMINISTRATOR License No. 214 If YOU have any questions regarding the regulation of the SERVICE CONTRACT PROVIDER or a complaint against the OBLIGOR, YOU may contact the Texas Department of Licensing & Regulation, 920 Colorado, P.O. Box 12157, Austin, Texas 78711, (800) 803-9202.

If this CONTRACT is cancelled within the first sixty (60) days, WE will refund the entire CONTRACT charge, less claims paid. If this CONTRACT is cancelled after the first sixty (60) days, WE will refund an amount of the CONTRACT charge according to the pro-rata method reflecting the greater of the days in force or the miles driven based on the term/miles selected and the date Coverage begins, less a fifty dollar ($50.00) administrative fee and less claims paid. In the event of cancellation, the lienholder, if any, will be named on a cancellation refund check as their interest may appear.

If WE cancel this CONTRACT, WE shall mail a written notice to YOU at the last known address held by US before the fifth day preceding the effective date of cancellation. The notice will state the effective date and the reason for the cancellation. However, prior notice is not required if the reason for cancellation is nonpayment of the PROVIDER fee, fraud or a material misrepresentation by the SERVICE CONTRACT Holder to the PROVIDER or the PROVIDER's ADMINISTRATOR, or a substantial breach of duties by the SERVICE CONTRACT Holder relating to the covered product or its use. If WE cancel this CONTRACT, no cancellation fee shall apply. YOU may apply for reimbursement directly to the insurer if a refund or credit is not paid before the 46th day after the date on which the CONTRACT is canceled.

If a CONTRACT is cancelled and the PROVIDER does not pay the refund or credit the SERVICE CONTRACT Holder's account before the 46th day after the date of the return of the CONTRACT to the PROVIDER, the PROVIDER is liable to the CONTRACT Holder for a penalty in an amount not to exceed ten percent (10%) of the amount outstanding per month.

MORALES_018

## Simplicity Funding Payment Plan Agreement

Service Contract $$PROVISIONAL

*administered by SunPath Funding, LLC ("SPF")*

| Buyer | | Seller | Dealer #: NCC4610 |
|---|---|---|---|
| Name:<br>Kurt Morales | | Name:<br>NATIONAL CAR CURE | |
| Address: | | Address<br>1665 Palm Beach Lakes Blvd., #215 | |
| City, State, Zip:<br>Carrollton, TX 75006 | | City, State, Zip:<br>West Palm Beach, FL 33401 | |
| Phone: | | Phone:<br>800-261-0096 | |
| E-Mail: | | Salesperson:<br>Jasmine Whitfield | |

| Vehicle Information | | Contract Effective Date: 04/03/2020 | |
|---|---|---|---|
| Make:<br>HONDA | Model:<br>CR-V | Year:<br>2018 | Odometer:<br>25,001 |
| VIN: | | Coverage Term: (in months)<br>60 | Coverage Mileage: (in Miles)<br>100,000 |

You, the Buyer, may buy the Vehicle Service Contract ("VSC") for the cash price shown in the Itemization or according to the terms of this Payment Plan Agreement ("Agreement"). By signing this Agreement, you choose to buy the Vehicle Service Contract from the Seller according to this Agreement. The Vehicle Service Contract is issued by SUNPATH ("Administrator"). The Vehicle Service Contract number is provided at the top of this Agreement. You and we agree to be bound by the terms of the Agreement. "We," "us" and "our" refer to the Seller shown above, and, upon assignment of this Agreement, to Simplicity Funding, LLC or its nominee, SunPath Funding, LLC ("SPF"). The Important Disclosures below are part of this Agreement.

Excepted as checked, you have purchased the Vehicle Service Contract primarily for personal, family or household use.

    ☐ Agricultural    ☐ Business



**Itemization of Payment Plan Amount:**

| | | |
|---|---|---|
| (a) | PRICE *(before taxes)* | |
| (b) | TAXES on SALE | |
| (c) | TOTAL SALE PRICE *(a + b)* | |
| (d) | DOWN PAYMENT | |
| (e) | PAYMENT PLAN AMOUNT *(c − d)* | |

18 payments of $_____

are due monthly beginning 04/04

| IMPORTANT DISCLOSURES | | | | |
|---|---|---|---|---|
| **ANNUAL PERCENTAGE RATE** Your yearly rate. | **FINANCE CHARGE** The dollar amount the credit will cost you | **Amount Advanced** The amount advanced on your behalf. | **Total of Payments** The amount you will have paid after you have made all payments as scheduled. | **Total Sale Price** The total cost of your VSC, including your down payment. Total Cost $____ Down Payment |
| **0%** | **$0.00** | $____ | | |

### Payment Schedule

| Number of Payments | Amount of Each Payment | When Payments Are Due |
|---|---|---|
| 18 | $____ | Monthly beginning 04/04 |

**Security Interest**: You give us a security interest in any refund due upon cancellation of the Vehicle Service Contract.

**Late Charge**: Except as provided below, if you do not make your full payment within 5 days of its scheduled due date, you will pay a late charge of the lesser of $20 or 5% on the part of the payment that is late. If you live in **Arizona, California, Colorado, the District of Columbia, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, New York, Oklahoma, South Carolina, Virginia, West Virginia, Wisconsin or Wyoming**, your late charge will be the lesser of $10 or 5% of the part of the payment that is late if you do not make your payment within 10 days of its scheduled due date. If you live in **Maine, Massachusetts, or Mississippi**, your late charge will be the lesser of $5 or 5% of the part of the payment that is late if you do not make your payment within 15 days of its scheduled due date. If you live in **North Carolina**, your late charge will be the lesser of $6 or 5% of the part of the payment that is late if you do not make your payment within 10 days of its scheduled due date.

**Prepayment**: If you pay off your payment plan early, you will not have to pay a penalty.

**Please read this Agreement for additional information on security interests, non-payment, default, and our right to require repayment in full before the scheduled maturity date.**

**PAYMENT OPTIONS**: You have paid Seller the Down Payment in the amount set forth above. You will make your remaining payments as scheduled and disclosed in the Important Disclosures to the Seller, or upon assignment, SPF, using the payment method you selected as defined below.

## AUTHORIZATION FOR CREDIT OR DEBIT CARD PAYMENT

Purchaser authorizes SPF (or its nominee) to make the applicable number of consecutive monthly charges to the Purchaser's credit/debit account listed below, in the amount and at the times disclosed above (including late charges or fees, if any). This authority will remain in effect until the Payment Plan Amount is paid in full, together with applicable charges if any, or until SPF (or its nominee) has received written notification of termination from Purchaser in time to allow reasonable opportunity to act on such notification.

Card Number: _____   Expiration Date: _____

**NOTICE TO BUYER**: (1) Do not sign this Agreement before you read it or if it contains any blank spaces. (2) You are entitled to an exact copy of this Agreement. (3) You have the right to cancel the Vehicle Service Contract at any time and make no further payments. (4) You have the right to pay in advance the full amount due without penalty. (5) Keep this Agreement to protect your legal rights.

BY SIGNING BELOW OR BY MAKING YOUR FIRST PAYMENT AFTER YOU HAVE RECEIVED A MAILED OR ELECTRONIC COPY OF THIS AGREEMENT, YOU ACKNOWLEDGE RECEIPT OF A COMPLETED COPY OF THIS AGREEMENT. YOU ACKNOWLEDGE THAT YOU HAVE READ THIS AGREEMENT, INCLUDING THE ARBITRATION PROVISION BELOW, AND YOU AGREE TO BE BOUND BY THE TERMS OF THIS AGREEMENT.

| BUYER | | SELLER | |
|---|---|---|---|
| X    PER PHONE | 03/04/2020 | By: X    *Jasmine Whitfield* | 03/04/2020 |
| Signature | Date | Signature | Date |

In accordance with the terms and conditions of the agreement between Seller and Simplicity Funding, LLC, Seller hereby assigns its right, title, and interest in this Agreement to Simplicity Funding, LLC, at 50 Braintree Hill Office Park – Suite 310, Braintree, MA 02184

## ADDITIONAL TERMS AND CONDITIONS

**PAYMENT PLAN ADMINISTRATOR:** Simplicity Funding, LLC has contracted with SPF, its nominee, to administer this Payment Plan Agreement. Your account records will reflect payment made to SPF.

**PROMISE TO PAY.** You agree to pay us the Payment Plan Amount according to the terms of this Agreement.

**LATE CHARGE AND RETURNED PAYMENT CHARGES.** You agree to pay the late payment charges specified in the Important Disclosures. The applicable late charge is based upon your state of residence at the time you sign or ratify this Agreement.

**Except as provided below**, if any payment you make is returned unpaid for any reason, after we make any demand applicable law requires and wait the time applicable law requires, you agree to pay us a

returned payment charge of $25. If you live in **Arizona or Massachusetts**, you agree to pay a returned payment charge of $10. If you live in **California or Wisconsin**, you agree to pay a returned payment charge of $15. If you live in **Connecticut, Idaho, New York or Utah**, you agree to pay a returned payment charge of $20. If you live in the **District of Columbia, Iowa or Wyoming**, you will not pay returned payment charges. If you live in **Maine, Virginia, or Vermont**, you will be liable for returned payment charges as prescribed by a court if we take action against you.

All late charges, returned payment charges, or other fees you incur must be paid in the next monthly payment and in accordance with the payment option you select and/or in effect at the time of the next monthly payment.

**CANCELLATION AND ASSIGNMENT OF RIGHTS.** You have the right to cancel the Vehicle Service Contract at any time in accordance with the terms of the Vehicle Service Contract. If you exercise the right to cancel the Vehicle Service Contract before making all payments, you agree to send written notice of the cancellation to the Administrator and us. You authorize us to direct the Administrator/Seller to cancel the Vehicle Service Contract if we do not receive any payment within 10 days of the scheduled payment date, as applicable law allows.

You hereby grant us a security interest in and assign to us your right to receive refunds pursuant to the Vehicle Service Contract. If the Vehicle Service Contract is cancelled before you have paid the full Payment Plan Amount and any other fees or charges due to us under this Agreement, any refund due to you after proceeds are applied to your outstanding obligations under this Agreement (the "Buyer Refund") will be paid to you. The Buyer Refund is calculated in the manner described in the Vehicle Service Contract but based on amounts actually paid by you rather than the Total Sales Price of the Vehicle Service Contract. If you are entitled to a Buyer Refund, you will receive the refund from the Seller or the Administrator of the Vehicle Service Contract. No assignee of the Seller shall have a contractual or other responsibility under this Agreement or the Vehicle Service Contract to pay or calculate such refund, or for the performance of any other services required by the Vehicle Services Contract.

**PAYMENTS AFTER CANCELLATION.** Any payment you make after we receive a notice of cancellation will not constitute a reinstatement of the Vehicle Service Contract but will be applied to your outstanding obligations under this Agreement. Neither the acceptance nor the application of any payment will constitute the reinstatement of Vehicle Service Contract or constitute a waiver of any default hereunder.

**DEFAULT.** If you fail to make any payment when due or, subject to the requirement in this section, fail to comply with any other provision in this Agreement (default), after notice and any right to cure required by applicable law, we have the right to cancel the Vehicle Service Contract and take any action permitted by law to collect what you owe. Upon cancellation, you agree that we may collect and receive any refunds or proceeds with respect to the Vehicle Service

Contract. We will apply those refunds and proceeds to your outstanding obligations under this Agreement. If there is a surplus in excess of $1.00, you are entitled to the surplus. Except where prohibited by applicable law, you hereby release and discharge us from any liability for damages with respect to cancellation of the Vehicle Service Contract due to default and you shall indemnify and hold us harmless from any liabilities, claims, damages or causes of action for any action taken as a result of your default under this Agreement. Our failure to require strict performance of any provision in this Agreement or to exercise any of our rights under this Agreement will not waive or relinquish any future right under this Agreement.

**If required by applicable law, we will only consider the failure to comply with other provisions of this Agreement an event of default if our prospect of payment, performance, or realization of collateral is significantly impaired. Where required, we bear the burden of establishing significant impairment

**POWER OF ATTORNEY**. In the event you default under the terms of this Agreement, and if allowed by applicable law, you hereby irrevocably appoint us as your true and lawful attorney-in-fact with respect to the Vehicle Service Contract until all amounts payable hereunder are paid in full. If allowed by applicable law, you agree that we will have full power under this power of attorney to (i) cancel or reinstate the Vehicle Service Contract, (ii) endorse or execute, in your name, all checks issued and all other documents or instruments relating to the Vehicle Service Contract, (iii) receive, demand, collect or sue for any amounts relating to the Vehicle Service Contract due and owing to us by the Administrator, insurer, Seller, or other obligor and (iv) take such other actions as are necessary to further the purposes of this Agreement.

**ACCEPTANCE, RATIFICATION, ACCURACY.** This Agreement shall be effective when signed by you and us, or where applicable, upon the first of the following events to occur after we mail you a copy of the Agreement (1) you sign and transmit to us a copy of the signed Agreement, in wet ink or electronically, or (2) you make your first payment. Either signature or payment according to the terms of the Agreement ratifies and makes effective your and our obligations under the Agreement. You may not modify the preprinted terms of this Agreement.

**SERVICING AND COLLECTION CONTACTS.** By providing your wireless (cell) telephone number, you expressly consent to receiving telephone calls from us, and any assignee of this Agreement, concerning your Agreement, including calls to collect what you owe. Live calls may be made by one of our employees. Calls may also be made by a prerecorded, autodialed voice or text message as applicable law allows. Your consent covers *all* types of calls. We do not charge you for such calls. Your wireless carrier will charge you for our incoming calls and text messages according to your plan.

**ENTIRE AGREEMENT.** This Agreement constitutes the entire agreement between you and us. It supersedes any other written or oral agreement between the parties, and, except as otherwise set forth herein, may be modified only in writing signed by us. No oral changes to the terms of this Agreement are binding on you or us.

**REMEDIES, GOVERNING LAW, WAIVERS.** This Agreement is governed and construed in accordance with federal law and the laws of the state of your residence as provided on the first page of this Agreement. Each provision in this Agreement will be interpreted so as to be effective and valid under applicable law. This Agreement includes an arbitration provision. By signing or ratifying this Agreement, you agree to be bound by the terms of the arbitration provision.

**MISCELLANEOUS.** The content and format of this Agreement has been adopted to provide you with important information in a clear and familiar form and its use does not imply that any particular federal or state law relating to lending or installment sales applies to this Agreement or transactions it contemplates. You expressly acknowledge and understand that the purchase of a Vehicle Service Contract is not required either to purchase or obtain financing for a vehicle. Time is of the essence in this Agreement.

For purchases primarily for personal, family or household use, the following disclosures applies.

**NOTICE: ANY HOLDER OF THIS AGREEMENT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH BUYER COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE BUYER SHALL NOT EXCEED AMOUNTS PAID BY THE BUYER HEREUNDER.**

---

ARBITRATION PROVISION. This Arbitration Provision significantly affects your rights in any dispute with us. Please read this Arbitration Provision carefully before you sign or ratify the Agreement.

EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT. IF A DISPUTE IS ARBITRATED, YOU AND WE WILL EACH GIVE UP CERTAIN RIGHTS THAT MAY BE AVAILABLE IN COURT, INCLUDING OUR RIGHT TO A TRIAL BY JURY. IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US.

---

Any claim or dispute, whether in contract, tort or otherwise (including the interpretation and scope of this clause and the arbitrability of any issue), between you and us or our employees, agents, successors or assigns, which arises out of or relates in any manner to this Agreement or any resulting relationship (including any such relationship with third parties who do not sign this Agreement, such as an assignee of the Agreement) shall, at your or our election (or the election of any such third party), be resolved by neutral, binding arbitration and not by a court action. Any claim or dispute is to be arbitrated on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. This is called the "class action waiver."

You may choose the applicable rules of either the American Arbitration Association ("AAA") or another arbitration organization, subject to our approval. You may obtain a copy of the rules of the AAA by visiting its web site (www.adr.org). We waive the right to require you to arbitrate an individual claim if the amount you seek to recover qualifies as a small claim under applicable law.

This Arbitration Provision relates to an agreement that evidences a transaction involving interstate commerce. Any arbitration under this Arbitration Provision shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 *et seq.*).

The arbitrators shall be attorneys or retired judges and shall be selected in accordance with the applicable rules of the chosen arbitration organization. The arbitrator shall apply substantive governing law and the applicable statute of limitations. The arbitration award shall be in writing. The arbitration hearing shall be conducted in the federal district in which you live, or such other place convenient to you as required by the rules of the chosen arbitration organization. If you demand arbitration first, you will pay the filing fee if the chosen arbitration organization requires it. We will advance and/or pay any other fees and costs required by the rules of the chosen arbitration organization.

The arbitrator's award shall be final and binding on all parties. There shall be a limited right to appeal to the extent allowed by the Federal Arbitration Act. The amount we pay may be reimbursed in whole or in part by decision of the arbitrator if the arbitrator finds that any of your claims is frivolous.

If any part of this Arbitration Provision other than the Class Action Waiver is found by a court or arbitrator to be unenforceable, the remainder shall be enforceable. If the Class Action Waiver is found by a court or arbitrator to be unenforceable, the remainder of this Arbitration Provision shall be unenforceable. This Arbitration Provision shall survive the termination of any contractual agreement between you and us, whether by default or repayment in full.

**STATE LAW DISCLOSURES**:

**OHIO**. If you reside in Ohio, the following disclosures applies: The Ohio laws against discrimination require that all creditors make credit equally available to all creditworthy customers and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.

This page left intentionally blank.

MORALES_024



0 - ncc-sunpath - SPHDN - 5
NATIONAL CAR CURE
1665 Palm Beach Lakes Blvd., #215
West Palm Beach, FL 33401

KURT MORALES
CARROLLTON TX  75006

MORALES_025

# Exhibit C

Native File Produced:
Morales_032.mp4

**EXHIBIT Morales-3**

## AT&T PREPAID Account History

### Voice Usage Details for 512-423-2227 From 2/5/2020 to 3/4/2020

| Usage | Contact | Date | Time | Duration | Charges |
|-------|---------|------|------|----------|---------|

MORALES_026

| Usage | Contact | Date | Time | Duration | Charges |
|-------|---------|------|------|----------|---------|



MORALES_027

| Usage | Contact | Date | Time | Duration | Charges |
|-------|---------|------|------|----------|---------|
| ███ | ███ | ███ | ███ | ███ | ██ |
| ██ | ███ | ███ | ███ | ███ | ██ |
| ███ | ███ | ███ | ███ | ███ | ██ |
| ███ | ███ | ███ | ███ | ███ | ██ |
| ███ | ███ | ███ | ███ | ███ | ██ |
| Incoming Call | 702-351-3030 | 3/4/2020 | 04:06:05 PM CST | 26min 52sec | $0.00 |
| ███ | ███ | ███ | ███ | ███ | ██ |
| ███ | ███ | ███ | ███ | ███ | ██ |
| ███ | ███ | ███ | ███ | ███ | ██ |

Usage Summary



*Time is US/Central

3

MORALES_028

| | | | |
|---|---|---|---|
| ⊖ 03/25/20 | 03/25/20 | NATIONAL CAR CURE 800-2618002610096 FL #7461084F00GS7G2J7 | +$355.00 |

Details

Billing location: **8002610096, FL**

Purchase Mode: **Manually Entered**

| | | | |
|---|---|---|---|
| ⊖ 03/24/20 | 03/24/20 | ONLINE PAYMENT #7446539F50A8V83MN | +$85.17 |

Details

Purchase Mode: **Not available**

| | | | |
|---|---|---|---|
| ⊕ 03/04/20 | 03/23/20 | *BANK ADJUSTMENT CONCORD CA #F558100FC000MI092 | $355.00 |
| ⊖ 03/23/20 | 03/23/20 | ADJUSTMENT-PURCHASES #F558100F3000GB188 | +$355.00 |

Details

Purchase Mode: **Not available**

| | | | |
|---|---|---|---|
| ⊖ 03/04/20 | 03/04/20 | NATIONAL CAR CURE 800-261800-2610096 FL #2461084EH22P1DD83 | $355.00 |

Details

Billing location: **800-2610096, FL**

Purchase Mode: **Manually Entered**

Dispute this transaction  |  Manage disputes  |  Request a receipt

**EXHIBIT**
Morales-5